STATE OF ILLINOIS    )
                          )  SS:
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-THIRD MUNICIPAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, )
                               )
          Plaintiff,      )
                               )
       vs.              ) NO.06MC37145
                               )
BRADLEY HAYASHI,     )
                               )
          Defendant.    )

TRIAL-A.M. SESSION

         REPORT OF PROCEEDINGS had at the hearing of the above-

entitled cause, before the Honorable KAY MARIE HANLON, one of the

Judges of said Division, on Thursday, the 17th day of May, 2007.

        PRESENT:
            HON. RICHARD DEVINE,
            State's Attorney of Cook County, by:
            MR. THOMAS KOUGAIS and
            MR. ROBERT GROEBNER,
            Assistant State's Attorneys,
              appeared on behalf of the People.

            MR. SAM L. AMIRANTE,
              appeared on behalf of the Defendant.

Sandra Lio
Official Court Reporter-084001897
2121 Euclid-Suite 60
Rolling Meadows, Illinois 60008

1          THE CLERK:  Bradley Hayashi.

2          THE COURT:  For the record, 06MC37145.  The Defendant is charged

3      with a battery currently out on bond.

4          MR. AMIRANTE:  Good morning.  Sam Amirante, A-M-I-R-A-N-T-E, on

5      behalf of the Defendant Hayashi.

6                      We stand ready for trial today.  We are waiving jury.

7          THE COURT:  State is ready?

8          MR. KOUGAIS:  We are ready, Judge.

9          THE COURT:  Sir, your attorney has indicated to me that you are going to

10     be waiving or giving up your right to a jury trial today.  That means I will hear the

11     evidence and determine your guilt or innocence.

12                     Is that your intention?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Counsel, when you have the document, if you will

15     pass it up, please?

16         MR. AMIRANTE:  I will right now, your Honor.

17                     Your Honor, at this time I will tender an executed jury waiver

18     to the court, and I will hand it to your clerk.

19         THE COURT:  Thank you.

20                     Sir, I'm going to show you a document bearing your name,

21     the charge, the case number, and today's date.  Is this your signature on the jury

22     waiver form?

23         THE DEFENDEANT:  Yes.

1       THE COURT:  I will accept that, and I will make it part of the court

2    record.

3             All right, any motions?  Let's get the witnesses up here.

4             MR. AMIRANTE:  Motion to exclude.

5             THE COURT:  Motion to exclude witnesses will be granted.

6             MR. AMIRANTE:  Before you swear the witnesses in, I do have a

7    preliminary matter I would like to address with the Court.

8             THE COURT:  Leave them back there for a second.  Swear them in

9    and do the motion to exclude, and then you can make your motion.

10             All those going to testify at this trial, please raise your right

11   hand, face the clerk to be sworn.

12                          (Witnesses duly sworn.)

13             THE COURT:  There is a motion to exclude witnesses.

14             State, are you joining in on that motion?

15             MR. KOUGAIS:  Yes, Judge.

16             THE COURT:  All right.  Motion to exclude witnesses will be

17   granted.  The attorneys will instruct their witnesses and if all the witnesses could

18   leave the room for a few minutes, we'll see if there are any opening statements

19   and Counsel has a preliminary motion.

20             MR. AMIRANTE:  Thank you, Judge.

21             THE COURT:  All right, Counsel, your motion please?

22             MR. AMIRANTE:  Your Honor, it's more of an inquiry than motion.

23   In interviewing the number of witnesses, you know, we have in court, there is one

1    witness in particular, Karen Muir, M-U-I-R, I believe.  She is one of my witnesses

2    who I would be calling.

3             During the course of my investigation I was told the police

4    interviewed her, a telephone interview, and she gave me the substance of that

5    interview and basically there was an exculpatory statement given and I have

6    never received that from the State.  There are some subpoenaed materials which

7    I have a copy that I have received an answer as to what witnesses would testify.

8    I do accept the State's representation that any witnesses called would be stated

9    in the police reports.  But I never had a statement.  I don't know if the police

10    officer ever wrote a statement up that she gave.  It should certainly be disclosed,

11    especially exculpatory.

12             THE COURT:  State?

13             MR. KOUGAIS:  I don't have any information on this at all.  The

14    documents I have I'll show Counsel.  The pack that I have consists of one, two,

15    three, three-and-a-half pages of text.  That is all I'm operating with.

16             THE COURT:  Is the officer here?  Did you ask the officer if this

17    conversation with Karen Muir was ever reduced to writing or just a conversation?

18             MR. KOUGAIS:  Judge, we can have the officer come in.  I have no

19    idea.

20             MR. AMIRANTE:  Can we be brief?

21             THE COURT:  State, you go talk to your officer and come back in

22    here, and we'll put him on.  We'll find out.

23             MR. KOUGAIS: Judge, I spoke with the officer.  He did indicate that

24    he had made contact.  He tried calling this individual on several occasions; did

1    speak with her; does not have anything in writing or anything that has been

2    recorded.

3            THE COURT:  All right, Counsel.  What do you have to say about

4    that?

5            MR. AMIRANTE:  Well, Judge, I would think if an officer is

6    investigating a case and he receives information from a witness, that information

7    should certainly be put into a police report, if nothing else, and the witness should

8    be disclosed.

9            THE COURT:  Well, it wasn't.  So what do you want me to do about

10    it?  What are you asking me to do?  It's your witness, and you're going to be able

11    to cross-examine.

12            MR. AMIRANTE:  The discovery violation is no fault of the Assistant

13    here.  Under Brady versus Maryland, under People versus Schmidt, we are

14    entitled to have that information, and we never received it and unfortunately the

15    State's Attorneys haven't received it either.  It's not their fault.

16            THE COURT:  First of all, I don't know if there's a statement.  I

17    don't know. What you represented to me there was a statement made by one of

18    your witnesses, and it was exculpatory.  I don't know.  That is your

19    representation.

20            The State has proffered that the officer reached out and

21    talked to this woman.  I have no idea what she said or didn't say.  She may have

22    said, I don't want to talk to you and hung up the phone.  So at this point I don't

23    know if there is a statement or if there's not a statement.  If you want to make a

1    motion, I can't really rule right now on the discovery violation. I don't know if

2    there's a statement.

3            MR. KOUGAIS: I don't believe that I'm calling the officer at this

4    point. There might be something in rebuttal that comes up, but Counsel certainly

5    has the opportunity. The officer is here. If he wants to call the officer, he

6    certainly has that ability to do that. That is all the officer told me. He's sitting out

7    there right now. I asked him the name, and he thought about it for a second, and

8    he indicated that something to the effect that he had made several calls, and I

9    think left messages, and at some point he did have contact with her. And that

10   was the extent and it was not documented.

11           MR. AMIRANTE: At the very least what I would be asking your

12   Honor to do if she needs to be called as a witness for the Defense, that the State

13   be prohibited from bringing the officer for any type of impeaching statement or

14   statement she gave because they have never been disclosed to me. At the very

15   least, I would ask you to do that.

16           THE COURT: All right, State?

17           MR. KOUGAIS: I don't know. Is counsel asking that I can't use

18   that officer in rebuttal if she testifies that she told the officer something? I don't

19   understand. Why would I be barred? It's not like we don't have a report, or we

20   have a report that we are not tendering. We don't have any report. To me, it

21   seems if the truth is to come out here, and if there is-- the officer has indicated to

22   me that he did speak with this individual, I don't know what his response is. He

23   didn't indicate to me out there either that she is crazy or she knows exactly what

24   she's talking about.

1          I don't know the extent of that conversation.

2               THE COURT:  All right.  Well--

3               MR. AMIRANTE:  Judge, do you want to reserve your ruling on

4      that?

5               THE COURT:  I will.  I'm tending though to agree with Counsel.  If

6      there is some type of a statement, if it's an oral statement, that has to be

7      documented in some kind of a police report.  If it's an exculpatory statement, it

8      should be there, and if it's not there and she testifies and for some reason you

9      want to call the officer for impeachment and there is nothing that has been given

10     to the defense, then I'm inclined to rule with the defense, you are unable to call

11     that officer to impeach the witness.

12               Right now I'm going under the premise that there is actually

13     no statement been made otherwise there would be a discovery violation.  So, I'll

14     reserve it.  If we get to that point, but I'm pretty strongly leaning towards the fact

15     it's not going to happen.

16               Any other motions?

17               MR. AMIRANTE:  Not at this time.  We are ready to proceed.

18               THE COURT:  All right.  Witnesses have been sworn.

19               Counsel, would you care to make an opening statement?

20     State?

21               MR. KOUGAIS:  Judge, briefly you will hear from Ms. Melaina

22     Kelley that on October 16th of 2006, she had gone to the Defendant's place of

23     business where he was a chiropractor and he had the victim as a patient for a

24     couple of years.

7

1          In fact, you are going to hear that she was a patient before

2     this doctor or the Defendant had ever been at that particular clinic; that she had

3     gone there on this particular occasion, and it was an unusual massage that

4     occurred on this particular date.

5          He had advised her to completely disrobe in her—in one of

6     the rooms that he has there and that while he was doing his massage he went

7     beyond the scope and fondled her genitalia, fondled her breasts, and she at

8     some point subsequently left the establishment, and it was, I believe, several

9     hours later she went to the police and made a police report and the Defendant

10    was charged with battery.

11         We are going to ask that after you hear the testimony of the

12    victim and possibly one other witness, that you too will see this Defendant is, in

13    fact guilty of battery.

14         THE COURT:  Thank you, State.

15         Counsel?

16    MR. AMIRANTE:  Your Honor, I am sure when you hear the

17    evidence you will find that the Defendant is-- not only is the Defendant not guilty;

18    the Defendant is totally, completely innocent from the false accusations made by

19    the complaining witness.

20         What her motive is, Judge, I certainly will test that during

21    examination.  We don't know, but she lied, and you are going to see that, Judge.

22    You not only have the experience of your position, your experience as an

23    attorney before you were judge, you are also female like she is and I'm sure in

24    many ways can relate to another female.

1          MR. KOUGAIS:  Objection.  I don't know what that means.

2          THE COURT:  I don't know what that means.

3          MR. AMIRANTE:  As a trier of fact, Judge, you can bring your

4    common sense.

5          THE COURT:  I'll bring my common sense, but I don't know what

6    being a female has anything to do with it.

7          MR. AMIRANTE:  Judge, the evidence here is going to show this

8    woman has been a patient of Dr. Hayashi's for quite some time.  Her entire family

9    were patients of Dr. Hayashi.  Dr. Hayashi has an excellent reputation in the

10   community and in the chiropractic community.  He has his own office.  There are

11   a number of females who work for him.

12          That she made an appointment to go in there that day on

13   October 16th , for a full body massage along with some other therapy.  She went

14   into the office, was unusually talkative on that day.  You are going to hear

15   witnesses testify she was unusually talkative.  She went in there, and she had set

16   up the appointment and went in.  The evidence will show she went in for a

17   massage, which she requested, a full body massage, and a full body massage

18   was done, completed.

19          She then—the evidence will show that after she had her full

20   body massage, she was there for another adjustment and therapy too.  Went out

21   into the waiting room.  Showed no signs of any type of trauma or any type of

22   change in behavior.  Went out in the waiting room.  The witnesses will testify if

23   we get that far, Judge.  The witnesses will testify that they observed her.  She

1    was no different when she came out of the massage room than when she went

2    in.

3                    Dr. Hayashi then came out and asked her to come back in,

4    for her to finish up her therapeutic session, the adjustment session of the

5    chiropractic-- and she went back in.  After he allegedly had been touched

6    inappropriately by the doctor.  She went back in there again.

7                    And also she made another appointment to go back, Judge.

8    This is what the State's evidence will show.  This is what she will testify to, and

9    you will hear other evidence, Judge.  I'm sure when you hear all the evidence,

10   you will totally exonerate Dr. Hayashi from these terrible accusations.

11                   THE COURT:  All right.  Thank you, counsel.

12                   State, call your first witness.

13                   MR. KOUGAIS:  Thank you, Judge.

14                   THE COURT:  If you'd please step up into the witness box and

15   have a seat.  I'll ask you to keep your voice up.  That microphone does not work.

16                   MR. KOUGAIS:  Judge, can the young lady have permission to

17   keep her can of soda there?  Do you have any objection to that?

18                   THE COURT:  Sure.

19                   MELAINA KELLEY,

20   Called as a witness, having been first duly sworn, was examined and testified as

21   follows:

22                   DIRECT EXAMINATION

23                   BY

24                   MR. KOUGAIS:

1          Q       Ma'am, in a loud voice can tell us your full name and spell

2     your last name for the court reporter?

3          A       Melaina Joy Kelley, K-E-L-L-E-Y. (phonetic)

4          Q       And what is your birth date?

5          A       12-5-77.

6          Q       And are you employed?

7          A       Not currently.

8          Q       What was the last time you were employed?  What did you

9     do for a living?

10         A       Two days ago was my last day.  I had a temp job.

11         Q       What was it for?

12         A       At a company called Autometer. (phonetic)

13         MR. AMIRANTE:  Judge, I would ask if we could have her speak

14    up?  I can't hear.

15         THE COURT:  Sure.  Counsel, if you have trouble, you can

16    reposition yourself maybe at the podium, but try to keep your voice up.

17              All right.  Next question.

18    BY MR. KOUGAIS:

19         Q       Do you reside in Kane County?

20         A       Yes.

21         Q       How long have you been a resident there?

22         A       Since July of last year.

23         Q       What is your marital status?

24         A       Married.

1    Q    What is the extent of your education?

2    A    High school.

3    Q    Where did you graduate from?

4    A    Streamwood High School.

5    Q    What year was that?

6    A    1996.

7    Q    Ms. Kelley, I'm going to direct your attention to the 16th of

8    October of 2006.  Do you remember that day?

9    A    Yes.

10    Q    And at approximately 11:00 o'clock that morning, do you

11    remember where you were?

12    A    Yes.

13    Q    Where were you?

14    A    At the Midwest Chiropractic Office in Hanover Park.

15    Q    Is that located at 1802 Irving Park Road in Hanover Park?

16    A    Yes.

17    Q    Is that Cook County, Illinois?

18    A    Yes.

19    Q    And what were you doing there at that time?

20    A    I was there for an appointment, a scheduled appointment.

21    Q    And what was the appointment for?

22    A    Full body massage.

23    Q    And who was the appointment with?  Was there a particular

24    individual who's supposed to conduct that?

| | | |
|---|---|---|
| 1 | A | Dr. Brad. |
| 2 | Q | Dr. Brad? |
| 3 | A | Uh-huh. |
| 4 | Q | Do you see that person here in court today? |
| 5 | A | Yes. |
| 6 | Q | Point to him and please tell the Court what he's wearing here |

7    in court today.

| | | |
|---|---|---|
| 8 | A | Blue shirt, sitting right there. |
| 9 | Q | Okay, try and keep your voice up. |
| 10 | A | Okay.  Sorry. |
| 11 | Q |  Say that again, please. |
| 12 | A | He's sitting right there with the blue shirt and tie. |
| 13 | | MR. KOUGAIS:  Let the record reflect the in court identification of |

14    the Defendant by the witness.

15               THE COURT:  It may.

16          BY MR. KOUGAIS:

| | | |
|---|---|---|
| 17 | Q | And do you know this gentleman? |
| 18 | A | Yes. |
| 19 | Q | How do you know him? |
| 20 | A | He's been my chiropractor.  Well, he was my chiropractor for |

21    two years, approximately.

| | | |
|---|---|---|
| 22 | Q | Two years? |
| 23 | A | Uh-huh. |
| 24 | Q | And how long—You said there was a two-year period that he |

1       was your chiropractor?

2                       A       Yes.

3                       Q       How often—what was the frequency that he was your

4       chiropractor?

5                       A       I would go in about two times a week, sometimes three.

6                       Q       And what would he treat you for?

7                       A       I have scoliosis.

8                       Q       What would he do?

9                       A       I would get adjustments from him, and I then I would get

10      message therapy and the electric stimulation for my back.

11                      Q       What is the first thing you would get from him, adjustments?

12                      A       Yes.

13                      Q       What do you mean by that?

14                      A       He would adjust my back for my scoliosis.

15                      Q       What did that involve?

16                      A       I'm not sure what you mean.

17                      Q       Well, was it like a physical manipulation, was it a machine, or

18      what did he do?

19                      A       No, no, no machine; just used his hands to put pressure on

20      my spine, and I don't know exactly how to explain it.

21                      Q       Okay, what was the other thing?  You mentioned three

22      things.  What was the second thing that the Defendant would do?

23                      A       The electric stimulation.

1    Q    You said there were adjustments, massage, and the electric

2    stimulation, right?

3    A    Yes.

4    Q    What is the massage about?

5    A    I would get approximately a twenty minute massage usually

6    from Val just to loosen the areas that were affecting--

7    Q    Is Val an employee of the doctor's?

8    A    Yes.

9    Q    Okay, so this doctor on those other occasions did not do any

10    massages?

11    A    No.  It was typically with Val, and then he would just do the

12    adjustment.

13    Q    Okay, so the Defendant would do the adjustments, Val

14    would do the massaging.  What is the electric therapy?

15    A    That was done in a different room.  Another lady would put

16    that on me, and I would be clothed, and she would just put the electric pads

17    under my shirt.

18    Q    All right, and there would be some kind of a stimulus that

19    would cause you to get minor shocks?

20    A    Yeah.  It was supposed to relax your muscles or something

21    to make it easier for the adjustment, I believe.

22    Q    And is this a consistent pattern the type of treatment you had

23    each time you went to his office?

24    A    Yes.

1               Q      What you just described?

2               A      Yes.

3               Q      You said approximately two times a week?

4               A      Uh-huh.

5               Q      Over the past two years, is that correct?

6               A      Yes.

7               Q      Up until, I assume, October 16th of 2006, correct?

8               A      Yes.

9               Q      On this particular day did you have contact with the

10   Defendant?

11              A      Yes.

12            Q      On the 16th?

13                   Okay.  Could you please tell the Court what happened on

14   this date from the beginning.  You had an appointment for what type-- was it the

15   same type of treatment you had in the past or this was different?

16             A      No.  This was completely different.

17             Q      What was this treatment for?

18             A      This was only for a full body massage which I have never

19   had before.

20             Q      This was the first time you were having this?

21             A      Uh-huh.

22             Q      Were you also supposed to have with that full body massage

23   the electrical treatments or the adjustment or the regular massage?

1            A     Yes.  I was supposed to have the electric stimulation and the

2  adjustment with that.

3            Q     Now, you said this would differ because it was categorized

4  as a full body massage as opposed to what, a partial body massage?

5            A     The twenty minute regular therapeutic massage that Val

6  would do.

7            Q     What would that involve?

8            A     That was only my back and she would just work on the areas

9  that affected my scoliosis.

10          Q     Those other occasions, would you have to disrobe for that?

11          A     Yes.  I would take my top off and bra.

12          Q     Okay.  Other clothing would remain on?

13          A     Yes.

14          Q     Specifically what—your other undergarments would remain

15  on?

16          A     Yes, and my pants.

17          Q     Okay, but this one was a full body massage, correct?

18          A     Yes.

19          Q     You had made an appointment for this?

20          A     Yes.

21          Q     When you arrived there, did you arrive there before 11:00 or

22  11:00 o'clock?

23          A     I believe it was at 11:00.

1           Q     At 11:00 o'clock, what did you do when you arrived at the

2  location?

3           A     I signed in like I always do, and then I sat in the waiting room

4  and it was taking a little bit so I made my next appointment for I think it was the

5  following Monday, and then I just sat in the waiting room.

6           Q     This appointment was for the following week?  You made

7  another appointment while you were there?

8           A     Well, yeah.  I usually would make my next appointment on

9  the way out or if I had to wait in the waiting room for a while then I would make it,

10  but as I was waiting for a few minutes, I just decided to make it when I was

11  waiting.

12          Q     What happened then?

13          A     After I think ten minutes of waiting, Dr. Brad came in the

14  waiting room and just waved me over.

15          Q     Was there anything unusual about that?

16          A     No.

17          Q     Okay, what did you do?

18          A     He brought me into one of the massage rooms, and he told

19  me, he said-- the first thing he said was, this one's going to be different than any

20  of the other ones I've had, and he told me to completely disrobe.

21          Q     What did you do?  Did you say or do anything at that point?

22          A     I asked him, I said, even my socks because I didn't know if

23  he really meant take everything off, and he said, yes, even your socks because I

24  do a foot massage as well.

1     Q  What happened then?

2     A  Then he left the room, and I changed.  And on the table is

3 usually the big sheet, but this time there was only a small hand towel.

4     Q  When you disrobed, you were completely naked, is that

5 correct?

6     A  Yes.

7     Q  Were you by yourself or was there anybody else in the

8 room?

9     A  By myself.

10     Q  Okay.  What happened after you completely disrobed and

11 you mentioned instead of being a sheet there, what was on the bed or table?

12     A  It was like a small hand towel.

13     Q  Okay, and what did you do?

14     A  He told me to lay face down.  I laid face down and put the

15 towel over my behind.

16     Q  Okay, at some point the Defendant entered into the room?

17     A  Yes.

18     Q  Did he knock on the door or barged in?

19     A  No, he didn't knock.

20     Q  Okay.  He came in.  Did he come in with somebody else or

21 by himself?

22     A  He was by himself.

23     Q  Okay, and he told you at that point to lay down?

1    A  No.  You know, before when he was telling me to get

2 undressed, he said lay face down.  Usually they would always say on their way

3 out, you know, lay face down.

4    Q  You actually disrobed and layed on the table before anybody

5 entered the room, is that correct?

6    A  Yes.

7    Q  At some point the Defendant enters the room?

8    A  Yes.

9    Q  Okay.  hat happens?

10   A  As I was laying face down, he asked, is there anything you

11 don't want me to do?  And I did not know what he meant by that so I said,

12 whatever you normally do.  And then he said, well, usually on women I massage

13 or work on the pelvic area.  Is that okay, and I did not know what that meant so I

14 said, whatever you normally do.

15   Q  Okay.

16   A  And then he started by massaging my calves, my left calf.

17 And he moved upwards to my hamstring area.

18   Q  I'm sorry to interrupt.  Are you lying face down at this point?

19   A  Yes.

20   Q  And you remained in that position, is that correct?

21   A  Yes.

22   Q  He starts, and continue on.

1          A        So then he moved up to my left hamstring and shortly after

2    that he moved the towel off from my left buttock, and so I was exposed.  My left

3    buttock was exposed, and he started working on my left buttock.

4          Q        Now, up until this point, was there anything unusual about

5    the massage, the way it was starting with the calf and going to the hamstring?

6          A        I didn't expect it was going to be that way, but I have never

7    had, you know, a full body massage so I didn't know what to expect.

8          Q        Okay, what happens next?

9          A        As he was massaging my left buttock, I could feel his

10   fingertips go in the crease of my rear whenever he would move his hand up and

11   down, his fingers would be like in the crease.  And then he continued to work on

12   my left inner thigh and every time he would move his hand up, he would brush

13   my vagina.

14         Q        Was he talking to you when this was going on?  Were you

15   talking to him?  Was there any conversation that you can recall?

16         A        This is like the point when I was starting to go into shock and

17   didn't know what was, you know, going on so I don't remember.

18         MR. AMIRANTE:  Objection.  Narrative.

19         THE COURT:  Overruled.  I'll let the answer stand.

20   BY MR. KOUGAIS:

21         Q        Without using the work shocked, what were you feeling at

22   this point?  What was happening?

1              A      I knew that I wasn't comfortable with it.  But like I said, I had

2    never had a full body massage especially from a doctor.  So I didn't know if I

3    should question it or—

4              Q      Well, you said that you felt what portion of him brush up

5    against your vagina?

6              A      His hand.

7              Q      His fingers?

8              A      Yes.

9              Q      Okay, can you describe how could you tell if it was more

10   than one digit?  Was it one finger?  And was there an extended period of time

11   where there was contact or explain how it felt.

12            A      It was like a quick brush, and I didn't know, you know,  if it's

13   a hand effect, so maybe, you know, I got in the way, you know.  He was working

14   on my thigh and I didn't know if maybe he didn't mean to do that.  But then I

15   noticed every time he would go up my inner thigh he would do that.

16            Q      We are talking about your left thigh, is that correct?

17           A      Yes.

18           Q      How many times was there contact made with your vagina

19   and his fingers involving your left thigh?

20           A      Probably three.

21           Q      You said probably three?

22           A      Yeah.

23           Q      Was it more than two?  Was it more than two times?

24           A      It was definitely two but—I think probably three times.

1    Q    And he didn't make any statement?  He didn't say anything

2    to you at this point?

3    A    I remember hee was talking about like my family.  He asked

4    how my brother was doing and my dad.  Supposedly, he was friends with my

5    brother, or so I thought.  He also mentioned during the massage about bringing

6    in a bottle of wine, one of his favorite bottles of wine that he liked at my next

7    appointment he would bring it.

8    Q    Was he a family friend?

9    A    I thought he was, but he led me to believe when I first started

10   going there two years before that that he was friends with my brother.

11   MR. AMIRANTE:  Objection.

12   THE COURT:  I sustained it as to the form.

13   State, ask another question.

14   BY MR. KOUGAIS:

15   Q    We discussed when he was massaging your left thigh, and

16   you said there were at least two contacts with his fingers and your vagina, is that

17   correct?

18   A    Yes.

19   Q    What happened after that point?

20   A    Then he repeated the exact same thing on my right leg.

21   Q    Okay, you need to tell us what happened.  You can't say he

22   repeated the exact same thing.

23   A    So then he started working on my right calf, and after maybe

24   only a minute moved up to my right thigh, my hamstring, and worked on that and

1    then he moved the towel off my right side and massaged my right buttock.  And

2    again like I could feel his fingers in the crease when he was working on that area.

3              Q       Again, to clarify, the crease of what?

4              A       My rear, my buttocks.

5              Q       And you felt his fingers at the crease of your buttocks, right?

6              A       Yes.

7              Q       What happened then?

8              A       Then he continued to work on my right inner thigh, and as he

9    would move up and his fingers would brush my vagina again.

10             Q       You said again his fingers brushed up against your vagina, is

11   that correct?

12             A       Yes.

13             Q       Do you recall on how many occasions the Defendant made

14   contact, his fingers in your vagina on the right, involving the right thigh now?

15             A       About three.

16             Q       Again, about three times?

17             A       Yes.  On the right side, yes, and he had spread my legs

18   apart when he first came in to kind of-- so he could get his hands, I guess, in-

19   between—

20             MR. AMIRANTE:  Objection.

21             THE COURT:  I will allow the answer, he had spread my legs apart

22   to stand and strike the rest of the answer.

23             BY MR. KOUGAIS:

1       Q       Just to clarify, at what point did he spread your legs or did he

2   ask you to spread your legs?

3       A       That was in the beginning, before he touched my right calf,

4   he kind of spread it apart but he spread it so much that I could feel my rear

5   cheeks separating.

6       Q       Were your feet still affixed to the table then or were they--

7       A       Yes.

8       Q       And at the point when there was contact with the

9   Defendant's fingers and your vagina, the second time involving where you

10  testified from the right side of your thigh, was there any conversation or any

11  comment from either you or from he?

12      A       I believe that was just when he was discussing my family.  I

13  didn't really say much.  I was so nervous and scared.  I didn't really say much in

14  response.

15      Q       Why were you nervous and scared?

16      A       Because I felt very uncomfortable but again I didn't know if

17  this was normal practice for a full body massage by a doctor.

18      Q       You felt uncomfortable because you had not had one of

19  these full body massages before?

20      A       Right.  And I felt like who am I to question what a doctor is

21  doing?  Obviously, you know, I thought obviously this is right.  This is how it's

22  supposed to be.  But I knew in my head I was still uncomfortable so I was kind of

23  fighting with that.

1    Q    Is it fair to saw that when he made contact with your vagina

2    the first time and then the second time, you didn't make any comment to him

3    about that, is that correct?

4    A    Correct.

5    Q    Okay, what happened then?

6    A    Then he worked on my back.

7    Q    What do you mean he worked on your back?

8    A    He massaged my back.

9    Q    With his hands, correct?

10    A    Yes.

11    Q    Okay, what happened then?

12    A    In doing so he was standing on my left side and I had my

13    arms on the table at my side but my elbows were bent a little bit, and he bumped

14    into me with what I feel was an erection as he was working on my back.

15    Q    Was the Defendant dressed or clothed in the room with you?

16    A    Yes.

17    Q    And you were still lying face down, is that correct?

18    A    Yes.

19    Q    Now, you said it was with your left elbow?

20    A    Yes.

21    Q    You felt that there was some part of his body that made

22    contact with your elbow?

23    A    Yes.

24    Q    What portion of his body do you believe he made contact?

1          MR. AMIRTANE:  Objection.  She answered that question.

2          MR. KOUGAIS:  Well, I don't think she answered it.  She said an

3     erection.

4          MR. AMIRANTE:  Maybe she didn't answer the way you wanted

5     her to answer, but she answered the question.

6          THE COURT:  All right.  Overruled.  You may answer.

7          THE WITNESS:  With his penis.

8     BY MR. KOUGAIS:

9          Q     With his penis.  And you believe that it was erect?

10         A     Yes.

11         Q     Was his penis exposed in any fashion?

12         A     Not that I knew of, no.  I was laying face down, but I don't

13    think it was.

14         Q     Did you actually see this?

15         A     No.

16         Q     What actually lead you to believe that it was his penis that

17    was erect and made contact with your elbow as opposed to something else?

18         A     His hands were on me at the time, and he bumped into me.

19    I could tell the difference, you know, between that and his leg or whatnot, you

20    know.

21         Q     Was there any conversation involving that?

22         A     No.

23         Q     What happened then?  How many times was there contact

24    with what you believe to be his erect penis and your elbow?

27

1    A    That was the only time that I noticed.

2    Q    What happened then?

3    A    After he massaged my back, he wanted me to flip over.

4    Q    Did he ask you to flip over?

5    A    Yes.

6    Q    Did you do so on your own or did he assist you?

7    A    He held up the hand towel leaving me there, you know, fully

8    exposed, and he was on my right side at the time and held it up and I had to think

9    to myself, well, if I turn this way he's going to see my front exposed so I'm going

10   to turn this way. So I turned and then he put the towel back on me, and it was so

11   small that, you know, it barely covered my chest and my vagina. I mean if it

12   moved a little bit, I would have been exposed.

13   Q    Did you indicate to him or make a request for any additional

14   towels or anything?

15   A    No.

16   Q    You did flip around, is that correct?

17   A    Yes.

18   Q    And what was the position of your legs now that you were

19   laying face up?

20   A    I was-- My legs were on the table together.

21   Q    Together?

22   A    Yes.

23   Q    And what did the Defendant do at this point once you flipped

24   around?

1    A    He started working on my lower leg below my knee.

2    Q    Okay, when you say worked on it, what did he do?

3    A    Massaging. I'm sorry, massaging my lower leg.

4    Q    He was using his hands, correct?

5    A    Yes.

6    Q    And how long did he massage your lower legs for?

7    A    A couple of minutes maybe.

8    Q    What happened then?

9    A    He moved up to my left thigh and was massaging that area.

10   And then he—

11   Q    Take your time.

12   A    Okay. He started getting higher and moved the towel so that

13   my left, my left side was exposed, and he was massaging my bikini area. And

14   then he would get a little closer, like basically massaging my labia.

15   Q    How long did he do that for?

16   A    That was a few minutes.

17   Q    A few minutes?

18   A    Yes.

19   Q    And that was the left portion of your vagina?

20   A    Yes.

21   Q    Was there any conversation or comments that either he

22   made or you made at that time?

23   A    He was talking, but I honestly don't remember. I was--

24   Q    And how were you feeling at this point?

1          A        Scared.  I didn't know what I should do; what I should say.  I

2    just knew I was not comfortable but I was embarrassed almost like I didn't want

3    to say anything, but I felt like I would be embarrassed because I felt like he would

4    be like, what,  I'm doing it, you know, how it's supposed to be done.

5          Q        You said there was contact for a few minutes with his fingers

6    and your vagina, is that correct?

7          A        Uh-huh.

8          Q        What was the contact?  What was he doing?

9          A        Well he was massaging, you know, my bikini area and then

10   would massage kind of like prod my labia and he asked if that hurt.  That is one

11   thing I remember he said, does that hurt.  And I remember thinking why would

12   that hurt?  And I said, no.  I mean in my opinion I think now maybe he was—

13          MR. AMIRANTE:  Objection.

14          THE COURT:  Sustained.

15   BY MR. KOUGAIS:

16          Q        Just tell us what happened.

17          A        Okay.

18          Q        You said it was a few minutes?

19          A        Right.

20          Q        What was the focus?  What was he doing with his hand or

21   hands?  Was it one hand or two hands by the way?

22          A        I believe it was one.

23          Q        Do you remember, was it his right hand or left hand?

1          A      No.  I had my eyes closed when I was laying face up

2    because I didn't want to see him look at me naked.

3          Q      The entire time or the portion of time when he had fondled

4    your vagina?

5          A      I had my eyes closed the entire time.

6          MR. AMIRANTE:  Judge, I have to object and I ask that the

7    question and answer be stricken.  Fondling--

8          MR. KOUGAIS:  Judge, I'll rephrase that.

9          THE COURT:  The answer will be stricken.  Ask another question.

10    BY MR. KOUGAIS:

11          Q      Was the contact the Defendant had with your vagina, were

12    your eyes opened or closed at this point?

13          A      Closed.

14          Q      How did you know it was his hand that he was using to make

15    contact with your vagina?

16          A      I could just tell.  Because he was using his hand to massage

17    my thigh and then his hand would keep traveling up towards my vagina.

18          Q      The entire—and what would you estimate was the time when

19    he was making contact what you believe to be his hand or fingers in your vagina.

20          MR. AMIRANTE:  Objection.

21          THE COURT:  Sustained.  I don't believe I heard that it was in.  I

22    didn't hear that testimony.

23          MR. KOUGAIS:  I'm sorry.  I misspoke.

24    BY MR. KOUGAIS:

1    Q    Contact with the finger and your vagina?

2    A    Can you repeat it, please?

3    Q    Well, you said it was a few minutes, I believe?

4    A    Right.

5    Q    -- that there was contact, is that correct?

6    A    Yes.

7    Q    What I need to know, what type of contact?  What was

8    happening?

9    A    He massaged my bikini area probably for a minute or two,

10    and then that's when he was like prodding my labia and asked if that hurt.

11    Q    You used the word, prodding.  Can you describe what you

12    mean by that?

13    A    He asked if that hurt.  He kind of poked with his finger.

14    Q    Now, you're indicating for the record that you just made a

15    gesture with your hand.  Can you show the Court what you did, please?

16    A    Just like poked.

17    Q    Let the judge see it.

18    THE COURT:  State, do you want to make a record?

19    MR. KOUGAIS:   Indicating for the record, Judge, she lifted her left

20    hand and she had her hand semi-closed in maybe the shape of the letter C or a

21    J.

22    THE COURT:  The record will indicate she put her hand up like the

23    letter C with all fingers extended and in the sideways motion.

24    BY MR. KOUGAIS:

32

1      Q      And was that what he was doing at that time or did it

2      alternate?  Did it change?  Did it vary?

3      A      I believe that was all.

4      Q      And what affect did that have on you?

5      A      Again, I was scared, and I didn't know if that was—I thought

6      it was like a medical question, you know, he asked if that hurt when he was

7      touching me there, I thought some women have pain there maybe and need to

8      be worked on there but it wasn't pain, and I just was uncomfortable.

9      Q      What happened after he did that?  Did he at some tpoint

10     stop having contact with your vagina on the left side?

11     A      Yes.

12     Q      What did he do next then?

13     A      Then he went to my lower right leg and massaged from my

14     knee to my ankle there, that area, for maybe a minute.  And then moved up to my

15     right thigh.

16     Q      And what happened at that point?

17     A      And again he would get closer to my bikini area and then he

18     would massage my bikini area after moving the towels, therefore, leaving me fully

19     exposed on my lower half.

20     Q      What happened at this point?

21     A      He massaged my bikini area on the right side and then again

22     he touched my labia.

23     Q      When you say he touched your labia, were your eyes open

24     at this point or were they closed?

33

1          A        No, they were closed.

2          Q        And you said he touched—what did he touch?  What did you

3     believe he touched or made contact with your labia?

4                   MR. AMIRANTE:  Objection, Judge, to what she believed.

5                   THE COURT:  Overruled.  She may answer.

6          BY MR. KOUGAIS:

7          Q        What did you feel?

8          A        I felt his hand touch my labia on the right side.

9          Q        What was the Defendant doing?

10         A        Again massaging; just massaging the area.

11         Q        And for approximately how long did that occur?

12         A        Maybe a minute or two.

13         Q        And how did you feel at this point?

14         A        Even more scared, and I didn't know what to do, what to

15    expect.

16         Q        Did you respond or say anything to him?

17         A        No.  Again he, you know, was talking about my family and

18    stuff, and I really wasn't responding that much.  I was scared and not knowing

19    what was going on.

20         Q        After he had contact with your vagina at this point, you said

21    that lasted for a minute I believe?

22         A        My bikini area was about a minute or two and then when he

23    touched my labia that was about a minute or two.

1        Q     How would you describe the contact he was having?  Is it

2    what you described earlier?

3        A     Yes.

4        Q     The same gesture you made for the Court?

5        A     Yes.

6        Q     What happened next?

7        A     And then he started massaging my lower stomach and at

8    that point I was just getting more and more uncomfortable, and so I told him I

9    needed to go to the bathroom.  I didn't have to go to the bathroom, but I just

10    wanted to stop at that point.  He said, okay.  You know, you can go to the

11    bathroom and then come back, and then I changed my mind because I didn't

12    want to have to come back in and change and whatnot so I said, I'll hold it.  It's

13    okay, and he said, well I'm only halfway done so, you know, you might as well go

14    now.

15            And I said, well, you know, I don't feel like getting dressed

16    and then coming back in and getting undressed.  He mentioned he would get me

17    a gown, and I have never seen anybody walking around in a gown so I was not

18    comfortable with that either, and I told him that.  And he said, well, I'll get you two

19    gowns.  You can put one on normal and one on backwards.

20        Q     What happened then?

21        A     So he went and got the gowns and then came back and

22    gave me the gowns and left and closed the door, and I put the gowns on and

23    walked across the hall and went to the bathroom.   And then I came back in and

24    quickly took the gowns off to get under the little towel again because he wouldn't

1    knock on the door and I didn't know when he was coming back in and I wanted to

2    hurry and get the towel on me before I went back in.

3                Q    Did you have your purse with you at that time?

4                A    It was in the room.

5                Q    Were your keys in the purse?

6                A    Yes.

7                Q    What happened next after you went into the back into the

8    room now with the gowns?

9                A    He massaged my stomach.

10               Q    I'm sorry to stop you.

11                    Are you laying face up now or face down?

12               A    Face up.

13               Q    Okay, so the Defendant re-enters the room?

14               A    Yes.

15               Q    When he re-enters is he with somebody or by himself?

16               A    By himself.

17               Q    Okay, what does he ask you to do or what happens?

18               A    He moved the towel and started massaging my lower

19    stomach just as he was starting to before I stopped to go to the bathroom.  And

20    then he so—he was working on my stomach, and then he wanted to work on my

21    upper body he said and moved the towel, therefore leaving the towel only across

22    my midsection and that is when he fondled my right breast.

23               MR. AMIRANTE:  I'll object to that conclusion to fondling her

24    breast.  That's a conclusion.  What did he do?

1          THE COURT:  Overruled.  That may stand.

2     BY MR. KOUGAIS:

3          Q     Can you please explain in detail when you say the word

4     fondled, what do you mean by that?

5          A     He was massaging my breast.

6          Q     How, with his hand?

7          A     With his hand.

8          Q     And were your eyes open at this point?

9          A     No.  I may have opened for a second but mostly no.

10         Q     Well, at some point did you know who was giving you the

11    massage?

12         A     Yes.

13         Q     And what did you feel with your eyes closed?  What did you

14    feel happening to your breast?

15         A     That he was massaging my breast.  I mean--

16         Q     Was he just touching it?  Was he manipulating it?  Was he

17    squeezing it?  What was he doing?

18         A     Just massaging it.  I mean I don't know how to explain that

19    more.

20         Q     Is that like rubbing?

21         A     Yes.

22         Q     How long did he do that?  This is your left breast or your

23    right breast?

24         A     My right.

37

1     Q     How long did he do that for?

2     A     A few minutes.

3     Q     Was there any conversation between you and him at that

4     point?

5     A     Yes.  He brought up the fact that I had a breast reduction

6     years prior to that.  And he asked if I have any sensitivity left from the surgery,

7     and he asked where I had sensitivity.

8     Q     What happened then?

9     A     Well, I answered him.  I told him that, you know, I only have

10    some sensitivity from the surgery.  And then he moved to my other side and

11    massaged my left breast.

12    Q     So after he left the right breast, he went to the left breast?

13    A     Yes.

14    Q     And can you describe what the extent of the massage

15    involved?

16    A     Rubbing.  Massaging.

17    Q     And how long did that last for with your left breast?

18    A     A few minutes I think.

19    Q     How much?

20    A     A few minutes.

21    Q     What happened then?

22    A     Then he moved the stool around to—behind my head and

23    was massaging my neck and my scalp.

24    Q     And what happened then?

1     A     After he massaged my neck and my scalp, he stood up and

2     said-- Well, can I go back one?

3     Q     Tell us what happened.  Sure.

4     A     While he was massaging my neck and my scalp, the towel

5     was still on across my midsection, and I was very uncomfortable so I wanted to

6     cover myself up, but again I was embarrassed.  I wanted to cover myself up

7     without him knowing that's what I was doing.  I slowly moved the towel up to

8     cover myself up and right when I covered myself up that's when he stood up and

9     said he was done working on that area.

10     Q     What was the next thing that occurred?

11     A     And then when he stood up he said, okay, I'm going to work

12     on your lower body more right now.  And he said, is that okay, and I said, yeah.

13     And then I had my eyes closed still at this point.

14     Q     Do you need a minute?

15     A     No.  No.  I just want to get it done.  I heard him put more of

16     the oil or whatever it was on his hands, and he said, this is for your lower back.

17     This is going to get your endorphins going and make you feel the way you feel

18     after you've had sex, and that is when he touched my vagina with his hand.

19     Q     Were you face up at this point or face down?

20     A     I was face up.

21     Q     Were your eyes open at this point?

22     A     No.

23     Q     How did you know he put oil on his hand?

1      A      I could hear it.  I have been in there enough with the other

2  massage therapists that I know, you know, the sound of the bottle.

3      Q      And did he make contact, before he had contact with your

4  vagina, did he have any other contact with your body with his oily hands?

5      A      No.  He put the oil on his hand and then touched my vagina.

6      Q      How did he touch your vagina at this point?

7      A      He touched my clitoris.

8      Q      And how did he touch it?

9      A      It was massaging or rubbing.

10      Q      Was he using one hand or both hands, if you recall?

11      A      I think just one.

12      Q      And how long was the approximate time that he was doing

13  this?  The length of time?

14      A      It was probably, I mean, I was so scared.  It felt like so long

15  but it was probably only a couple of minutes.  That's when he said, are you okay,

16  and I said, no.  I knew I had to say something to get it to stop, but again I was

17  scared.  I was embarrassed.  I knew I had to say something to get it to stop so I

18  said no, no.  And he said, well, what's wrong?  And I said, I'm really cold.  I'm

19  really cold.  I was talking fast because I was so nervous.  He said, well, I'll get

20  you a blanket.  So he left the room and closed the door, and while he was gone I

21  knew I would have to say something else when he came back in otherwise he

22  would continue doing what he was doing.

23          And so he came in with another small blanket and gave it to

24  me.  And he said, are you okay?  And I said, no, and this was with my eyes

1    closed still because I couldn't look at him.  I said, no, I want to skip that part, and

2    he said, are you sure?  And I said, yeah, I just want to skip that part.  And he

3    said, well,   I don't want you to think I was hitting on you.  This is very clinical, you

4    know.  It helps your lower back, and I said, no, no, that's okay.  I know you

5    weren't hitting on me.  I don't like that.  I'm not comfortable with that right now,

6    and he said, okay, and he was acting a little-- almost like he didn't understand

7    that I didn't want him to do that.

8         Q       What lead you to believe that?

9         A       Because he just seemed confused.  I said I was

10   uncomfortable with it and he's like, are you sure?  Like it seems like he didn't

11   understand.  And he said, do you want me to work on your neck then, and he

12   said it in a confusing way.  And I said, yeah, yeah, just work on my neck.  I just

13   wanted him to get, you know, working on something else.

14                     And so he brought the stool around back behind my head

15   and worked on my scalp.  And I just wanted to talk about anything else.  I wanted

16   to—I didn't want to think about what just happened, so I was just trying to be

17   relaxed, and he said, well, are you okay, and I said, yeah, I'm fine.  I'm fine.

18                     He said, you know, I don't want you walking out of here all

19   weirded out.  I said, no, I understand, you know, it's okay; because I thought I did

20   something wrong.  I thought I was misinterpreting something at that point.

21                     He continued to work on my scalp for about a couple of

22   minutes and that's when he stood up and said he was done, and he told me to

23   get dressed and go into the other room for the electric stimulation therapy.

24        Q       And what happened?

1        A        So he left the room and closed the door, and I got changed

2    and walked out of the room.  And I passed by the electric stimulation room

3    because I didn't want the stimulation.   I just wanted to get out of there, and he

4    was in his room adjusting another patient with the door open at the time.  And as

5    I walked by he saw me and he said, oh, aren't you going to get the electric

6    stimulation?  I said, no, I want to get out of here.  He said, well, just wait in the

7    waiting room and I'll be in there in a minute when I'm done with this patient.

8        Q        What happened then?

9        A        So I sat in the waiting room and—Can I have a tissue or

10    something?  I'm sorry.

11            MR. KOUGAIS:  Judge, can we have a moment?

12            THE COURT:  Sure.

13            THE WITNESS:  I sat in the waiting room and Karen, the

14    receptionist, was at the desk.  That was the only people in the room.  And I

15    remember just thinking that I felt like I did something wrong, and I didn't want her

16    to see me upset.  I wanted her to think I was just fine and normal like nothing

17    happened.

18        Q        What did you do?

19        A        I sat in the waiting room.  After I think maybe five minutes Dr.

20    Brad popped his head in and told me to come back.  So I came back with him in

21    the adjustment room, and he adjusted my back and neck.

22        Q        How long did that procedure take?

23        A        A couple of minutes, I think.

24        Q        Did he have any conversations at this point?

42

1          A          Yes.  He said that if I wasn't ready to get pregnant yet not to

2     have sex with my husband that night because I was all relaxed from the

3     massage, and it's easier to get pregnant when you're relaxed.  And he said even

4     the pre-come could get me pregnant.

5               THE COURT:  What?

6               THE WITNESS:  He said even pre-come could get me pregnant.

7     That's what he said.

8               BY MR. KOUGAIS:

9          Q          Was there any type of response by you at this point?

10         A          No.  I don't remember if I said anything.  I don't think I said

11    anything.  I just wanted to get out of there, and I said, okay, and see you next

12    week and I left.

13         Q          What happened after that point?

14         A          When I left the office?

15         Q          You did leave, correct?

16         A          Yes.

17         Q          You left by yourself?

18         A          I got in my car, and I drove to my parents' house to drop

19    something off, and nobody was home.  I went in the house, dropped it off.  I don't

20    remember even going in.  I was there only for a minute.  And then I got back in

21    my car and drove home.

22         Q          Did you have your cell phone with you?

23         A          Yes.

24         Q          And it worked?

1    A    It worked, yes.

2    Q    Did you make any calls at that point once you left the

3    doctor's office?

4    A    At first I didn't want to tell anybody about it.  I just wanted to

5    forget it happened, but then for some reason I reached for my cell phone on the

6    way home and tried calling my friend, Heather, at work, but I got her voice mail.

7    Q    What's Heather's name?

8    A    Heather Peredy. (phonetic)

9    Q    Peredy?

10    A    Yes.

11    Q    What did you do?

12    A    I left her a voice mail and asked her to call me back.

13    Q    What was the voice mail, if you recall?

14    MR. AMIRANTE:  Judge, I'm going to object.  Is there a Heather

15    Peredy on this list that was disclosed to me?

16    THE COURT:  What's your objection at this time?

17    MR. AMIRANTE:  Judge, he's asking about a conversation with

18    somebody on a voice mail on a witness I don't know anything about.

19    THE COURT:  I'll sustain the objection.

20    BY MR. KOUGAIS:

21    Q    After you made a phone call to this individual named

22    Heather, what did you do?

1          MR. AMIRANTE:  Judge, I'll object to any further testimony at this

2    point.  I thought there was one witness named Karen Muir.  Now we are talking

3    about a Peredy?

4          THE COURT:  I'm not letting him get into a conversation.  He

5    basically asked after she made a phone call, what did she do?  So I'm going to

6    overrule the objection as to what she did.  We are not getting into the

7    conversation with Heather.  She may testify as to what she did next.

8          BY MR. KOUGAIS:

9          Q     After the phone call to this Heather individual, what did you

10   do next?

11         A     I continued to drive home, and I remember just wanting to

12   get home as fast as I could.  I got home.  Nobody was home.  My husband was

13   at work.

14         Q     I'm sorry to interrupt.  How far is your house from where this

15   clinic is at, driving time?

16         A     About twenty minutes, twenty-five.  And I remember pulling

17   in the garage and hitting the wall of my garage with my car.  I was just out of it at

18   that point.  I just wanted to get home so fast, and I hit the wall with my car.

19         Q     How were you feeling at this point?

20         A     Like I did something wrong.  I felt like I did something wrong.

21   I was scared.  I didn't know what happened really.  I--

22         Q     And this is based upon what, the contact of the defendant

23   that he had with your intimate area, is that correct?

24         A     Yes.  I felt like I did something wrong.  I felt, I don't know.

45

1    Q    And when you arrived at the house and you struck your car,

2    what happened next?  What did you do next?

3    A    I walked in the house and without even thinking about doing

4    it I just walked upstairs and took a shower.  Something in me just wanted me to

5    take a shower as fast as I could.  I already took a shower that morning, put all

6    clean clothes on, but right when I walked in I just went right upstairs.  I was in the

7    bathroom getting ready to get in the shower and that's when my phone rang and

8    it was the person I left a message for.

9    Q    Without getting into the conversation, what did you then do?

10    A    I didn't answer the phone.  I wanted to talk to her so badly at

11    that point, but I physically knew I wanted to get into that shower right then and

12    there.

13    Q    What happened then?

14    A    I took a shower, and I got out, got changed.  I got all new

15    clean clothes and put all the clothes that I wore that morning in the laundry,

16    everything.  Even though they were all clean, and so I got dressed and that's

17    when I called my friend back.

18    Q    After you spoke—did you speak with your friend?

19    A    Yes.

20    Q    After you had that conversation, what did you do next?

21    A    I mean, I don't know what I can say without bringing her up.

22    Q    Tell us what happened.

23    A    Okay.  Well, after talking to her, she made me realize

24    something.

1    MR. AMIRANTE: Judge, I'm going to object.

2    THE COURT: All right. I will sustain it as to any conversation that

3    you had with Heather, but you may testify after you spoke to her, what did you

4    do.

5    MR. AMIRANTE: Judge, I'm going to object to anything she did.

6    This is a conversation that caused her to do something on an unknown fathom

7    witness that has never been disclosed to the defense.

8    THE COURT: But how do I know that? How do I know that,

9    Counsel? All that he's asking is what did she do next? I don't know if it's based

10   upon a conversation. You can object and ask me to strike it and not consider it.

11   I have no idea what she's going to answer. It may have something to do the

12   conversation. It may not.

13   MR. AMIRANTE: I don't know either, Judge, because I never got

14   this matter disclosed to me otherwise I would know what she is going to testify to,

15   Judge, and, I should know. And I have no idea because under Brady and under

16   Schmidt, those things should be disclosed. Why is this the first time I'm hearing

17   about this? It makes no sense.

18   THE COURT: As an officer of the court will you make an offer of

19   proof or will you just tell us?

20   MR. KOUGAIS: Judge, you know, there is apparently young lady

21   out here. I have no intention of calling her. At this point it's premature. If he

22   thinks there is a Brady violation if I intend to call her, he can invoke it at that time.

23   At this point this witness is testifying to my knowledge I just talked to this young

24   lady shortly before the trial started and this is all coming out now.

1          THE COURT:  Here's what I'm going to do.  I'll overrule the

2   objection.  I'm going to let her answer.  If you have a motion after her answer,

3   Counsel, I'll let you make it.  I don't know what she's going to say.  At this point

4   the objection is overruled.  You may answer what did you do next.

5          MR. AMIRANTE:  Judge, I'm sorry but I have a motion for a mistrial

6   based upon a Brady violation.  Jeopardy is attached.  This is an appalling

7   situation.  Just because the State decides not to call a witness--

8          THE COURT:  I will deny your motion.

9          MR. AMIRANTE:  They are not going to disclose that witness--

10          THE COURT:  Stop.  Stop. Stop.  If you want to be heard, we'll

11   excuse her and make a motion.  Based upon what you have told me, right now

12   your motion is denied.  If you want to argue further with the witness, with her out

13   of the room, or do you want to let her answer?  I'll overrule the objection.

14          All right.  You may answer.

15          THE WITNESS:  After I got out of the shower and talked on the

16   phone, then I called my mom and told her what happened.  She was at work.

17          BY MR. KOUGAIS:

18          Q     And after you talked to your mom, what did you do next?

19          A     While I was talking to her on the phone, my friend came to

20   my house.  I don't know—

21          Q     I don't want you to say what happened with your friend.

22   What did you do?

23          A     Well, I was talking on the phone to my mom, and while I was

24   talking to her that's when my friend came over.  And I went over the details on

48

1    what happened and that's when I started really realizing that something bad

2    happened.

3                Q        At some point did you have contact with the police?

4                A        Later that day, yes.

5                Q        How much time went by from the incident when you left the

6    doctor's office until the point when you contacted the police?  How much time

7    went by?

8                A        Maybe five, six hours.

9                Q        Okay, and when you arrived at the police station, were you

10    by yourself or were you with anybody?

11                A        I was with my husband and my sister-in-law.

12                Q        Just for the record what's your husband's name?

13                A        James Kelley, Jr.

14                Q        And what's your sister-in-law's name?

15                A        Rita Kelley.

16                Q        Okay and when you arrived at the police station, you told

17    them everything that happened to the best of your knowledge?

18                A        Yes.

19                Q        And do you remember the officer that you spoke to?

20                A        Yes.

21                Q        Did you see the officer earlier today?

22                A        Yes.

23                Q        He was the officer in court, right?

24                A        Yes.

1    Q    You told him everything that happened, is that correct?

2    A    Yes.

3    Q    At any time when you had this contact, the massage with the

4    Defendant, did you ever give him any permission to have contact with your

5    vagina or your breasts?

6    A    No.

7    MR. KOUGAIS:  If I may have one moment, please?

8    THE COURT:  Surely.

9    MR. KOUGAIS:  I have nothing further.  I tender the witness for

10    cross.

11    THE COURT:  We have a heavy call at 1:30.  We need to give the

12    staff a break.  I will break until 1:30.  We'll recall this case, and you're still under

13    oath, and I admonish you not to speak to anybody about the case.

14    Motion to exclude witnesses.  Your attorney is going to

15    explain to you what that means.  You will not be able to discuss it with anybody

16    else.  Do you understand?

17    THE WITNESS:  Yes.

18    THE COURT:  We'll see you at 1:30.

19    MR. AMIRANTE:  Do you want to go through your 1:30 call and

20    then go through it first?

21    THE COURT:  Usually I'm pretty quick.  Maybe we'll start the 1:30

22    call, and I'd say by 2:00, we'll be back on trial.  2:00 o'clock.

23    Thank you.

24    MR. AMIRANTE:  Thank you, Judge.

1          MR. KOUGAIS:  Judge, I would further indicate there are other

2     family members, parties in the room.  I just would like to make it crystal clear to

3     all parties there is absolutely no talking whether you testified or not testified.

4     Motion to exclude so we are all on the same page whether sitting outside or

5     inside.

6          THE COURT:  If I can have a moment?

7          MR. AMIRANTE:  Can we have one of the witnesses and admonish

8     them not to speak with anybody?

9          MR. KOUGAIS:  I want to make it clear so there is no issue at two

10    o'clock.

11         MR. AMIRANTE:  Will you admonish the witness not to speak with

12    anybody?

13         THE COURT:  I did.

14                              (Whereupon a recess was taken after

15                               which the following proceedings were

16                               had.)

17         THE CLERK:  Bradley Hayashi.

18         THE COURT:  06MC37145.  Charge against the Defendant is

19    battery.  We are in the middle of trial.

20              Counsel, again your name for the record?

21         MR. AMIRANTE:  My client is waiting outside.  For the record, Sam

22    Amirante.

23         THE COURT:  All right.

1        The matter is back on trial, and we will proceed with cross-

2    examination.

3        MR. AMIRANTE:  May I proceed, Judge?

4        THE COURT:  You may.

5        MR. AMIRANTE:  The State is not in here.

6        THE COURT:  Oh well.  I called the case on trial.  It's supposed to start at

7    2:00 o'clock, and it's 2:30.

8        MR. AMIRANTE:  He was here a second ago.  I appreciate your Honor's

9    courtesy for me, Judge.  He was here just a second ago.  I think he ran out looking for

10   his witness, and he's sitting here.

11       THE COURT:  Counsel, cross-examination.

12       MR. AMIRANTE:  Okay.  May I?

13       THE COURT:  Yes, please.

14                CROSS-EXAMINATION

15                BY

16                MR. AMIRANTE:

17       Q      Mrs. Kelley?

18       A      Yes.

19       Q      Ma'am, you were—all these events you testified to

20   happened on October 16th of last year, is that right?

21       A      Yes.

22       Q      And before you were Mrs. Kelley, your name was Melaina Romano,

23   correct?

24       A      Yes.

1    Q    Mrs. Kelley, you got married back in May?

2    A    Yes.

3    Q    And I believe you testified that some time during a course of your visit or

4  somehow Dr. Hayashi learned of your wedding, is that correct?

5    A    Yes.

6    Q    Isn't it really a fact, Mrs. Romano, that you invited Dr. and Mrs. Hayashi to

7  your wedding?

8    A    Yes.

9    Q    So, it's not that he learned about it through the course of your visits, you

10  actually sent him an invitation?

11    A    I did.

12    Q    And before you sent him and his wife an invitation, you never met his wife,

13  did you?

14    A    No.

15    Q    His wife's name is Debbie Hayashi?

16    A    I'm not sure what her name is.

17    Q    You're not sure.  Do you know what she looks like?

18    A    No.  I met her one time.

19    Q    Would that one time have been Friday, October 13th?

20    A    I don't know what day it was.  There was one time that she was in the

21  office, and I think I was on my way out and he introduced me to her.

22    Q    Well, you were in the office the Friday before the Monday you got this

23  massage, weren't you?

24    A    Yes.

53

1          Q          That was Friday the 13th, is that correct?

2          A          Yes.

3          Q          And could that have been the day that Mrs. Hayashi was

4    there with her children?

5                     MR. KOUGAIS:  Objection.

6                     THE COURT:  Basis?

7                     MR. KOUGAIS:  Judge, she indicated she doesn't recall what the

8    date was and now Counsel is asking to speculate.

9                     THE COURT:  On that basis the objection will be overruled.

10                        You may answer.

11                    THE WTNESS:  I'm not sure what day it was that I met her the one

12   time.

13              BY MR. AMIRANTE:

14          Q          But you didn't meet her before you invited her to the

15   wedding?

16          A          I don't believe so.

17          Q          You did meet her before you had your full body massage

18   though, did you not?

19          A          Yes.

20          Q          And that was just in passing, and you knew who she was,

21   right?

22          A          He introduced me to her.  That's how I knew who she was.

23          Q          And the reason you didn't meet her at the wedding because

24   the Hayashi's didn't attend your wedding, is that correct?

54

1    A    No, they did not.  It was more a courtesy invitation on my

2    part.

3    Q    It was a courtesy invitation?  So you never intended that they

4    come to your wedding?

5    MR. KOUGAIS:  Objection.

6    THE COURT:  Sustained.

7    BY MR. AMIRANTE:

8    Q    In any event, you said you had been seeing him as your

9    doctor or chiropractor for a couple of years, is that right?

10    A    Yes.

11    Q    Actually it was more than a couple of years, wasn't it?

12    A    I'm not sure exactly how long.  I believe it was a couple

13    years.

14    Q    Do you know who Dr. George is?

15    A    Yes.

16    Q    Who's Dr. George?

17    A    Dr. George was the chiropractor who owned the company, I

18    believe, before he bought it, and I used to see another doctor at that office when

19    Dr. George owned it.  My mom worked for Dr. George.

20    Q    Your mom worked for Dr. George?

21    A    Yes.

22    Q    Did she work for Dr. Hayashi?

23    A    No.

1    Q    And so did your mom leave the office when Dr. Hayashi took

2    over?

3    A    No, she left before Dr. George sold it.

4    Q    Your entire family continued to go see Dr. Hayashi for their

5    chiropractic needs?

6    A    My dad started seeing him and my brother.

7    Q    Your dad had seen him for about five years?

8    A    My dad—

9    Q    Dr. Hayashi?

10    A    I'm not sure exactly how long he went to see him.  It was

11    before I started going.

12    Q    You went because of your scoliosis?

13    A    Yes.

14    Q    You also got treated from Dr. George, didn't you?

15    A    Dr. McCackran worked for him and Dr. McCackan treated

16    me.  But Dr. George owned the office at that time.  (phonetic)

17    Q    You were seeing Dr. Hayashi for your scoliosis?

18    A    Yes.

19    Q    And you never had a friendship or social relationship with

20    him or his wife, with Dr. Hayashi or his wife?

21    A    No.

22    Q    How many people did you have at your wedding?

23    MR. KOUGAIS:  Objection.

24    THE COURT:  Sustained.

56

1        BY MR. AMIRANTE;

2            Q       Did you invite any other physician or your lawyer to your

3    wedding?

4            MR. KOUGAIS:  Objection.

5            THE COURT:  Basis?

6            MR. KOUGAIS:  It's irrelevant.

7            MR. AMIRANTE:  Judge, I can prove motive and the reason for

8    these allegations.

9            THE COURT:  This is really stretching it.  I'll overrule it, but you're

10    not going to go very far on that.  Overruled.

11                    You may answer.

12            THE WITNESS:  Can you repeat the question, please?

13        BY MR. AMIRANTE:

14            Q       What other doctors did you invite to your wedding?

15            A       I don't believe I did.

16            Q       Did you invite your family lawyer to your wedding?

17            A       Did I what?

18            Q       Your family lawyer?

19            A       No.

20            Q       Did you invite—were you married by a priest?

21            A       Yeah.

22            MR. KOUGAIS:  Objection.

23            THE COURT:  Sustained.

24        BY MR. AMIRANTE:

1     Q     Anyway then you—you set an appointment for a full body

2     massage with Dr. Bradley, did you not?  When I say Dr. Bradley, I mean

3     Dr. Hayashi.

4     A     Yes.

5     Q     You set that appointment up with Karen Muir, Dr.

6     Bradley's—Judge if I may refer to, Judge, Dr. Bradley, that is what he's

7     commonly called, Dr. Bradley's receptionist?

8     A     Yes.

9     Q     And you specifically requested Dr. Bradley when you

10     set that up, did you not?

11     A     He told me he was the only one who performed full

12     body massages.  I was under the impression that I had no other option so

13     when I went up there, Karen asked me who it was going to be with, and I

14     said, well, with him.  I thought that was the only one that did it.

15     Q     That was your impression?

16     A     That's what he told me.  He told me that.

17     Q     You had been getting massages at that facility for at

18     least a couple of years, right?

19     A     Yes.

20     Q     You got massages from Val, right?

21     A     Yes.

22     Q     You got massages from Nancy, correct?

23     A     Yes.

1    Q    But you never got a full body massage from any of

2    them?

3    A    No.

4    Q    Your husband went there for a massage, correct?

5    A    Yes.

6    Q    And Karen made the appointment for your husband,

7    Mr. Kelley, with Dr. Natalie, did she not?  Do you remember that?

8         MR. KOUGAIS:  Objection.

9         THE WITNESS:  Say that again.

10        THE COURT:  Hang on a second.  Basis?

11        MR. KOUGAIS:  Relevance.

12        THE COURT:  How is this relevant?

13        MR. AMIRANTE:  Judge, Ill tie it up.  Again, it goes to—

14        THE COURT:  The question was, did Karen make an

15   appointment with your husband with a certain other doctor?

16        MR. AMIRANTE:  Karen's the receptionist.  I'll clarify it.

17        THE COURT:  Sustained.  Ask another question.

18   BY MR. AMIRANTE:

19        Q    Mrs. Kelley, did you ever have occasion to make an

20   appointment for your husband, Mr. Kelley, after you were married to him

21   for a full body massage in Dr. Bradley's office?

22        MR. KOUGAIS:  Objection.  I don't know the foundation here

23   as to what date; before or after the incident occurred here or just in

24   general?

59

1          THE COURT: The question is, did you ever make an

2    appointment for your husband for a full body massage.

3          I'll overrule it. You may answer yes or no.

4          THE WITNESS: No.

5    BY MR. AMIRANTE:

6          Q    Did you ever make an appointment for a massage for

7    your husband?

8          A    Did I make an appointment for a massage for my

9    husband?

10         Q    Yes.

11         A    I don't think I did.

12         Q    Do you know if your husband, if you know if your

13   husband, Mr. Kelley, ever had an appointment for a massage at Dr.

14   Bradley's office?

15         A    Yes.

16         Q    And who was that appointment with?

17         A    With Val.

18         Q    Do you know who Dr. Natalie is?

19         A    Yes.

20         Q    Did he have an appointment with Dr. Natalie?

21         A    He was supposed to see Dr. Brad. Dr. Brad was the

22   one that told me to have him come in. I made the initial appointment for

23   my husband with Dr. Brad, but then when he went in, Dr. Brad was too

24   busy, or whatever, and Dr. Natalie had to see him.

1      Q  When that happened, what did you do?

2      A  When what happened?

3      Q  When Dr. Bradley was too busy to see your husband?

4      A  I wasn't there when he was at his appointment.  I

5 wasn't with him.

6      Q  You found out about it though?

7      A  Yeah.

8      Q  What did you do?

9      MR. KOUGAIS:  I'll object to that line of question.

10      THE COURT:  I'll overrule it.  I'm assuming, Counsel, you're

11 going to tie this up because I'm not seeing the relevance, but I'll give you a

12 little leeway.  If you're going to tie it up, tie it up.  If you don't tie up, it's all

13 going to be stricken.

14      Do you understand that question?

15      THE WITNESS:  No.  Can you please repeat your last

16 question, please?

17      BY MR. AMIRANTE:

18      Q  When Dr. Bradley couldn't see your husband and this

19 is before this incident occurred, right?

20      A  Yes.

21      Q  And you found out about it, did you call somebody at

22 the office?

23      A  No.

24      Q  Did you tell anybody about it at the office?

1      A      Did I tell somebody that Dr. Brad didn't see him?

2      Q      Were you upset about that?

3      A      No.

4      Q      Did you tell Karen Muir about that?

5      A      I didn't understand why Dr. Natalie saw him when I

6   set up the appointment with him because Dr. Bradley is the one that said,

7   have your husband come in and see me.

8      Q      You were upset that Dr. Natalie saw your husband,

9   weren't you?

10     A      No, I wasn't upset.

11     Q      Is Dr. Natalie a female doctor?

12     A      Yes.

13     Q      And you were upset that Dr. Natalie saw your

14  husband instead of Dr. Bradley who you wanted to see your husband?

15     A      I was not upset about that.  I wanted my husband and

16  I to see the same doctor, and Dr. Brad was the one that said, have him

17  come to me.  I didn't understand why he didn't see him.

18     Q      This all happened prior to the incident that you're

19  complaining about?

20     A      Yes.

21     Q      How long before?

22     A      I'm not sure.

23     Q      You got married in May and this allegedly happened

24  in October so it happened sometime between May and October?

1    A    Possible, yeah.

2    Q    Now, you testified earlier that you felt Dr. Bradley was

3    touching you inappropriately, to use that word, but you said you were—felt

4    uncomfortable?

5    A    Yes.

6    Q    And I believe you testified that this was your first full

7    body massage.  You felt uncomfortable getting a full body massage?

8    A    Yes.  The first full body massage I ever had by a

9    doctor and by a male.

10    Q    You were nervous?

11    A    Yes.

12    Q    A little scared?

13    A    Yes.

14    Q    And you were told to go into the massage room or a

15    room in Dr. Bradley's office, right?

16    A    Yes.

17    Q    And you went into that room, right?

18    A    Yes.

19    Q    You went into that room by yourself, right?

20    A    He walked me in the room.

21    Q    He walked you in and then he left you in the room by

22    yourself, right?

23    A    Yes.

24    Q    And you disrobed, is that correct?

1       A       Yes.

2       Q       You took all of your clothes off except your socks, I

3   think you said?

4       A       No, I took my socks off.  He told me to.

5       Q       You asked him, should I take my socks off too?

6       A       Yes.

7       Q       And he asked you if you'd be comfortable he said

8   because this massage is going to be a little different than the partial body

9   massage, right?  He told you that?

10      A       He stated right when we walked in the room this was

11  going to be different from what you had before.  That's how he said that.

12      Q       And you said, okay.  Right?  Right?

13      A       Yes.

14      Q       And he even said something about I believe you

15  testified that he said, this may involve pelvic area?

16      A       Yes.

17      Q       And you said that's okay.  Right?

18      A       If I knew what he really meant by that, I never would

19  have been okay with that.

20      Q       And once you felt him what you say was his hands or

21  fingers in a certain place, did you object?  Did you object?

22      A       No.

23      Q       Did you tell him, no, don't do that?

1      A      When I was laying face up and when he touched me

2      down there as I testified earlier that's when I stopped it.

3      Q      When he had his hand as you say on your right

4      buttock, did you object?

5      A      No.

6      Q      Did you tell him you didn't like that?

7      A      No.

8      Q      Did you tell him you felt uncomfortable?

9      A      No.

10     Q      When you felt his fingers in the crease of your butt,

11     did you tell him you felt uncomfortable about that?

12     A      No.  I was scared because I didn't know what to do.

13     Q      Did you tell him not to do that?

14     A      No.

15     Q      Did you object at all?

16     A      No.

17     Q      When you said you felt a sensation what you called a

18     hand putting pressure in your vagina area in the—I think that you said in

19     your labia, bikini area, did you tell him you felt uncomfortable about that?

20     A      No.

21     Q      At times during massages Dr. Bradley asked you, is

22     this okay.  Right?

23     A      Yes.

1           Q      He did that when he was massaging your back.  He

2  would ask you that too, is this okay?

3           A      It seems more like he would say that when he was

4  touching me inappropriately.

5           Q      He said it differently when he touched you

6  inappropriately?

7           A      He didn't ask me when he was touching my back.

8           Q      He never asked you if he was putting too much

9  pressure in a certain spot?

10          A      Yes.

11          Q      If he's massaging the back of your thighs, he would

12  say, am I putting too much pressure, right?

13          A      Yes.

14          Q      As a matter of fact, not only him but Dr. Val, the

15  massage therapist, Val would ask you when she was massaging you,

16  right?

17          MR. KOUGAIS:  Objection.  What another doctor would do?

18  Another unrelated event.

19          THE COURT:  Sustained.

20       BY MR. AMIRANTE:

21          Q      She's had massages from Dr. Val, not full body but

22  other massages, right; not Dr. Val but Ms. Val?

23         A      Yes.

24         Q      And you had massages from Ms. Nancy, right?

1     A  Yes.

2     Q  And when they give their massages, they will ask you

3 from time to time is this okay or am I pressing too hard?

4     A  Yes, but it's not when they are touching my vagina.

5     Q  Is the only time Dr. Bradley asked you that was when

6 he was touching your vagina?

7     A  No.  When he would touch my chest he would ask

8 that as well.

9     Q  He asked you, accordingly to you, according to when

10 he was touching the vagina, he asked, is this okay, and what did you tell

11 him?

12     A  He asked if it hurt when he was touching my labia.

13 He asked me if it hurt when he was touching me there.

14     Q  What did you tell him?

15     A  I said, no.

16     Q  Did you continue by saying move your hand?

17     A  I was scared so I didn't' say that.

18     Q  You were scared?  You had your eyes closed, right?

19     A  Yes.

20     Q  You told the prosecutor that Dr. Bradley's hand was in

21 the form of a J or a C of some sort, is that what you testified to?

22     A  I was trying to show with my hand how it felt.

23     Q  How it felt?

1          A     I didn't say this is what his hand looked like because I

2    didn't see his hand.

3          Q     So you're testifying to the sensation you felt, is that

4    right?

5          A     Yes.

6          Q     And the sensation that you felt was-- felt like

7    somebody's hand was in the form of a J or a C?

8          A     I felt somebody's hand was touching my vagina.

9          Q     Now, when you have had other massages from the

10   other massage therapists there, Ms. Val, Ms. Nance or anybody else and

11   perhaps Dr. Bradley, isn't it a fact you can be touched in one spot and you

12   get a sensation like you're getting touched in another spot?

13        A     I don't understand the question.

14        Q     You have scoliosis, right?

15        A     Yes.

16        Q     You get electrical treatments on your back for some of

17   your treatment?

18        A     Yes.

19        Q     You have massage therapy on your back and your

20   legs and other parts of your body, right?

21        A     Yes.

22        Q     Sometimes when one of the massage therapists

23   presses a spot on your back, you can feel that in your leg, can't you?

1          MR. KOUGAIS:  Objection.  Is this in reference to the electro

2    shock?

3          THE COURT:  I don't know.  If she understands, she may

4    answer.

5          THE WITNESS:  Ask one more time, please.

6          BY MR. AMIRANTE:

7          Q    I'm saying sometimes doesn't it feel like—say you're

8    being touched on your lower back, okay?

9          A    Uh-huh.

10         Q    You're being massaged.  Somebody presses on your

11    lower back?

12         A    Uh-huh.

13         Q    Can you sometimes feel sensation in your upper leg

14    or your butt when somebody is pressing on your lower back?

15         A    Not that I have experienced.

16         Q    You never experienced that?

17         A    I don't believe so.

18         Q    And you never saw Dr. Bradley touch your area, did

19    you?  Did you ever see his fingers touch your vagina?

20         A    No.

21         Q    You felt like fingers were touching your vagina?

22         A    Yes.

23         Q    You said that he brushed up against your vaginal

24    area?

1       A       Yes.

2       Q       And you testified under counsel's examination that

3  you felt, first you said what you thought was an erection.  Then you

4  changed, you said it was an erection?

5       A       In my opinion it was.

6       Q       And you said it touched part of your body, right?

7       A       Yes.

8       Q       And for how long did this thing that you thought was

9  an erection touch part of your body?

10      A       I don't know.  It was brief.

11      Q       Split second?

12      A       I don't know.

13      Q       What part of your body did this alleged object touch?

14      A       My arm.

15      Q       Your elbow maybe?

16      A       My arms were bent and my elbows kind of hung off

17  the table a little bit.

18      Q       Your elbow was hanging off the table.  Dr. Bradley

19  was leaning over the table giving you a massage and at one point you

20  thought with your elbow just briefly you may have felt—I don't know what

21  you called an erection?

22      A       Yes.

23      Q       Do you know for sure what your elbow touched?

24      A       In my mind I'm sure.

1    Q    In your mind you're sure?

2    A    Yes.

3    Q    Do you know for sure?

4    A    I mean I didn't' see anything so I can't say that I saw

5    it.  But in my mind I'm sure of what I testified to.

6    Q    In your mind you're sure that Dr. Bradley's fingers

7    touched you that day in an area that you said you didn't want him to touch

8    you?

9    A    Yes.

10    Q    When you went into that room that morning at about

11    11:00 o'clock, I asked you earlier if that was a massage.  This was a

12    massage?

13    A    Yes.

14    Q    There was sort of a bed or table in there covered with

15    sheets, right?

16    A    Yes.

17    Q    And there are also in that room a number of towels

18    and other sheets folded, aren't there?

19    A    I'm not sure about that.

20    Q    Well, you go into this office two or three times a week,

21    don't you?

22    A    Right, but there is always a towel on the table.  I

23    never had to look for anything so I'm not sure.  I really don't know if there

24    were any other towels.

71

1          Q        Two or three times a week for at least two maybe

2     more years, is that right?

3          A        Yes.

4          Q        And on this particular day you were—And you have

5     been in other doctor's offices, right?

6          A        Other chiropractors?

7          MR. KOUGAIS:  Object to the form of the question.

8          THE COURT:  Sustained.  Irrelevant.

9     BY MR. AMIRANTE:

10         Q        You said you totally disrobed.  You didn't put anything

11    on?

12         A        On the day of the 16th, I totally disrobed.

13         Q        You totally disrobed and didn't put any clothes on?

14         A        Right.

15         Q        Did you put any coverings on?

16         A        I had the small hand towel that he had on the table for

17    me, and that's what he told me to cover myself with.

18         Q        There was sheets on the table?

19         A        There was one sheet and it was secured onto the full

20    mattress.  It's the one that you can't move.

21         Q        No other sheets in that room?

22         A        There may have been, but there was nothing on the

23    table other than that sheet that was on the full mattress and the small

24    towel he gave me and told me to cover up with.

1    Q    There were no other towels in that room?

2    A    I don't know.

3    Q    Did you look for something to cover yourself?

4    A    No.

5    Q    So you sat there naked?

6    A    I layed there as he told me, face down, and put the

7    towel on my rear as he told me.

8    Q    So you layed naked with a little towel on your rear

9    end?

10    A    Yes.

11    Q    And you-- and at one point I believe you testified that

12    you had-- you told Dr. Bradley that you had to go to the bathroom?

13    A    Yes.

14    Q    And he gave you at that time two like doctor's robes

15    or gowns to put over you, right?

16    A    Yes. He had to leave the room to go get them.

17    Q    That was after the time when you say he was

18    touching you inappropriately, right, because you said you felt

19    uncomfortable because he put his hand on your belly. And so you said

20    even though I don't have to go to the bathroom I'm going to tell him I have

21    to go to the bathroom, isn't that what you testified?

22    A    Yes.

1        Q     When you said I have to go to the bathroom, he gave

2    you not one gown but two gowns.  Did he go to another room to get those

3    towels, to get them?

4        A     He left the room.

5        Q     He gave you two gowns?

6        A     Yes.

7        Q     And did you put these gowns on?

8        A     Yes.

9        Q     And you went into the bathroom?

10       A     Yes.

11       Q     And he was gone?

12       A     Yes.

13       Q     And this was after you felt that he had touched you

14    inappropriately?

15       A     Yes.

16       Q     And you went back in to get more?

17       A     Yes.  But can I answer—

18       Q     You not only went back in to get more of this

19    inappropriate touching, Ma'am, you went back in the room and you took

20    off not one gown but both gowns, didn't you?

21       A     Yes.

22       Q     And you proceeded to put this little tiny towel you said

23    was in there on you again, is that right?

24       A     Yes.

1    Q    And this is after you were upset what he was doing?

2    A    Yes.

3    Q    And then after that he began to massage you again,

4    and you said he touched you further inappropriately, right?

5    A    Yes.

6    Q    You said he touched your breasts?

7    A    Yes.

8    Q    Did he touch your nipples?

9    A    I believe so.

10    Q    You believe so?  In your mind do you believe he

11    touched your nipples?  Mrs. Kelley, in your mind do you believe he

12    touched your nipples?

13    A    Yes.

14    Q    Did you tell the police office when you talked to the

15    police officer that Dr. Brad touched your nipples?

16    A    I don't think I said nipples exactly.  I said he touched

17    my breasts.

18    Q    So you told the police officer he touched your breasts,

19    but you didn't say he touched your nipples?

20    A    He touched my entire breast.  My nipple is part of my

21    entire breast.

22    Q    Is that what you told the officer when he interviewed

23    you?

24    A    I said, he fondled my breasts.

1    Q    Did the officer ask you where he fondled your

2    breasts?

3    A    What do you mean, where?  I'm mean, I'm confused.

4    MR. KOUGAIS:  I'll object to the form of the question.

5    THE COURT:  Sustained.  Ask another question, counsel.

6    BY MR. AMIRANTE:

7    Q    After all this allegedly occurred, you got up off the

8    table, right?

9    A    Yes.

10    Q    And then you—Dr. Bradley left and then you walked

11    out into the waiting area, right?

12    A    Yes.

13    Q    And in the waiting area Karen Muir was there, right,

14    receptionist?

15    A    Yes.

16    Q    And the other lady, Bernice, the office manager was

17    there?

18    A    I don't know who Bernice is.

19    Q    There were other people there, right?

20    A    In the waiting room it was only me and Karen was at

21    the desk.

22    Q    Karen Muir?

23    A    Yes.

24    Q    There were other patients there at the time too, right?

1    A    The only one I saw is when I walked by the room that

2    he was in adjusting somebody.  There was a woman in there he was

3    adjusting.

4    Q    And you were very-- I think you told counsel, you

5    were very, very upset about what had happened, right?

6    A    Yes.

7    Q    But in spite of being so upset, you never objected

8    because you felt like you did something wrong, isn't that what you said?

9    A    Yes.

10    Q    You didn't want to show Karen how upset you were

11    because you felt like you had done something wrong and you didn't want

12    to show Karen that, is that correct?

13    A    I was in shock and didn't know what just happened.

14    Q    So you didn't know what just happened?

15    A    I thought I did something wrong.  I felt like it was—

16    Q    You felt guilty?

17    A    I trusted him so much.

18    Q    Did you feel guilty?

19    A    No.

20    MR. KOUGAIS:  Objection.  I ask that she be allowed to

21    answer the question.

22    THE WITNESS:  No.

23    THE COURT:  I'll let the answer, no, stand.  Overruled.

24    BY MR. AMIRANTE;

77

1    Q    Now, you went out there and you said you were upset

2    and you proceeded to talk to Karen, is that right?

3    A    No, I didn't speak with her.

4    Q    Didn't you make an appointment to go back?

5    A    I made the appointment when I first got there as I

6    testified to.

7    Q    That's what you testified to under oath?

8    A    Yes.

9    Q    But when you talked to the police officer about

10   this incident the next day, you told the police officer that you made

11   the appointment after you went back out.

12   A    I talked to the police officer that night, not the

13   next day, and he had misinterpreted that in the police report.  I did

14   not make it after the appointment.  I made it when I first got there

15   and was waiting in the waiting room.

16   Q    So, if the police officer in his sworn police

17   report says that you told this police officer that you made the

18   appointment when you went back in the room, this officer would be

19   lying and he misinterpreted what you said?

20   A    Yes.

21   MR. KOUGAIS:  Objection.

22   THE COURT:  I'll let the answer stand, yes.

23   THE WITNESS:  It had to be a typo because I sat

24   there and told him that I made it when I was in the waiting

78

1    room.  I'm assuming that it was a typo or a misinterpretation

2    on his part.

3    BY MR. AMIRANTE:

4         Q    You have gone over the police report, right?

5         A    I read it twice.

6         Q    And you know that is it says something

7    differently than what you testified to today?

8         A    Right, and that's why I'm here telling you what

9    was correct.

10        Q    Did you ever tell the police officer that he put it

11   in there wrong?

12        A    No.

13        Q    When you said he misinterpreted you,

14   shouldn't you have told him that he did something wrong in that

15   report?

16        MR. KOUGAIS:  Objection.

17        THE COURT:  Sustained.

18   BY MR. AMIRANTE:

19        Q    Well, was it true though you went out of this

20   room after you were so upset and Dr. Bradley came back out then,

21   right?

22        A    Yes.

23        Q    You didn't leave the office and go home?

24        A    No.

1    Q    You didn't tell Karen what happened, did you?

2    A    No.

3    Q    You didn't tell anybody else at the office what

4    happened to you?

5    A    No.

6    Q    You didn't go right to the police department or

7    go home and say what happened to you, did you?

8    A    Say that one more time.

9    Q    As soon as you walked out of this massage

10   room, you went back into the waiting room and you stayed there,

11   didn't you?

12   A    For about five minutes until he came back.

13   Q    After five minutes this man who you said just

14   did these things to you asked you to come back in to do an

15   adjustment, isn't that right?

16   A    Yes.

17   Q    And an adjustment entails touching your body,

18   does it not?

19   A    Yes.

20   Q    Did you object to going back in and having this

21   man touch your body?

22   A    Do I object now?

1    Q    Did you object to go back in right after you said

2    you were offended, did you go back in and have the same man

3    touch your body again?

4    A    Did I object to going back in?  No.  I skipped

5    the therapy because I wanted to get out of there, but then he

6    stopped me and said wait for a minute, I'll adjust you.

7    Q    What you skipped was the electrodes, right?

8    A    Yes.

9    Q    Dr. Bradley doesn't even do the electrodes?

10    A    I know, but it takes twenty minutes, and I

11    wanted to get out of there.

12    Q    You took the time to wait for Dr. Bradley to take

13    your body again but you couldn't take the time to have the woman,

14    the female person who does the electrodes with your clothes on to

15    do that?

16    A    I wanted to get out of there.  That would have

17    taken twenty more minutes of being in that office, and I wanted to

18    get out of there.

19    Q    But you had enough time to have Dr. Bradley

20    touch your body again?

21    MR. KOUGAIS:  Objection.

22    THE COURT:  I'll sustain the objection.

23    BY MR. AMIRANTE;

1          Q       After you went back in and had your

2    adjustment, you left?

3          A       Yes.

4          Q       And you went home and took a shower?

5          A       I stopped at my parents' house and then I

6    drove home and took a shower.

7          Q       You called this girlfriend?

8          A       Yes.

9          Q       Called your mom?

10         A       Yes.

11         Q       And you weren't feeling very good about

12   yourself?

13         A       What do you mean by that?

14         Q       You said you had to take a shower?

15         THE COURT:  Is there a question pending, Counsel?

16         MR. AMIRANTE:  I'll withdraw that.

17         THE COURT:  Leave to withdraw.

18         MR. AMIRANTE:  Judge, if I may have a minute?

19         THE COURT:  Surely.

20         BY MR. AMIRANTE:

21         Q       You never worked at the chiropractor's office,

22   right?

23         A  I did.

24         Q       You did?

1    A Before he owned it.

2    Q You worked for Dr. George?

3    A Yes.

4    Q Did you ever work for Dr. Bradley?

5    A Nope.

6    Q You're familiar with chiropractor techniques in

7 the office, right?

8    A I worked in the office when it was owned by Dr.

9 George for about two months because I needed a medical job for

10 my—

11    Q Pardon?

12    A I needed a job in the medical field for my senior

13 health class, so I got a job there worked at the front desk for two

14 months.  That was my extent about learning about the chiropractic

15 business or whatnot, answering phones.

16    Q And you worked with the insurance and things

17 like that?

18    A No.

19    Q Insurance documents?

20    A No.  I answered phones.  It was a basic job.  I

21 was seventeen in high school, so it was basic receptionist job.

22    Q Was Dr. George a successful chiropractor?

23    MR. KOUGAIS:  Objection.

24    THE COURT:  Basis?

1          MR. KOUGAIS:  Relevance.  Dr. George?

2          THE COURT:  How is that relevant, counsel?

3          MR. AMIRANTE:  Going to motive, Judge.

4          THE COURT:  Whether the other doctor was

5    successful?

6          MR. AMIRANTE:   Her knowledge of the amount of

7    money brought into an office.

8          THE COURT:  Well, I'll sustain it as to Dr. George.

9    You can ask about your client, but Dr. George, I don't see how

10   that's relevant.

11         BY MR. AMIRANTE:

12         Q      What kind of work do you do?

13         A      I already said that I'm not working currently.

14   My last day was two days ago.  I was in marketing for ten years.

15         Q      Were you on disability for a while?

16         A      Disability, no.

17         Q      Were you off work and had Dr. Bradley write

18   you a letter?

19         A      Did he write me a letter for what?

20         Q      The kind of treatment you were getting?

21         A      Can you be more specific?

22         Q      Were you trying to collect some sort of

23   unemployment or some sort of--

24         A      He never wrote me a letter.

84

1    Q    He never wrote you a letter?

2    A    I don't think so.

3    Q    But you were trying to do that, weren't you?

4    A    What?

5    Q    Trying to collect some sort of unemployment or
6  disability?

7    A    No.  I asked him how unemployment worked
8  because I got laid off at my job.  I don't think he ever wrote me a
9  letter.  I don't remember anything about that.

10    Q    Did you ask Dr. Bradley how unemployment
11  worked?

12    A    Well, because I got laid off because of my
13  back.  I had to miss too many days because of my back pain.

14    Q    You missed a lot of time from work so you
15  missed a lot of money from work, right?

16        MR. KOUGAIS:  Objection.

17        THE COURT:  Overruled.  You may answer.

18        THE WITNESS:  You mean--

19    BY MR. AMIRANE:

20    Q    What does your husband do for a living?

21    A    He's a carpenter.

22    Q    Employed steadily?

23    A    Yes.  He's a carpenter.  That's what he's been
24  doing for six years.

85

1      Q    Does he work on his own?

2      MR. KOUGAIS:  Objection.

3      THE COURT:  Sustained.

4      MR. AMIRANTE:  Nothing further.

5      THE COURT:  Thank you.

6      Redirect by the State?

7      REDIRECT EXAMINATION

8      BY

9      MR. KOUGAIS:

10      Q    Counsel asked you questions about other

11  massages that you have had with other doctors.  Do you remember

12  when he asked you those questions?

13      A    Yes.

14      Q    He asked you about Dr. Val, Ms. Nancy, Dr.

15  George?

16      A    Yes.

17      Q    You have had massages from these people?

18      A    From Val and Nancy, not Dr. George.

19      Q    You had on more than one occasion with each

20  of these individuals?

21      A    Did I have a massage from these others?

22      Q    Yes.  From Val and Nancy?

23      A    Yes.

1    Q    At any time with these other massages did any

2    of them ever touch your vagina?

3    A    No.

4    Q    Or your breasts?

5    A    No.

6    Q    Including the nipple?

7    A    No.

8    Q    As Counsel asked?

9    A    No.

10    Q    In fact, other massages that you had had from

11    the Defendant, did he ever make contact with your vagina or your

12    breasts or your nipples?

13    A    With the Defendant?

14    Q    Other than this incident on October 16th?

15    A    Yes.

16    Q    Were there other, other than October 16th, the

17    day we are talking about, had you had other massages with the

18    Defendant?

19    A    Yes.

20    Q    On those other occasions not October 16th, did

21    he ever make contact with your vagina?

22    A    No.

23    Q    Your breasts?

24    A    Yes.

1    Q    Was the contact on the other occasions the

2    same contact that he had on October 16th?

3    A    Can you—

4    Q    --You testified that the Defendant on other

5    occasions when he is giving you massages, he never had contact

6    with your vagina, right?

7    A    Right.

8    Q    But he did have contact with your breasts?

9    A    Right.

10    Q    How did that contact differ from the contact you

11    discussed that occurred on October 16th?

12    A    I had a gown on.  I mean, is that what you

13    mean?

14    Q    Well, what was different?

15    A    I had a gown on.  It opened in the front, but he

16    touched my breast under the gown and said he wanted to loosen

17    my upper area or muscles under my breast that he wanted to work

18    on.  So I think the difference with that is I really believed that that

19    was a medical reason.

20    Q    Earlier Counsel asked you some questions on

21    cross-examination as to how you felt and you testified you didn't—

22    You felt guilty and you started to say you trusted him so much and

23    then you were cut off.  How did you feel at that time after you

1    were—the Defendant had contact with your vagina or/and your

2    breasts?

3          A    On the 16th?

4          Q    On the October 16th?

5          A    I was basically in shock, and I couldn't get a

6    grasp on what just happened and I trusted him so much over the

7    last two years and had so much respect for him that I was—it was

8    like disbelief at that point.  I mean I couldn't believe that it really

9    happened.  He would have been like-- I just trusted him.

10          Q    What did you believe had happened on this

11    occasion that was different from any other occasions then?

12          A    He touched my vagina which never happened

13    before and it was the whole thing was just different.

14          Q    Counsel asked you some questions about what

15    the police report stated.  Did you write that police report?

16          A    No.

17          Q    Are you a police officer?

18          A    No.

19          Q    You said you reviewed that police report on

20    two separate occasions?

21          A    Yes, yesterday when I first got it.

22          Q    You didn't review it today, did you?

23          A    No.  I tried not to read it because it's hard to

24    read for me.

1              THE COURT:  What?

2              THE WITNESS:  It's hard for me to read and think

3      about it.

4              BY MR. KOUGAIS:

5              Q       Counsel asked you after Defendant made the

6      inappropriate contact with you on October 16th ,when you had

7      wanted to skip that portion of the testing the—I think the electro

8      therapy, and you declined to do that, is that right?

9              A       Yes.

10             Q       And you said that that would have taken an

11     additional twenty minutes and you just wanted to get out of there, is

12     that correct?

13             A       Yes.

14             Q       At any time did you talk to anybody in the office

15     when you left as to what had happened?

16             A       No.

17             Q       You didn't tell them anything about it, right?

18             A       No.

19             Q       You testified earlier that you had said that even

20     with Karen in there you didn't want to let her know or express your

21     emotions to her, is that right?

22             A       No.

23             Q       Why was that?

1          A       I didn't want her to think something was wrong.

2   I just wanted to pretend it never happened.

3          Q       Were you blaming yourself for something that

4   had happened?

5          A       Yeah.  I mean, I have never been through

6   anything like that before, and I couldn't believe he did that and I felt

7   like maybe I did something wrong.

8          Q       You had known this Defendant for at least two

9   years from the testimony, is that right?

10          A       Yes.

11          Q       In that entire two-year period other than the

12   October 16th date, had there ever been any contact with your

13   vaginal area by the Defendant or by any other doctors or staff at

14   that clinic?

15          A       Never.

16          MR. KOUGAIS:  May I have one moment, please?

17          THE COURT:  Sure.

18          MR. KOUGAIS:  Nothing further.

19          THE COURT:  Any recross?

20                  RECROSS EXAMINATION

21                  BY

22                  MR. AMIRANTE:

23          Q       All these other massages, this was your first

24   ever in your life your first full body massage?

91

1    A    From a doctor, yes.

2    Q    You have had full body massages?

3    A    I had one other one the week of my wedding at

4    a spa which is why I originally canceled the appointment with him.

5    He wanted to do it before my wedding.  He said he did it for all his

6    brides to be, and he wanted me to have this massage.  Well, I

7    ended up going to the spa the week of my wedding to get other

8    treatments for the wedding and one of the treatments had a full

9    body massage as part of the deal.  So I canceled it with him and

10    went to the spa and had that one done.

11    Q    So this wasn't your first full body massage?

12    A    From a doctor.

13    Q    You had one from a spa?

14    A    Yes.  But she's not a doctor.

15    Q    So you knew what to expect from a full body

16    massage, right?

17    A    Not from a doctor's point.  A doctor's massage

18    is more medical.  I would think it would be different.

19    Q    Well, a full body massage is a full body

20    massage, right?

21    A    I don't know.  I don't know much about that.  I

22    have had two now in my life and that's all I have to base upon.

23    Q    Didn't you just tell me a little while ago and tell

24    this gentleman that this was your first full body massage?

92

1    A    Yeah, from a doctor.

2    Q    You are under oath today?

3    A    Yes, I am.

4    Q    When he asked you the question when this

5    gentleman asked you the question, and I asked you the question,

6    did you say this was my first full body massage from a doctor?  Is

7    that what you said?  Is that what you said?

8    A    Can you repeat that, please?

9    Q    When the gentleman standing to my left, the

10    State's Attorney, and I, the defense lawyer, both asked you this,

11    was this your first full body massage, you answered under oath,

12    yes?  Isn't that true?

13    A    I guess I did but—

14    Q    When you got on that witness stand today or

15    when all these other witnesses out here you raised your right hand

16    and you said I swear to tell the truth, the whole truth, and nothing

17    but the truth?

18    A    Yes, and I am.  I am telling the truth.

19    Q    So because we left out the word from a doctor

20    you thought it wasn't important to tell Judge Hanlon that you had

21    another full body massage only within a few months before this?

22    A    But that to me, that is totally different.  I didn't

23    even know at the spa they were called full body massages.  It's part

24    of another treatment and they gave me a massage with it.

1          Q       After the body massage in your spa treatment,

2    did they put a little tiny towel on your butt?

3          A       No.

4          Q       Did they—

5          A       I wasn't naked for that either.

6          Q       So you didn't lay on a table with no clothes on

7    in the nude?

8          A       It was like a different massage.  It was part of

9    this other treatment that I was getting.  It wasn't one from a doctor

10   that would—that I would think would be more medical and—

11         Q       So there's a difference in the medical for not

12   putting your clothes on at all and getting one at the spa?  What did

13   you put on at the spa?

14         A       What did I have on?

15         Q       Yeah.

16         A       I had on my underwear.

17         Q       So you left your underwear on?

18         A       Yes.

19         Q       Bra and your panties?

20         A       Yes.

21         Q       And the person massaged your whole body?

22         A       Not my entire body.

23         Q       Was this a man or a woman?

24         A       A woman.

1       Q       Were you nervous when you got that?

2       A       When I had the one at the spa?

3       Q       The first full body massage?

4       A       No.

5       Q       Were you scared about it?

6       A       I was covered with the sheet the whole time,

7    and I wasn't nervous.

8       Q       Would you tell Dr. Bradley that you had a full

9    body massage a few weeks ago, and you were covered with a

10   sheet?  Why am I not covered with a sheet now?  Did you tell him

11   that?

12      A       No.

13      Q       Did you object to your not being covered with a

14   sheet?

15      A       Did I tell him that I wanted—say that one more

16   time.

17      Q       Let me go onto something else.

18              You said you objected to what the police officer

19   wrote in the report.  It was wrong, right?  What the police officer

20   wrote was wrong.  It's not what you said about making the

21   appointment?

22              MR. KOUGAIS:  Object.  It was clarified.  I withdraw

23   the objection.

1           THE COURT:  The objection was withdrawn.  You

2  may answer the question.

3           BY MR. AMIRANTE:

4           Q     You told the police officer you were making an

5  appointment.  You told him that you made an appointment after the

6  massage, went right out of the office and made another

7  appointment to come back the following week.  Today you're saying

8  that didn't happen.  That you made the appointment before you had

9  the massage?

10          A     I told the officer I made the appointment when I

11  was in the waiting room.  It must have been misinterpreted.  That's

12  why it's wrong.  I did not say I made the appointment after the

13  massage.

14          Q     Before you testified today you had the

15  opportunity to talk to the States Attorney, and you have talked to

16  the other State's Attorney and other police officers?

17          A     I didn't talk to any police officers.  I talked to

18  the State's Attorney.

19          Q     And you had an opportunity to read the report

20  not once but twice, right?

21          A     Yes.

22          Q     You had an opportunity to bring that up to the

23  State's Attorney that this was wrong, is that right?

24          A     Yes.  And I did.

1    Q    You told him it was wrong?

2    A    Yeah, I did.

3    Q    You told him it was wrong what the police

4    office said?

5    A    I said what was on the report was wrong.  That

6    I actually made the appointment when I first got there.

7    Q    Before today, you never correct it?

8    A    I didn't know if it was my place.  I didn't write

9    the report.  I know what I told him.

10    MR. AMIRANTE:  Nothing further.

11    THE COURT:  State?

12    MR. KOUGAIS:  I have one question.

13    FURTHER EXAMINATION

14    BY

15    MR. KOUGAIS:

16    Q    In regards to this other full body massage that

17    you had at the spa prior to the one you had on October 16th , that

18    full body massage, did that—I believe you said it was a female

19    masseuse, is that correct?

20    A    Yes.

21    Q    Did that individual ever fondle your vagina?

22    A    No.

23    Q    Did she ever fondle your breasts?

24    A    No, not even close.

1          MR. KOUGAIS:  Nothing further.

2          THE COURT:  Okay.  Thank you.

3          Counsel for the defense, nothing else based

4     upon that?

5          MR. AMIRANTE:  No.

6          THE COURT:  All right.  Thank you very much.  You

7     may step down.

8          State, call your next witness.

9          MR. KOUGAIS:  Judge, nothing further.  People rest.

10          THE COURT:  State rests.

11          Counsel for the defense?

12          MR. AMIRANTE:  I move for a directed finding at this

13     time.

14          THE COURT:  Would you like to argue that motion?

15          MR. AMIRANTE:  Judge, well, just as I indicated in

16     my opening statement, your Honor, you're looking at this case in

17     the light most favorable to the State's witness, one witness, no

18     corroboration, nothing.  You heard the testimony.  You heard it at

19     length.  I don't have to belabor it, but she testified as to what I said

20     she would testify to.

21          She goes to the office.  I mean, you have to

22     use your common sense here, Judge.  How can anybody fathom—

23     let's say she was too timid to say anything.  Let's assume arguendo

24     that this happened.  Okay.  Her testimony, you have to believe her

1  testimony.  It happened.  She goes in there and gets this massage,

2  and she feels uncomfortable.  Now, we find out she had another

3  massage a few weeks, a couple of months before this.  She knows

4  what a full body is.  Now she say's she's uncomfortable.  Never one

5  time objects.  Never says, Doctor, don't do that.  Doctor, I feel

6  uncomfortable.  Doctor, please, you know, maybe we shouldn't do

7  this.

8          Now, let's assume she's timid.  Let's take a

9  percentage in the world of women who are timid and she's not—

10  she's afraid because he's a doctor or for whatever purposes, she's

11  afraid to say anything.  She feels guilty about it, bad about it.  She

12  doesn't say anything.  She's too timid.  Many, many women would

13  say, hey, don't do that.  If you're doing something inappropriate.

14  Why are you doing that?  Let's give her the benefit of the doubt and

15  say she's timid.

16          Now, the doctor leaves the room.  Gives her --

17  and it's her testimony not our defense, Judge, but her testimony, he

18  gives her robes because she says has to go to the bathroom, gives

19  her gowns to put on.  She puts the gowns on and leaves the room

20  and has an opportunity to leave and not come back if she feels so

21  violated, so uncomfortable, leave and not come back and the

22  doctor is gone from the room.  What does she do?  Goes right back

23  into the same room where she allegedly got touched

24  inappropriately, where she got violated, and puts herself back on

1      the bed again and not only puts herself back on the bed where

2      she's allegedly objecting to this touching of an insulting and

3      provoking nature, I think that's what was in the complaint says.

4      She takes the gowns off, Judge.  Not one gown but both gowns that

5      the doctor gave her and lays back on the table.  This is if you are to

6      believe what she is saying, lays on the table naked again, and puts

7      the little towel back over herself, allegedly.  This is what she's

8      saying, if you would believe this testimony.

9              Now, after this is done, now she says the

10     doctor again touches her inappropriately.  She tells you she never

11     told the police officer, but today she comes up with, he touched my

12     nipples, and she never said that before, and self-admittedly never

13     said that before.

14              Today she says she made an appointment

15     before she went in for the massage, a future appointment.  Self-

16     admittedly she says she told the officer;  that he interpreted it

17     differently than what she told him.  But then she goes back in there

18     to finish this massage.  The massage is over.  She now leaves,

19     Judge.

20              Now, we are talking about, I think, one hundred

21     percent of all women in the world, now if she's too timid to say

22     anything to him, if she's too afraid to walk out with the gowns on,

23     she's now fully clothed, fully clothed, out of his presence, he's

24     away.  She goes back into the lobby, waiting room.  There's other

1   women there, some other people around.  She knows she doesn't

2   look upset, so she tries to have your Honor believe, well, I was

3   upset but I don't want to look upset because I felt guilty, and  I

4   didn't want anybody else to know I was upset.

5                    Why wouldn't she want anybody to know that

6   she's upset?  She gets allegedly violated by some man, and she

7   doesn't want anybody to know she's upset about it, and goes back

8   in?  Now, she has an absolute one hundred percent opportunity to

9   walk out of the place, go home, and take her shower and tell the

10  world, tell the policemen, tell her sister-in-law, her mother, her

11  husband, anybody she wants to tell about this.  What does she do?

12  It's by her own statements, Judge.  She waits there, sits there in the

13  waiting room.  The doctor comes.  She skips the electrodes

14  because she doesn't want to be there for twenty minutes.  That the

15  man isn't even going to do.  That Dr. Bradley isn't going to do that.

16  His female assistants are going to do, skips that, and once again to

17  get touched and get adjusted by the man who allegedly just

18  violated her.

19                    If this isn't the most unbelievable story you can

20  ever imagine, I don't know what is.  In my opening statement I know

21  there was an objection when I said, Judge, you're an experienced

22  lawyer, an experienced judge, a female, yourself.  If you take that

23  whole scenario, and again, you don't object.  Maybe fifty percent of

24  the women wouldn't say anything.  They are too scared.  But what

1    about the scenario, I don't think there is any shadow of a doubt that

2    -- why would any woman go back in there to get their body touched

3    by this guy if she had a perfect opportunity to leave.  And it makes

4    no sense at all, your Honor, and because it makes no sense at all,

5    and I don't know what her motive is.  I don't know why she's saying

6    this.  Maybe she felt guilty about the full body massage.  Maybe

7    she felt he came close to her, her pubic area or something.  I don't

8    know what it is, Judge, but I do know it's preposterous.

9              And at this point, even at this point, Judge,  the

10   State needs to prove evidence that would convince your Honor or

11   the trier of fact that my client is guilty beyond a reasonable doubt.

12             Based upon the testimony, your Honor, without

13   having  any corroboration, whatsoever, I would ask your Honor to

14   discharge my client at this stage of the proceeding.

15             THE COURT:  Thank you, counsel.

16             State?

17             MR. KOUGAIS:  Judge, you heard from this young

18   lady and at this point this is the only witness you have heard from

19   and you saw her demeanor and saw how she testified.  She

20   answered all the questions, and she relived this horrific nightmare

21   all over again.

22             Here's a young lady who has had an ongoing

23   professional relationship with this guy for over two years, never had

1    an event like this occur before and all of a sudden October 16th she,

2    who not only worked in the same office and had been going to

3    other doctors prior to this Defendant having been having his own

4    employment there, and she had had other massages. This was a

5    unique one, a full body massage, but here's what you have to

6    consider.

7        If you're looking at the credibility, what axe

8    does she have to grind? Why is she here? Why would she

9    go through all this to put a case on him? For what? I would

10   submit to you if she was going to do that, why not just have

11   him having raped her? Penetrate her. Why would she just

12   say that as she testified, he brushed up against my vagina

13   several times. He had contact. He massaged my breasts.

14   He fondled my breasts. He then later actually fondled her

15   vagina. Again. And Counsel argues like why didn't she get

16   up and leave? There was an—she had not just met the guy

17   and walked in there. She was trying to figure out what

18   happened here. She still to this day is blaming herself for

19   what happened. She feels that she's somehow at fault, and

20   she's not. You heard the evidence. This guy was doing it.

21   He orchestrated the whole thing, and based on the testimony

22   you heard from this young lady, she has been consistent,

23   she's been honest, she's been straightforward, very brave to

24   come here and testify to everything that transpired.

1          And based upon that, Judge, we ask you to

2     deny the defendant's motion for a directed finding.

3          THE COURT:  Thank you.

4          In looking over my notes and reviewing the

5     testimony of the complaining witness, first of all I do believe that

6     Ms. Kelley was a credible witness.  I believed that she was upset

7     while she was testifying.  She was somewhat nervous, but I believe

8     she was credible.

9          Counsel for the defense made a valid

10     argument why in the world would she stay in that situation?  If the

11     Defendant actually touched her inappropriately during the

12     massage, why as counsel pointed out that fifty percent of the other

13     women in the world, wouldn't she have gotten up, told him to stop,

14     ran out of the office or done something?  I don't exactly know why.

15          She testified that she trusted him so much, that

16     she respected him.  She obviously felt that she had done

17     something wrong.  She felt guilty about it.  She felt bad.  She didn't

18     know, never had a full body massage from a doctor before.  She

19     had one before at the spa with her clothes on but this was a new

20     experience for her.

21          Something wasn't right, but she was not

22     comfortable enough to tell him to stop or get up and go.  It's a bit

23     troubling that she would come back into the room, and counsel

24     made that argument that after the Defendant gives her the gown

1    and she goes to the bathroom, why in the world would she come

2    back into the room and take off the gown and get back on the

3    table?

4              The testimony up until that point was that he

5    started the massage on her thigh, moved higher, moved the towel,

6    was massaging her butt at that point, her labia.  She didn't feel it

7    was right.  She was too embarrassed to say anything was wrong.

8              When she came back in, however, and got

9    back on the table for whatever reason, whatever reason she did

10   that, that is when she testified that she heard the Defendant open a

11   bottle of oil.  That she really felt him touching her vagina and she

12   was face up and then he was rubbing her clitoris and she at that

13   point said something was really wrong.

14             He said, I don't want you walking out of here all

15   weirded out.  He massaged her scalp for a couple of minutes, and

16   he was done and she dressed.  Again a little bit troubling if she

17   would have made that appointment when she came out to come

18   the next week, but she testified she didn't.  She testified as she was

19   waiting to see the doctor, she had time.  So she made an

20   appointment to come back the next week.  That was her testimony.

21             Apparently in some police report that is not

22   what it said.  I don't know.  I haven't seen anything, but Counsel

23   cross-examined her but, you know, if the police officer wrote in the

24   report and she pretty much acknowledged that, that that was in the

1    report.  The officer said that she made the appointment afterwards,

2    but she testified that was a mistake.

3                    At this point based upon her credibility, I

4    believe her and I'll deny your motion for directed finding.

5                    MR. AMIRANTE:  Judge, we are prepared to put on

6    our defense.

7                    THE COURT:  You may do so.

8                    MR. AMIRANTE:  Ms Karen Muir.

9                    THE COURT:  You may call her.

10                   State, there is a motion to exclude in effect

11   so—

12                   MR. KOUGAIS:  I'll let my victim know.  I may need to

13   call her in rebuttal.

14                   MR. AMIRANTE:  That's not appropriate rebuttal.

15                   THE COURT:  There is a motion to exclude and make

16   sure the witnesses understand what that means.  You take the

17   appropriate actions that you need.  I'm not going to give you a long

18   break.

19                   MR. KOUGAIS:  No, no, just to step outside.

20                   THE COURT:  Ma'am, you can come and have a seat

21   in the witness box if you will please.  You have already been sworn

22   so keep your voice up nice and clear.

23                   Counsel, proceed.

24                   KAREN MUIR,

1    Called as a witness, having been first duly sworn, was examined and testified as

2    follows:

3                                DIRECT EXAMINATION

4                                BY

5                                MR. AMIRANTE:

6        Q        Good afternoon, Ma'am.  Could you please state your name and

7    spell it for her Honor, Judge Hanlon, and the court reporter?

8        A        Karen Muir.

9        Q        Spell that, please.

10       A        M, as in Mary, U-I-R.

11       Q        And how old are you, Ms. Muir?

12       A        Forty-five.

13       Q        And what is your present job?

14       A        Receptionist.

15       Q        Where are you a receptionist?

16       A        Midwest Medical.

17       Q        And where is that located?

18       A        Hanover Park.

19       Q        And who do you work for?

20       A        Dr. Bradley Hayashi.

21       Q        Are there any other doctors who work there?

22       A        Dr. Natalie Frobish.

23       Q        Could you spell these names for the court reporter?

24       A        Hayashi, H-A-Y-A-S-H-I; Frobish is F-R-O-B-I-S-H.

1    Q    And who else works there with you?

2    A    The staff.

3    Q    And do you know who is on the staff?

4    A    Toots Musgrave.

5    Q    Toots?

6    A    Bernice Musgrave.

7    Q    Can you spell Musgrave?

8    A    M-U-S-G-R-A-V-E.

9    Q    What does she do?

10   A    She's the officer manager.

11   Q    Who else?

12   A    Lisa Herrington.

13   Q    What does she do?

14   A    She sits in the office along with Bernice.

15   Q    And who else?

16   A    There's Sherri Wilson.  She's a P.T.A.

17   Q    Meaning what?

18   A    Physical Therapist Assistant.

19   Q    Who else?

20   A    Anna Kous.  She's a physical therapist.  Val Taft, she's a massage

21   therapist.  Nancy Hallgren.  She's a massage therapist.  Nancy Craiger.  She's a

22   massage therapist.

23   Q    And Dr. Bradley Hayashi?

24   A    Dr. Bradley Hayashi.

1      Q     And Natalie—

2      A     Frobish.

3      Q     And you said for how long have you been so employed there?

4      A     Eight years almost total.

5      Q     You have worked there for how long for Dr. Hayashi and Dr.

6   Natalie?

7      A     A little over five years with Dr. Bradley.

8      Q     Before that who did you work for?

9      A     Dr. George.

10     Q     And for how long did you work with Dr. George?

11     A     A little over two years.

12     Q     And as part of the practice there did you set up appointments?

13     A     Yes, I do.

14     Q     And you keep an appointment book in the front of your office?

15     A     Yes, I do.

16     Q     Calling specifically—do you know a person by the name of Melaina

17   Kelley who used to be known as Melaina Romano?

18     A     Yes.

19     Q     Do you see her here today?

20     A     Yes.

21     Q     Is that the person who testified earlier?

22     A     Yes.

23     Q     How do you know her?

24     A     From a patient in the clinic.

1    Q    About how long to your knowledge has she been a patient in your

2    clinic?

3    A    She was a patient before I started there.

4    Q    So for Dr. George?

5    A    Uh-huh.

6    Q    And how do you know she was a patient before you started?

7    A    Because when I do the patient history, when I put the information in

8    the computer.

9    Q    So you're familiar with how long she's been there?

10   A    Uh-huh.

11   Q    Do you know why she's been going there?

12   A    That I don't recall.

13   Q    How often does she come in there?

14   A    She was coming in once a week, sometimes twice a week.

15   Q    Did she invite you to her wedding?

16   A    No.

17   Q    Did anybody from your office do you know get invited to her

18   wedding?

19   A    Yes.

20   MR. KOUGAIS:  Objection.

21   THE COURT:  The answer yes may stand.

22   BY MR. AMIRANTE:

23   Q    How many people got invited?

24   A    I know Dr. Bradley was invited.

| 1 | Q | Anybody else? |
|---|---|---|
| 2 | A | Not that I know of. |

3    Q    Now seven years or—I'm sorry.  You also—do you know anything

4    about Dr. Bradley's family?  Is he married?  Is he unmarried?

| 5 | A | Yes. |
|---|---|---|
| 6 | Q | He is married? |
| 7 | A | Yes. |
| 8 | Q | And who is he married to? |
| 9 | A | Debbie. |
| 10 | Q | Does he have any children? |
| 11 | A | Yes. |
| 12 | Q | How many children? |
| 13 | A | Two. |

14    Q    Now, you have gone over the facts of this case with me, have you

15    not?

| 16 | A | Yes. |
|---|---|---|

17    Q    I have asked you certain things and asked you what you

18    remembered?

| 19 | A | Yes. |
|---|---|---|

20    Q    And do you remember telling me something about Friday, October

21    13th?

| 22 | A | Yes. |
|---|---|---|

23    Q    That was—do you remember if Dr. Hayashi's wife was in the office?

| 24 | A | Yes. |
|---|---|---|

1    Q    And who was she with?

2    A    With her children.

3    Q    And was anybody else there at that time that day?

4    A    Standing up at the desk, yes.

5    Q    Who else?

6    A    Bernice Musgrave.

7    Q    Who else?  This was on Friday the 13th.

8    A    Yes.  She was standing at my desk.

9    Q    And who else?

10   A    Debbie was on the floor next to me with the girls.

11   Q    How did Melaina happen to be in there?

12   A    She walked out of the examining room where you get adjusted at.

13   She walked out of there into the waiting room.

14   Q    She was with--being adjusted with Dr. Brad?

15   A    Yes.

16   Q    Did she always ask for Dr. Bradley?

17   A    Yes.  Dr. Bradley was her doctor.

18   Q    And when she walked out of Dr. Bradley's office, did anybody

19   introduce her to Dr. Bradley's wife?

20   A    Dr. Bradley did.

21   Q    And did they talk or did they say anything to each other?

22   A    Yes.  Debbie stood up and introduced herself as being his wife, and

23   he introduced the girls to her.

1    Q    To your knowledge did she ever meet Dr. Bradley's wife before

2    that?

3         MR. KOUGAIS:  Objection.

4         THE COURT:  Overruled.  You may answer.

5         THE WITNESS:  No.

6         MR. AMIRANTE:  Motive.

7    BY MR. AMIRANTE:

8    Q    And now did she make an appointment on that day to come back?

9    A    Yes.

10   Q    When I say, she, I mean Melaina?

11   A    Yes.

12   Q    When was her next appointment?

13   A    The following Monday.

14   Q    What was that appointment for?

15   A    A massage.

16   Q    Anything else?

17   A    An adjustment.

18   Q    Anything else?

19   A    No.

20   Q    Electrode treatment too?

21   A    She gets electrical stem.

22   Q    Is that part of her treatment too?

23   A    Yes.

24   Q    And did you make the appointment for her to come back?

1     A     Yes, I did.

2     Q     And did she specifically ask for anybody?

3     A     She asked for a full body massage from Dr. Bradley.

4     Q     She asked for that?

5     A     Yes.

6     Q     Did Dr. Bradley come out and tell you, I want her to have a full body

7     massage?

8     A     No.

9     Q     So she specifically asked for that?

10    A     Yes.

11    Q     And did she ever have a massage from Dr. Bradley before?

12    A     I don't recall.

13    MR. KOUGAIS:  Object to the form of that question.

14    THE COURT:  I'll sustain that.  Ask another question.

15    BY MR. AMIRANTE:

16    Q     Does he perform massages on people?

17    A     Yes.

18    Q     Does the other doctor?

19    A     Yes.

20    Q     And other massage therapists?

21    A     Yes.

22    Q     Did you have any conversation with Melaina when she asked to set

23    an appointment with Dr. Bradley?

24    A     Yes.

1   Q      What did you say to her and what did she say to you?

2   A      I told her that the massage would be with Dr. Bradley because Val

3   was completely booked that day, and she said that was not a problem.

4   Q      Did she ask for Val to do it or did she ask for Dr. Bradley?

5   A      Well, she asked for a full body massage and Val was already

6   booked back to back with patients and I said, well, that would be booked with Dr.

7   Bradley, is that a problem?  And she said, no.

8   Q      And then she left and did she come back the following Monday or

9   the 16th for her appointment?

10  A      Yes.

11  Q      About what time did she come in?

12  A      I want to say approximately 10:00 o'clock.

13  Q      Let me ask you, did you notice anything on that day-- she comes in-

14  -  Strike that.

15         She comes in here two or three times a week, right?

16  A      Yes.

17  Q      For a number of years.

18         What is her demeanor generally?

19  A      She's pretty quiet.

20  Q      Any other description?

21  A      No.

22  Q      Was there anything different about her when she came in that day

23  than she's usually?

24  A      She was talkative.

1    Q  What do you mean, talkative?

2    A  I have never really heard her talk.  She was sitting there having a

3 conversation with both myself and patients that were in the room regarding some

4 TV. program.

5    Q  What TV program?

6    A  I don't know if it was The View.

7    MR. KOUGAIS:  Objection.

8    THE COURT:  Overruled.  Answer my stand.

9 BY MR. AMIRANTE:

10    Q  The View.  Any other?

11    A  I don't know.  It could have been the end of Oprah.  I don't know.

12    MR. KOUGAIS:  Objection.  Calls for speculation.  The View, Oprah.

13    THE COURT:  Well, I'm not really sure how it's relevant so I'll sustain it.

14 BY MR. AMIRANTE:

15    Q  You noticed this because her demeanor was different that

16 morning?

17    A  Yes.

18    Q  And she's certainly not that talkative?

19    A  No.

20    Q  Did you hear her say anything or do anything else while she was

21 waiting for her appointment?

22    A  No.

23    Q  What time was her appointment, do you remember?

24    A  Her appointment was at 10:00 o'clock.

1     Q    10:00 or 11:00?

2     A    I don't recall. I want to say 10:00. I'm not sure.

3     Q    You're the one that set up the appointment, right?

4     A    Yes.

5     Q    And you have an appointment book that you use?

6     A    Yes.

7     Q    And when you say 10:00 or 11:00, you are not sure, is there

8 anything that would refresh your recollection as to what time she had an

9 appointment?

10     A    No.

11     Q    What if you saw a copy of the book?

12     A    Yes.

13     Q    Would that refresh your recollection?

14     A    Yes.

15     MR. AMIRANE: Judge, may I approach the witness?

16     THE COURT: Sure.

17     MR. KOUGAIS: Counsel, can I see?

18     THE COURT: You're marking Defense Exhibit Number One?

19     MR. AMIRANTE: I don't want to show the names of the other people.

20     THE COURT: Why don't you just fold it up, if you will, and mark it

21 Defense Exhibit Number One for identification. If you can fold it and cover the

22 other names and then you can show it to the State.

23     MR. AMIRANTE: May I approach, Judge?

1          I'm going to show you Ms. Muir what I'm marking as Defendant's—

2    make it Group Exhibit Number One, containing three pages of a book from

3    October 13th, October 16th and October 23rd, and hand these to you.  Do you

4    recognize those three pages and what they are copies of?

5          A    Yes.

6          Q    What are those?

7          A    The schedule.

8          Q    And whose writing is that on there?

9          A    Mine.

10         Q    Is that a true and accurate representation of what the books look

11   like?

12         A    Yes.

13         Q    Those are pages from the book?

14         A    Copied, yes.

15         Q    And you made those appointments?

16         A    Yes.

17         Q    Is there an appointment for-- or upon looking at those, do you recall

18   if there was an appointment on October 16th, with Melaina Romano or Kelley?

19         A    Yes.

20         Q    What time was that appointment?

21         A    11:00 o'clock.

22         Q    And was there also an appointment on October 13th?

23         A    Yes.

1    Q  And there is another page for October 23rd.  Did you set that

2 appointment up for October 23rd?

3    A  Yes.

4    MR. KOUGAIS:  I will object.  I thought that was to refresh her recollection

5 of the time of the appointment on October 16th?

6    THE COURT:  Counsel, you refreshed her recollection.  You can remove

7 your exhibits and you can question further.

8 BY MR. AMIRANTE:

9    Q  You said the appointment was at 11:00 o'clock?

10    A  Yes.

11    Q  And while on the subject of appointments, on October 16th did you

12 set up another appointment for Melaina on another date?

13    A  Yes.

14    Q  Can you please tell Judge Hanlon exactly when you set up that

15 appointment?

16    A  On the following Monday when she came in for her massage; the

17 previous Monday.

18    Q  She came in for the massage when her appointment started maybe

19 10:00 or 11:00 o'clock?

20    A  Uh-huh, 11:00.

21    Q  And when did she set up the appointment—she set up another

22 appointment while she was there for the 23rd , right?

23    A  Yes.

24    Q  Do you understand my question?

1        A     Yes.

2        Q     Tell Judge Hanlon when, at what time that appointment was set up,

3 not what time, when the October 23rd appointment was set up.

4        A     She came out from having her massage and came and sat down

5 and made her next appointment while waiting to be adjusted.

6        Q     So when she came out of the massage, she set up an

7 appointment?

8        A     Yes.

9        Q     You're absolutely sure of that?

10       A     Yes.

11       Q     Are you sure while she was sitting there talking about Oprah or The

12 View or whatever she was talking about, she didn't come up to you and set up an

13 appointment?

14       A     No.

15       Q     She did it after the massage?

16       A     Yes.

17       Q     When I say the massage, I mean this full body massage that Dr.

18 Bradley gave her?

19       A     Yes.

20       Q     When she came out, you saw her when she went into the room.

21 You said she was talkative?

22       A     Yes.

23       Q     You saw her when she came out of the room?

24       A     Yes.

1  Q Did she appear to be upset to you?

2  A No.

3  Q Did she appear to be scared or nervous or anything?

4  A No.

5  Q Did she complain to you that anything was wrong with the

6 massage?

7  A No.

8  Q When she came out of the massage, did she sit in the room?

9  A Yes, in the waiting room.

10  Q And were you there?

11  A Yes.

12  Q Who else was there?

13  A Toots or Bernice.

14  Q And when she sat in the waiting room, did she attempt to

15 leave at all at that time?

16  A No.

17  Q --to leave the building?

18  A No.

19  Q What happened while she was in the waiting room?  Besides

20 making an appointment.  She made an appointment?

21  A She made an appointment.

22  Q You're positive of that?

23  A Yes.

1        Q        And then after she made that appointment or while she was

2   in the waiting room what else happened?

3        A        She just sat and waited to be adjusted.

4        Q        Adjusted by whom?

5        A        Dr. Bradley.

6        Q        And did Dr. Bradley come out wherever he was?

7        A        Yes.

8        Q        Did he ask her to come in for the adjustment?

9        A        Yes.

10       Q        Did she appear to be nervous or scared or upset or anything

11   about getting the adjustment?

12       A        No.

13       Q        Was she hesitant in going back to him for the adjustment?

14       A        No.

15       Q        Did he do the adjustment out there in the lobby?

16       A        No.

17       Q        Where did he take her?

18       A        In his examining room.

19       Q        Was she alone with him?

20       A        In the room with the doors open.

21       Q        And where is the massage room, by the way?  Are there

22   different massage rooms?

23       A        There are two massage rooms.

24       Q        Where are they located?

1    A    Down the hallway off to the left.

2    Q    And do you know how those massage rooms are stocked?

3    A    Yes.

4    Q    If you go into a typical massage room, what do you see?

5    A    Candles, sheets, towels, they are all on open shelves.

6    Q    They are all on open shelves and they are readily available

7    to anybody?

8    A    Yes.

9    Q    I'm going to show you what, Judge, I'm marking this as

10    Defendant's Group Exhibit Number Two, which purports to be a bag containing a

11    number of towels. Actually the bag is not part of the Exhibit.

12    THE COURT: It is or it is not?

13    MR. AMIRANTE: Is not.

14    THE COURT: Okay, you're marking a group of towels as Defense

15    Group Exhibit Number Two for identification. Okay.

16    BY MR. AMIRANTE:

17    Q    I'm going to hand you a group of towels, a sheet, couple of

18    towels, wash cloths. Hand these up to you.

19    MR. KOUGAIS: I'll object. I don't see the relevance unless we are

20    talking about the specific date or the specific event or specific room. Just the fact

21    there could have been a thousand towels in other rooms. We're talking about the

22    room, if she recalls, if she has knowledge of that particular room, if that's where

23    he's going with this. I'll stipulate that I'm sure the place had towels and sheets.

1      MR. AMIRANE:  I'm going with the kind of towel.  The towel his

2 witness described doesn't exist, is not in there.

3      THE COURT:  I don't know exactly where he's going.  I'll allow him

4 to mark the group exhibit and show it to the witness.

5      Counsel, if you feel there's an objection after he starts

6 asking questions, you can make it, but right now it's overruled.

7      BY MR. AMIRANTE:

8      Q    Would you describe those things to her Honor, Judge

9 Hanlon?

10     A    Washrag.

11     Q    Is that typically in the rooms?

12     A    No.  These are in the therapy suite.

13     Q    That's in the therapy suite?

14     A    Uh-huh.

15     Q    So the washcloth—

16     A    They are not in the massage rooms.

17     Q    What about the next?

18     A    In the therapy suite.

19     Q    The little blue towel?

20     A    Yes.

21     Q    What's in the therapy suite?

22     A    The therapy suite is where you get your electrical stem and

23 heat.

24     Q    Those are not contained in the massage room?

1     A     No.

2     Q     In any in the massage rooms?

3     A     No.

4     Q     What next?

5     A     The bath towel.  These are in the massage rooms right at

6   the bottom of the bed.

7     Q     Can you unfold that, and can you describe about how long,

8   how wide that towel is?

9     A     I don't know.  About four feet tall maybe two and a half wide.

10     Q     Is that the only kind of towel that's in there?

11     A     That is the only towel that's used in the massage room.

12     Q     How many towels like that are typically in the rooms?

13     A     There's approximately—

14     MR. KOUGAIS:  Objection.  Calls for speculation.

15     THE COURT:  Little more specific, Counsel, at this time if you're

16   going to have her testify, I want to know what room, what date.  It doesn't really

17   matter--

18     BY MR. AMIRANTE:

19     Q     On that particular date—

20     THE COURT:  --Unless it's this incident, otherwise it's not relevant.

21     BY MR. AMIRANTE:

22     Q     On that particular date, did you have occasion to know what

23   inventory was in these different rooms as far as towels?

24     A     How many?

1   Q    On October 16th.

2   A    Probably five.

3   Q    You go in the rooms, right?

4   A    Yes.

5   Q    You know what is in there?

6   A    Yes.

7   Q    Other than that kind of towel, that two and a half by four foot

8   towel, were there any other kind of towels in there?

9   A    No.  We don't stock any others in there.

10   Q    Do you have any small towels that cover from their breast to

11   their vaginal area?

12   A    We don't have any of those.

13   Q    You didn't have any on that date?

14   A    We don't have any of those at all.

15   Q    Okay, and how about this blanket here?

16   A    This is what we put the heat pad in.

17   Q    The heat pad for what?

18   A    When you get heat on your back, we put the heat from the

19   hot pack inside of here and fold over.

20   Q    This was in the massage room?

21   A    Not in the massage room, in the therapy room.

22   Q    Okay, what is the other thing?

23   A    Sheet.  Those sheets are in the massage rooms.

24   Q    About how big are those sheets?

1            A      Twin sized for twin sized bed.

2            Q      In the room where Melina got the massage, was there a

3   sheet like this in there?

4            A      There's one on these on the bed and also one laid on top of

5   this, like a top sheet.

6            Q      Is there any doubt in your mind that there were the two

7   sheets, the top sheet and the bottom sheet?

8            A      There's always two sheets on the bed.

9            Q      There was that day?

10          A      There was that date.

11          Q      So if she said there was not two sheets on that bed, would

12   she be lying?

13        MR. KOUGAIS:  Objection.

14        THE COURT:  Sustained.

15     BY MR. AMIRANTE:

16          Q      You have known Dr. Bradley Hayashi for approximately five

17   years or eight?

18          A      Five-and-a-half.

19          Q      Do you know other people who know him?

20          A      Yes.

21          Q      You are familiar with his reputation?

22          A      Yes.

23          Q      What is that reputation?

24        MR. KOUGAIS:  Objection.

1    THE COURT:  Basis?

2    MR. KOUGAIS:  Relevance.  If he has the propensity not to do this.

3    We are talking about a specific date and event here.

4    THE COURT:  Counsel, your response to the relevance objection?

5    MR. AMIRANE:  Judge, he's being accused of something that is

6    basically inappropriate, dishonest thing as a professional, and I think it's

7    appropriate to have this kind of testimony allowing for reputation evidence.

8    THE COURT:  Based upon the objection of relevance, overruled.

9    You may answer.

10    BY MR. AMIRANTE:

11    Q    What is his reputation?

12    A    He's got a good reputation.

13    Q    Did you ever hear anybody saying anything bad about him?

14    A    No.

15    Q    Ever heard any complaints about him?

16    A    No.

17    Q    You have been there for five years?

18    A    Yes.

19    Q    He gives you massages, doesn't he?

20    A    Yes.

21    Q    And your daughter?

22    A    Yes.

23    Q    Do you trust him in doing that?

24    A    Yes.

128

1    Q    Do you know if he prefers massages on other females?

2    A    No.

3    MR. KOUGAIS:  Objection.  I don't see the relevance to all this.

4    THE COURT:  Your objection is relevance?

5    Counsel, what's your response?

6    MR. AMIRANTE:  Without any corroboration from the other witness

7    at all, and I think all of this is relevant, his reputation.

8    THE COURT:  I'm overruling it.  You may answer, yes or no.  He

9    gives massages to other females?

10    THE WITNESS:  Yes.

11    BY MR. AMIRANTE:

12    Q    In all of these five years, has any one ever made any

13    complaints against him?

14    A    No.

15    Q    Do you recall an incident regarding an appointment made for

16    Mr. Kelley for a massage in your office?

17    A    Yes.

18    Q    And why is it that you recall this incident?

19    A    Because Melaina had called the office and wanted to speak

20    with Dr. Bradley regarding his appointment.

21    Q    Whose appointment?

22    A    Jim's.

23    Q    James Kelley?

24    A    Yes.

1      Q      That's Melaina's husband?

2      A      Yes.

3      Q      She was married in May, right?

4      A      Yes.

5      Q      And you made the appointment so you're the person who

6    talked to her about this?

7      A      Yes, I did.

8      Q      Who set up the appointment for Jim Kelley?

9      A      I did.

10     Q      Who made that appointment?

11     A      Melaina did.

12     Q      Melaina made the appointment?

13     A      Yes.

14     Q      And for what did she make the appointment?

15     A      She made the appointment with Dr. Bradley for her husband

16   to be seen.

17     Q      In regard to what?

18     A      I'm not quite sure what body part.  I just made the

19   appointment.

20     Q      And did that include a massage?

21     A      Yes.

22     Q      And did that appointment somehow get changed?

23     A      No.

24     Q      Did he see—Did Mr. Kelley see Dr. Bradley?

1    A    No, he didn't see Dr. Bradley.

2    Q    Who did he see?

3    A    Dr. Natalie Frobish.

4    Q    The female doctor?

5    A    Yes.

6    Q    And did Melaina talk to you about that?

7    A    It was either the second or third visit she had called the

8    office and wanted to talk to Dr. Bradley concerning his appointment for that

9    evening.

10    Q    Did she express anything to you on the telephone call?

11    A    That she was upset because James did not see Dr. Bradley.

12    Q    Instead he saw Dr. Natalie?

13    A    Yes.

14    Q    The female doctor?

15    A    Yes.

16    Q    And do you know why she was upset about this?

17    A    Excuse me?

18    Q    When you say, she was upset, what do you mean?

19    A    She was upset that the appointment, that she did not-- that

20    he did not get to see Dr. Bradley.  He had seen Dr. Natalie instead and she had

21    wanted him to see Dr. Bradley.

22    Q    Was this prior to the massage that she had from Dr. Bradley

23    on October 16th?

24    A    Yes.

1        Q      Do you know how much prior to that that was?

2        A      Months. I'm not quite sure.

3        MR. AMIRANTE: Judge, if I can have one moment?

4        BY MR. AMIRANTE:

5        Q      After the date of October 16th, okay, one of my investigators

6  came to see you, is that correct, Mr. Lloyd came to see you? (phonetic)

7        A      Yes.

8        Q      He talked to you about these incidents?

9        A      Yes.

10       Q      And you gave a statement?

11       A      Yes.

12       Q      Did anybody else ever contact you regarding these

13  allegations against Dr. Bradley of October 16th? Any police officer?

14       A      Yes.

15       Q      When were you contacted by the police?

16       A      The day Dr. Bradley was arrested.

17       Q      And do you know who contacted you?

18       A      Hanover Park Police.

19       Q      How do you know it was Hanover Park Police?

20       A      They announced themselves on the telephone.

21       Q      You got a telephone call?

22       A      Yes, a telephone call.

23       Q      Who did you talk to? Do you remember?

24       A      One of the investigators. I don't remember.

1          Q      Do you know who the investigator identified him or herself

2    as?

3          A      No.  It was a him.

4          Q      What did you tell the investigator?

5          MR. KOUGAIS:  Objection.

6          THE COURT:  Basis?

7          MR. KOUGAIS:  She's already testified.  I don't know what counsel

8    is trying to bring out a prior inconsistent statement.

9          MR AMIRANTE:  No, that she gave a statement.

10         THE COURT:  State, your objection is hearsay?

11         MR. KOUGAIS:  Hearsay as well, Judge.

12         MR. AMIRANTE:  Judge, I'm going to ask what she said.  Did you

13    give a statement.

14         THE COURT:  Sustained.  It's out of court.

15         BY MR. AMIRANTE:

16         Q      Did you give a statement?

17         A      Yes, I did.

18         Q      And you based—you basically told the investigator the same

19    thing you told him here today, correct?

20         MR. KOUGAIS:  Objection.

21         THE COURT:  Sustained.

22         MR. AMIRANTE:  Just give me a second.

23         THE COURT:  Surely.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

(Whereupon the following proceedings

were transcript by another official court

reporter.)

STATE OF ILLINOIS )
                   )SS:
COUNTY OF COOK )


       I, Sandra Lio, Official Shorthand Reporter of the Circuit Court of

Cook County, County Department-Third Municipal Division, do hereby certify

that I reported in shorthand the evidence had in the above-entitled cause and that

the foregoing is a true and correct transcript of all the evidence heard.


Sandra Lio
Official Shorthand Reporter
License No. 084-001897
Circuit Court of Cook County