STATE OF ILLINOIS          )
                           )   SS:
COUNTY OF C O O K          )


IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-THIRD MUNICIPAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, )
                                 )
                 Plaintiff,      )
                                 )
          vs.                    ) NO.063007145
                                 )
BRADLEY HAYASHI,                 )
                                 )
                 Defendant.      )

TRIAL-P.M. SESSION


          REPORT OF PROCEEDINGS had at the hearing of the above-

entitled cause, before the Honorable KAY MARIE HANLON, one of the

Judges of said Division, on Thursday, the 17th day of May, 2007.

          PRESENT:
               HON. RICHARD DEVINE,
               State's Attorney of Cook County, by:
               MR. ROBERT GROEBNER and
               MR. THOMAS KOUGAIS,
               Assistant State's Attorneys,
                 appeared on behalf of the People.

               MR. SAM L. AMIRANTE,
                 appeared on behalf of the Defendant.


Sandra Lio
Official Court Reporter-84001897
2121 Euclid-Suite 60
Rolling Meadows, Illinois 60008

1      THE COURT:  You have been sworn?

2      MR. AMIRANTE:  Yes, she has.

3      THE COURT:  Keep your voice up.

4                          BERNICE MUSGRAVE,

5      called as a witness, having been first duly sworn, was examined and

6      testified as follows:

7                          DIRECT EXAMINATION

8                          BY

9                          MR. AMIRANTE:

10      Q      Ma'am, could you please state your name and spell it for her

11      Honor Judge Hanlon and the court reporter.

12      A      Bernice Musgrave, B-E-R-N-I-C-E; M-U-S-G-R-A-V-E.

13      Q      What is your business or occupation?

14      A      Office manager.

15      Q      For who?

16      A      Midwest Medical Offices in Hanover Park .

17      Q      For how long have you been doing that?

18      A      At the office, five and-a-half years.

19      Q      Have you worked for Dr. Bradley Hayashi?

20      A      Yes.

21      Q      And who else; any other chiropractor?

22      A      Yes.  Dr. Brad Maxon in Northbrook, Illinois. (phonetic)

23      Q      You worked at another clinic?

24      A      No.  That was previously.

2

1      Q      What are your duties as officer manager for Dr. Hayashi?

2      A      I do all the billing, and I run the office and basically run the

3      office.

4      Q      Are you familiar with the—a patient by the name of Melaina

5      Kelley formerly known as Melaina Romano?

6      A      Yes.

7      Q      How are you familiar with her and how do you know her?

8      A      As a patient.

9      Q      How long has she been a patient, to your knowledge?

10     A      Since 2004, I believe.

11     Q      About 2004?

12     A      Yes.

13     Q      And do you recall seeing Melaina Kelley on October 16th of

14     last year at the office?

15     A      Yes, I do.

16     Q      And you were working that day?

17     A      Yes, I was.

18     Q      And how is it that you had occasion to see her on that day?

19     A      I had gone up to the front desk to ask a question to Karen,

20     the receptionist, and she was in the waiting room at that time.

21     Q      Who was in the waiting room?

22     A      Melaina.

23     Q      And what was she doing in the waiting room?

1   A   She had just come out from her massage and was waiting to

2   go in to see Dr. Brad for an adjustment.

3   Q   How do you know she had come out from a massage?

4   A   I had asked. I usually go, when I would go up front if I'd see

5   a patient waiting in the waiting room because we don't have a long time

6   for a patient to be in the waiting room. I had asked Karen. I said, has she

7   not been taken back yet? And Karen said, no, she already had her

8   massage and she was waiting for Dr. Brad.

9   Q   She was waiting for Dr. Brad to do what?

10   A   To have her adjustment and have her visit.

11   Q   Did you see any conversation take place between Karen and

12   Melaina?

13   A   Yeah. She came up to the desk and made her appointment

14   for the next week.

15   Q   Melaina went up to the desk and made the appointment?

16   A   Yes.

17   Q   This was after she had her full body massage?

18   A   Yes.

19   Q   You're sure about that?

20   A   Yes.

21   Q   Do you see that group of things in front of you?

22   A   Yes.

23   Q   That's been previously marked as Defendant's Group Exhibit

24   Number Two. Do you recognize the item right on top of that group?

1         A      Yes.  That is a towel we used in the massage room.

2         Q      You say, we use them in the massage room.  How many

3 massage rooms do you have?

4         A      Two.

5         Q      Are there-- other than that towel there, are there any other

6 kind of towels to your knowledge contained in the massage rooms?

7         A      Just hand towels for the massage therapist to wipe their

8 hands off on.

9         Q      How big are the hand towels?

10         A      Regular hand towel.

11         Q      Is there any towel that would go lengthwise from—you know

12 how big Melaina is, right?

13         A      Yes.

14         Q      You have seen her?

15         A      Yes.

16         Q      Is there any towels contained in the rooms that would go

17 from her breasts covering down to her vagina?

18         A      No.

19         Q      To your knowledge, you have never seen a towel like that?

20         A      No.

21         Q      When you saw Melaina in the room on October 16th, in the

22 waiting room there, did she appear to be upset to you?

23         A      No.

24         Q      Did she appear to be nervous?

1          A      No.

2          Q      Anything about her demeanor that was unusual?

3          A      No.  Actually we were-- there was-- we have a TV in the

4    waiting room, and there was a program on and there was another patient

5    in the waiting room, waiting to go back to the therapy suite, and we were

6    making comments, I don't remember exactly what the show was but we

7    were laughing about it and making comments.  And I'm not up at the front

8    desk that often.  That's why I remember the incident.

9          Q      This was also after the massage was done?

10         A      Yes.

11         Q      Are you familiar—you say you worked for another

12   chiropractor too in Northbrook?

13         A      I did before I started working at Hanover Park.

14         Q      Before you started working for Dr Brad, I suppose you

15   checked out what his reputation in the community is?

16         MR. KOUGAIS:  Objection.

17         THE COURT:  I'll let her answer yes or no.

18              Overruled.

19   BY MR. AMIRANTE:

20         Q      His reputation as a chiropractor and a person?

21         A      Yes.  We worked together before.

22         Q      Tell her Honor, Judge Hanlon, what that reputation is.

23         MR. KOUGAIS:  Objection.

24         THE COURT:  Basis?

6

1          MR. KOUGAIS:  Relevance and hearsay.

2          THE COURT:  On those two bases, overruled.

3          THE WITNESS:  I worked with Dr. Hayashi before at another office.

4     BY MR. AMIRANTE:

5          Q      What's his reputation?

6          A      Impeccable.

7          Q      Impeccable as to what?  In every regard?

8          A      Yes.  Never had a—

9          MR. KOUGAIS:  Objection and the leading nature.  Counsel has

10     been really stretching it with his witnesses, asking leading questions here

11     but as to impeccable on all grounds, what does that mean?

12          MR. AMIRANE:  We have a state's witness who is attacking my

13     client's moral integrity, his professionalism, and everything else, and I

14     think this kind of testimony is absolutely relevant.

15          THE COURT:  I overruled it.  The answer may stand.

16               Next question.

17     BY MR. AMIRTANE:

18          Q      All those years you have been with Dr. Hayashi other than

19     these allegations being made here, had he ever had one patient, male or

20     female, complain about him?

21          A      No.

22          MR. KOUGAIS:  Objection.

23          THE COURT:  The answer may stand.  Overruled.

24     BY MR.  AMIRANTE:

1   Q       Do you handle billing?

2   A       Yes, I do.

3   Q       One second.

4           I'll withdraw that.  No further questions.

5   THE COURT:  Thank you.

6           Cross examination?

7           CROSS-EXAMINATION

8           BY

9           MR. KOUGAIS:

10  Q       How long have you been employed by the Defendant,

11  Ma'am?

12  A       Five-and-a-half years.

13  Q       And counsel asked you a question about billing.  The

14  Kelley's don't have an outstanding bill, do they?

15  A       Yes.

16  Q       How much?

17  A       I don't know that off the top of my head.

18  Q       You're absolutely sure there is an outstanding bill.  Is it for

19  the prior appointment, for the prior year?

20  A       Are you asking me if the patient has an outstanding bill?

21  She, yes, came in and the appointment she has a balance from the

22  appointment that she came in for.

23  Q       How much is that?

24  A       I don't know of the top of my head.

8

1       Q     How long have you been working there?

2       A     Five-and-a-half years.

3       Q     Mrs. Kelley attends there two or three times a week up until

4    this incident occurred?

5       A     Yes.

6       Q     Since this incident occurred on October 16th, she hasn't

7    been back there, has she?

8       A     No.

9       Q     And is the bill that she and or her husband owes for that

10   event, the massage that occurred on October 16th , or is it a history of

11   other open tickets on there?

12      A     There is the—yes, because it takes four to six weeks to get

13   paid on so the previous appointment that she had, I had to wait for the

14   insurance company to pay us on it before I knew what her balance would

15   be.

16      Q     So if it's your testimony then that the insurance had been

17   paying all their portion of whatever the treatments were, and there was a

18   portion that the Kelleys had to pay as well?

19      A     Correct.

20      Q     And it's your testimony that there is one or a series of

21   outstanding bills?

22      A     There's I think two or three.  I don't know.  I have three

23   thousand patients I bill for, so I don't exactly remember.

1    Q    And I appreciate that. I'm sure you work very hard. You

2    said that you are not up at the desk that often, right?

3    A    No.

4    Q    You said, what do you do?

5    A    I have an office. I'm in the office running the office. I pay

6    bills in there. I direct the staff.

7    Q    Are you the office manager?

8    A    Yes.

9    Q    And do you ever clean the rooms?

10    A    Sometimes I help out if we get very busy.

11    Q    On October 16th of 2006, did you ever go into the room that

12    Ms. Kelley was in when she was having her treatment?

13    A    Into the adjustment room I did, and I don't remember if I

14    actually went into the massage rooms. I usually if I pass by and there's a

15    room that needs to be cleaned up, I'll go in and clean it up if I'm on my

16    way back to the bathroom.

17    Q    Do you ever go into the room when the doctor is in with a

18    patient?

19    A    I have knocked on the door and gone in, yes.

20    Q    On this particular day, on October 16th, 2006, did you ever

21    enter the room that the victim was in, Ms. Kelley, when she was lying on

22    the bed when the doctor was massaging her?

23    A    No.

1      Q      And at that particular time, do you know specifically what

2      towels or sheets or whatever—what quantity if any was in that room while

3      Ms. Kelley was getting her massage?

4      A      The rooms were always fully stocked.  We have ample

5      supply.

6      Q      Okay, that's great.  Thank you.  But I'm asking you

7      specifically this particular time while Ms. Kelley was in the room, do you

8      have an accounting of exactly what towels or sheets or cases were in that

9      room?

10     A      Do we keep an actual count like ten sheets and ten—

11     Q      Or do you have an answer based upon your memory at that

12     time?

13     A      No, I don't know exactly how many, but there are always

14     fully stocked.

15     Q      Is this towel a representative towel from the clinic?

16     A      Yes, it is.

17     Q      And as I'm holding the towel here, is it fair to say this towel

18     can cover from a person's-- depending upon their size of the chest area to

19     their crotch area, as I'm holding it?

20     A      Yes, but it wouldn't be—it's never put on that way.  It's put

21     on the other way, lengthwise.

22     Q      Does the doctor put on the towels or the patients?

23     A      The patient goes into the room and gets normally under the

24     sheet and waits.

1    Q    Or the patient showed how to?

2    THE COURT:  Let her answer the question.

3    MR. KOUGAIS:  I'm sorry.

4    THE WITNESS:  Normally the patient goes in and gets under,

5    between the sheets and waits for the massage therapist or the doctor to

6    come in.

7    Q    So as I'm holding this towel out, I'm holding the length

8    portion side to side, is that correct?

9    A    Correct.

10    Q    So the width would you say is approximately, what, three-

11    and-a-half, four feet?

12    A    Okay.

13    Q    Is that right?

14    A    Yes.

15    Q    Does that seem accurate to you?

16    A    Yes.

17    Q    And it's your testimony that this is an inappropriate use of a

18    towel as I'm holding it up here?

19    MR. AMIRANTE:  Objection, Judge.  How is that relevant?  That

20    wasn't the testimony of the witness.  It was longwise, the towel.

21    THE COURT:  Counsel for the record is holding the towel the

22    longest portion on the top and bottom, and shorter portions on the side.

23    So the record is reflective of what is going on.

24    All right, and your question, Counsel is--

BY MR. KOUGAIS:

Q    These are the towels used in the clinic, is that correct?

A    Correct.

Q    And there aren't any other size bath towels?  This is the standard size?

A    Yes.

Q    It's your testimony these towels were around on October 16th of 2006, is that right?

A    Yes.

Q    Now you were also present when you say Ms. Kelley made an appointment after she had a treatment?

A    Yes.

Q    And is there any reason you independently remember this particular date out of any other date?

A    Basically because I was up there, and we were all talking, you know, and everything was kind of interacting.

Q    Was this an unusual day you were all talking and interacting?

A    Yes.

Q    What was unusual about it?

A    Because Ms. Kelley usually isn't as friendly.

Q    Is she ever mean to you?

1     A     Not to me, but she has been from what I understood from

2     the other staff members that have come to me and said she was rather

3     abrupt with them.

4     Q     Really?  And on October 16th, was she abrupt with you or

5     any of your other staff members?

6     A     No.

7     Q     Did Karen, the other young lady, ever tell you on October

8     16th that Ms. Kelley was abrupt with her or anybody else?

9     A     No.

10     Q     In fact, on October 16th, who else was in that room other

11     than-- you worked that day, correct?

12     A     Yes.

13     Q     Who else was in there?

14     THE COURT:  What room?

15     MR. KOUGAIS:  I guess the main office, in the main office, the

16     reception area.

17     THE WITNESS:  It was Karen and I and Ms. Kelley, and I believe

18     there was another patient in there.

19     BY MR. KOUGAIS:

20     Q     Okay.  You remember that day petty good, don't you, but

21     you don't remember who the other patient was and I don't want you to say

22     the name for confidentiality, but do you remember who the other person

23     was in that room?

24     A     No, I don't.

14

1          MR. KOUGAIS:  If I may have one moment, please?

2          THE COURT:  Sure.

3          MR. KOUGAIS:  Nothing further.

4          THE COURT:  Counsel, any redirect?

5          MR. AMIRANE:  No redirect.

6          THE COURT:  Thank you very much.

7                    You may step down.

8          THE COURT:  Counsel, how many more witnesses do you have?

9          MR. AMIRANTE:  Three.

10         THE COURT:  Okay.  Call your next witness.

11                              (Witness duly sworn.)

12         THE COURT:  Have a seat in the witness stand, please.

13         MR. AMIRANTE:  Good afternoon, Ma'am.

14                    May I proceed, Judge?

15         THE COURT:  You may.

16                         NANCY HALLGREN,

17    Called as a witness having been first duly sworn, was examined and

18    testified as follows:

19                         DIRECT EXAMINATION

20                              BY

21                         MR. AMIRANTE:

22         Q       Please state your name and spell it for her Honor Judge

23    Hanlon and the court reporter.

24         A       Nancy Hallgren; N-A-N-C-Y, H-A-L-L-G-R-E-N.

1       Q       Ms. Hallgren, what is your business or occupation?

2       A       I'm a massage therapist.

3       Q       For whom are you presently employed?

4       A       I work for a few different people.  Dr. Brad, Delnor Health

5    and Wellness Center, South Barrington Club.  Those are the three that I

6    work for right now. (phonetic)

7       Q       And you're familiar with other—and Dr. Brad is a

8    chiropractor?

9       A       Correct.

10      Q       And you work with other chiropractors?

11      A       I have in the past, yes.  I'm not presently working with

12   another chiropractor right now.

13      Q       You're familiar with Dr. Brad's reputation in the community

14   and the chiropractic community?

15      A       Yes.

16      Q       Tell Her Honor Judge Hanlon what that reputation is.

17      MR. KOUGAIS:  Objection.

18      MR. AMIRANTE:  Same thing.

19      THE COURT:  Basis?

20      MR. KOUGAIS:  Once again the relevance. Counsel argues if there

21   is a bar fight and it's a first time the guy is a bar fight doesn't mean it

22   prevents him to commit the fight.  Here once again this young lady is

23   going to testify, he's a good guy.  I'll stipulate that might be in the

24   community.  That has nothing to do with this event on October 16th of

1    2006, and what happened between the Defendant and the victim in this

2    matter.

3        THE COURT:  All right.  Counsel, what's your response to that

4    objection?

5        MR. AMIRANTE:  It's relevant.  This is a professional person.  His

6    professionalism is being attacked, his integrity, his morals.

7        THE COURT:  You are offering this witness to say his reputation is

8    what, he has a good reputation in the community?

9        MR. AMIRANTE:  It's impeccable as a chiropractor, as a

10   professional.  You hear this—Judge, we are all professionals in here.  You

11   hear things in the community and I'm simply asking this woman—

12       THE COURT:  Well,   I haven't heard anything about him in the

13   community.  However, he is now objecting to relevance as he did in the

14   past and saying—and he's saying he'll stipulate.  Counsel, you're going to

15   stipulate his reputation is impeccable as a chiropractor in the community?

16       MR. KOUGAIS:  That's fine, Judge

17       THE COURT:  Will you accept that stipulation, Counsel, if that's

18   what you're offering it for?

19       MR. AMIRANTE:  I would like to have the witness testify, but it's

20   getting late, Judge, so I will accept that stipulation.

21       THE COURT:  All right.  There will be a stipulation then Mrs.

22   Hallgren would testify that Dr. Bradley's reputation is impeccable as a

23   chiropractor in the community.  Yes?  So stipulated?

24       MR. AMIRANTE:  Yes.

17

1          THE COURT:  Thank you.

2     BY MR. AMIRANTE:

3          Q     You are also familiar with his reputation and truth and

4     veracity?

5          A     I beg your pardon?

6          Q     Truth and honesty?

7          A     Yes.

8          Q     You have talked to other people about that?

9          A     Yes.

10          Q     What is his reputation for truth and honesty?

11          MR. KOUGAIS:  Once again I'm objecting.

12          MR. AMIRANTE:  That is absolutely admissible.  His reputation is

13     being attached here.  His reputation for truth.  Truthfulness as far as

14     truthfulness in what he is doing. They say he  is committing a battery.  It's

15     not the run of the mill battery.  It's the battery in the course of his

16     professional conduct.  It's a battery in the course of performing a

17     massage.

18          THE COURT:  But his truth and honesty, how is that defined if you

19     will to that particular charge?  I understand if it's a retail theft, of course,

20     that would be relevant as to his defense.  How as to this particular charge

21     of battery with an insulting or provoking nature, how is that truth and

22     veracity?  How is that relevant?

23          MR. AMIRANTE:  Because it's a professional taking an oath, that

24     goes into integrity and his reputation as to truth and veracity.  Integrity is

1    very relevant to this.  I'll challenge the State to bring out any witness in the

2    world that would testify differently than these witnesses.

3                    THE COURT:  They don't get to do that.

4                    MR. AMIRANTE:  They could.  They can rebut it.  We

5    welcome a rebuttal.

6                    THE COURT:  I'll overrule it.  She may answer.

7    BY MR. AMIRANTE:

8            Q        What is his reputation for truth and veracity?

9            A        Excellent.

10           Q        And honesty?

11           A        Honesty, I mean that is one of the reasons I came to work

12   for him when I first became a massage therapist.

13           Q        And do you know a person by the name of Melaina Kelley

14   formerly known as Melaina Romano?

15           A        I believe I have met her.

16           Q        Have you ever given her a massage?

17           A        They said I have, yes, in the past.

18                   MR. KOUGAIS:  Object.

19                   THE COURT:  Objection is sustained as to, they, whoever that is

20   said.

21   BY MR. AMIRANTE:

22           Q        You don't remember her specifically?

23           A        I don't.  I mean, yes, she does look familiar to me, but I see

24   so many people that it's really hard for me to say, yes, I have.

19

1          Q     Do you know how to give or have you ever given a full body

2    massage?

3          A     Yes.

4          Q     Have you ever given a massage in the massage rooms at

5    Dr. Brad's office?

6          A     Uh-huh.

7          Q     Have you used one room or two rooms or both rooms?

8          A     I've used both rooms.

9          Q     There is a group of exhibits sitting in front of you.

10   Defendant's Exhibit number Two for identification purposes.

11        A     Okay.

12        Q     Do you recognize any of those items there?

13        MR. KOUGAIS:  Judge, I'm going to object unless we are talking

14   about October 16th of 2006.  What the supplies are on other dates is

15   irrelevant.

16        MR. AMIRANTE:  It is relevant.  She's a massage therapist who

17   does work in those rooms, and we are not specifically talking about that

18   date.  If they're there that day, they're there every day.  If I--

19        MR. KOUGAIS:  No.  No.

20        MR. AMIRANTE:  May I finish?

21        THE COURT:  Hey, guys.  First of all, no arguing between each

22   other in the courtroom.  You both know better.  Nobody addresses each

23   other.  I don't believe it.  You're both experienced defense attorneys and,

24   prosecutor.  You don't fight in a courtroom, at least not in my courtroom.  If

1    anybody is going to yell, it's going it be. It's not going to be the two of you.

2    So knock it off, number one. If you have an objection, you state the basis

3    and then you respond.

4              This objection is overruled. She may answer the question if

5    you remember. Do you remember the question?

6              THE WITNESS: Please repeat it.

7              THE COURT: Ms. Court Reporter, please read the last question

8    back to the witness.

9                        (Whereupon the last question was read

10                       back by the court reporter.)

11             THE COURT: You may answer.

12             THE WITNESS: Yes, I do. I recognize all of them from the clinic of

13   Dr. Brad's office.

14             BY MR. AMIRANTE:

15             Q       For how long have you been doing massage therapy?

16             A       Over six years.

17             Q       And what items in front of you are used during the course of

18   a full body massage?

19             A       The sheet. Sometimes I will use the hot pack padding if I'm

20   using a hot pack. Mostly the sheets, towel, if necessary. But usually definitely two

21   sheets are always used in the massage therapy rooms at all times.

22             Q       Two sheets?

23             A       Correct.

1    Q    And have you ever one time seen an instance where there was not two

2    sheets on a massage bed?

3    A    No.  There's always two sheets on the bed.

4    Q    And in Dr. Bradley's office when you have given massages, have there

5    always been two sheets on the bed?

6    A    Yes.

7    Q    What are the two sheets for?

8    A    One is laid down over the little wool, it's like a sheep skin wool padding

9    over the mattress, over the massage table bed.

10    Q    Is that for the person to lay on top of?

11    A    No.  It's just for comfort only.  Also for warmth.  We also have a heating

12    pad underneath that, underneath the sheep skin so the sheet goes on top of the sheep

13    skin wool padding and then another sheet is laid on top, and I instruct all my patients to

14    get underneath the top sheet, put the sheet back over them.

15    Q    So there's a sheep skin, a bottom sheet, and a top sheet?

16    A    Correct.

17    Q    That's on about every massage table you have seen?

18    A    Correct.

19    Q    Including in Dr. Bradley's office?

20    A    Yes.

21    Q    Would it be unusual if there was not a top sheet there?

22    A    If there wasn't a top sheet?

23    MR. KOUGAIS:  Objection.  Calls for speculation.

24    THE COURT:  Sustained.

22

1    BY MR. AMIRANTE:

2        Q      You have never seen—Have you ever seen one of these set up in Dr.

3    Bradley's office without a top sheet on it?

4        MR. KOUGAIS:  Objection.

5        MR. AMIRANTE:  Judge, there was testimony--

6        THE COURT:  I'll overrule it, for whatever it's worth.

7            You may answer.

8        THE WITNESS:  There is two sheets on the bed.

9    BY MR. AMIRANTE:

10       Q      And the towel over there?

11       A      Uh-huh.

12       Q      Are those the kind of towels that are in Dr. Bradley's office?

13       A      Yes.

14       Q      And in either of these rooms that you have ever been in, have you ever

15   seen any other kind of towel?

16       A      This one right here.

17       Q      And what is that towel?

18       A      The only time that this is ever used is if I have a gentleman on the table

19   and I'm doing his back, I don't want to get lotion or oil on his clothes, I'll put this over the

20   back of the gentleman's pants.

21       Q      There is a blue towel?

22       A      Yes.

23       Q      Describe for the court reporter the size of that towel.

24       A      That's twelve by twelve.

1    Q    About one foot by one foot approximately?

2    A    Approximately.  I'm not sure.

3    BY MR. AMIRANTE:

4        Q    Now, besides that blue towel that you have described and the white

5    towel which purports to be some sort of bath-size towel, have you ever seen any other

6    towels of any other different sizes in there?

7        A    If it isn't this size, it's a hand towel, you know,  hand-sized towel.

8        Q    Have you ever seen a towel that would lengthwise go down from

9    the breast to the vagina on a woman?

10        A    No.  I mean if it isn't this size, it's very similar to this.

11        THE COURT:  Again for the record she's holding up the blue towel that

12    was previously identified.

13        BY MR. AMIRANTE:

14        Q Between the size of that blue towel and the white towel in front of

15        you, have you ever seen any towels between the sizes?

16    A    No.

17    Q    These are the only two kinds of towels you have seen in there?

18    A    Yes.

19    Q    Have you taken classes to be a massage therapist?

20    A    Yes, I have.

21    Q    In the course of your study did you learn that you can touch one

22    part of a body and you get a sensation in a different part?

23        MR. KOUGAIS:  Objection.

24        THE COURT:  Overruled.

1       THE WITNESS:  Yes.

2       BY MR. AMIRANTE:

3       Q       Can you describe how that could take place to Judge Hanlon?

4       MR. KOUGAIS:  Objection.  If he wants to qualify her as an expert in the

5   field, then he needs to do it appropriately.

6       THE COURT:  I'll sustain that objection and let the answer stand, and you

7   can cross examine if you would like as to her answer to that particular question.  So

8   sustained.  You don't have to answer the following question.

9       MR. AMIRANTE:  Judge, do you want me to lay a foundation?

10      THE COURT:  Counsel, you do what you need to do.  You can't be asking

11  me.  Ask her a question.

12      MR. AMIRANTE:  You don't want to—do you want to stipulate?  You

13  subpoenaed her.  She's your witness.

14      THE COURT:  Counsel, wait a minute.  What are we doing here?  Are we

15  have having a conversation with the State?  That's not allowed.

16      MR. AMIRANTE:  He doesn't want me to--

17      THE COURT:  Ask another question.  This is your witness.  Don't be

18  asking the State.

19      BY MR. AMIRANTE:

20      Q       Who subpoenaed you to testify here today?

21      A       The State.

22      Q       You are under the State's subpoena?

23      A       Correct.

1          Q        And you took—but they chose-- you came here today and they

2     chose not to call you as a witness?

3                   MR. KOUGAIS:  Objection.  How could she possibly know any of that?

4                   THE COURT:  Sustained.  I'm noting for the record she didn't testify on

5     the state's case in chief.

6                        Next question.

7          BY MR. AMIRANTE:

8          Q        What are your qualifications?  How do you become a massage

9     therapist?

10         A        You have to have—

11                  THE COURT:  Before we start going into this long qualifications both of

12         you approach, State and Defense.

13                       I will ask you to step down out of the witness box, if you will,

14         please?

15                  THE COURT REPORTER:  Judge, is this on the record or off?

16                  THE COURT:  On.

17                       You are going to attempt to qualify this witness as an expert, in

18     what?

19                  MR. AMIRANTE:  Massage therapy.

20                  THE COURT:  For what purpose?

21                  MR. AMIRANTE:  Basically to testify that if someone is touched and

22     there's pressure points in the body, in certain spot of the body, it could be felt in other

23     parts of the body as if it's being touched.  We have a witness here who is making

24     allegations against my client, obviously very serious allegations in his profession, and

26

1    she had her eyes closed the entire time of this massage.  She comes up with these

2    allegations, and they subpoena the massage therapist, here today.  I'm going to use

3    their witness to testify if somebody for instance comes close to the pubic area or the

4    groin area, buttocks, there could be a pressure, and it could actually feel like there is a

5    sensation in the vagina, not in the vagina but around or around the vagina, or if you

6    press the back, you can feel the sensation in the leg.

7                    When there are massaging of the breasts, there are pectorals up

8    there.  All massages therapists do that.  And I'm going to use this later on, Judge.  To

9    argue that this woman, maybe she had sensations, maybe she didn't know, maybe she

10   felt guilty.  There are all kinds of reasons these allegations could have occurred, and

11   they subpoenaed the witness in and I have the right to at least qualify them as experts.

12   They are State's witness.  They subpoenaed them.

13                    THE COURT:  State, your response?

14                    MR. KOUGAIS:  Judge, if Counsel has—he came up with this at the

15   eleventh hour because he has repeatedly said we had subpoenaed this individual.  If he

16   wants to have a massage therapist say you can touch a person in one spot and it can

17   have an affect on another spot, I think you need a medical doctor to do that.

18                    Massage therapists, I don't know see what qualification that person

19   has.  Even if she does acupuncture, that's a tall stretch to try and bring somebody in.

20   We don't know whether this woman was there on that date, whether she had a

21   particular room room, whether she had exposure to the victim.  That is what this witness

22   should be testifying to.

1    The fact as to well, you know, I believe there is, you know, there is

2    information that you can touch somebody in their thumb and it will affect their toe, is

3    completely irrelevant and I don't believe this person has the qualifications for that.

4    If Counsel wants to get a doctor, you know, certainly commence

5    and continue to bring in a physician if they would be able to say that.  We are stretching

6    it here.  I would ask unless this is somehow tied up, that this witness' entire testimony

7    be stricken.

8    THE COURT:  First of all, I overruled the objection whether or not if you

9    touch one part of the body do you feel it elsewhere.  I overruled that, and she said, yes.

10    I don't know what more she is going to say.

11    Counsel, you're arguing if you touch the back of the leg, then you

12    feel it somewhere else.

13    MR. AMIRANTE:  I'll withdraw the question and leave it at that.

14    THE COURT:  I don't know why would you qualify her here anymore?  It's

15    out there on the record, and I can think of arguments for both of you to make a closing

16    argument if you're touched in one part of the body, you can feel it else where.

17    MR. KOUGAIS:  I imagine Counsel's question should be, what part of the

18    body can you touch where it would give a sensation in the vagina?

19    THE COURT:  He's withdrawing her as an expert witness.  He's not going

20    to qualify her.  And the record will stand.

21    Off the record.

22    (Whereupon a discussion was had off the

23    record.)

24    THE COURT:  Any further witnesses?

1          MR. AMIRANTE:  Judge, I will withdraw the last question.

2          THE COURT:  The Defendant has gone to the restroom so let's wait until he

3     comes back.

4                                    (Whereupon a recess was had in the above-

5                                    entitled cause.)

6          THE COURT:  Back on trial.

7          MR. AMIRANTE:  May I, your Honor?

8          THE COURT:  Yes.  You may.

9     BY MR. AMIRANTE:

10         Q       Ma'am, in giving you a massage did you ever ask a patient if you're

11    pressing too hard or what you're doing is okay?

12         A       Yes, all the time.

13         Q       Why do you do that?

14         A       Because--

15         MR. KOUGAIS:  Objection.

16         THE COURT:  Overruled.

17         THE WITNESS:  Because the pressure may be too hard.  There's different

18    sensitivity levels for different parts of the body.  I may be pressing too hard.  I may be

19    pressing too light.  I need to know what is the right combination for them.

20         MR. AMIRANTE:  Nothing further of this witness.

21         THE COURT:  Thank you very much.

22              Any cross?

23                        CROSS-EXAMINATION

24                        BY

29

1                    MR. KOUGAIS:

2            Q      Ma'am, you're licensed?  Do you have a license to be a massage

3    therapist?

4            A      Yes.

5            Q      That involves what years of schooling?  What does it involve?

6            A      For me it involved about a year and a half of schooling.  You know

7    hospital work, different centers that I had to go to have so many hours in before I could

8    actually, you know, go out and work as a massage therapist.

9            Q      Does this include any type of medical school?  Do you have to

10   attend classes at medical school?

11           A      We have anatomy, you know, pathology.  We have different

12   classes like that, yes.

13           Q      That happens at a medical school, or are these classes that are

14   offered at college?

15           A      I had—I went to a massage clinic therapy school.

16           Q      What's the name of it?

17           A      Solna Institute in Chicago, Illinois. (phonetic)

18           Q      And the name was what?

19           A      The Solna Institute of Clinical Massage Therapy.

20           Q      Solna?

21           A      Correct.

22           Q      That is about a year's worth of work that you do there?

23           A      For me, a year and-a-half.

24           Q      Did you go part time or full time?

30

1          A       I went part time.

2          Q       If you went in the full time program, can you get it done in a year or

3    six months?  What's the program?

4          A       You can probably get it done in nine months to a year.  I don't know

5    because I didn't do it myself.

6          Q       So you're licensed though, is that correct?

7          A       Correct.

8          Q       By the state?

9          A       Correct.

10         Q       Is there a minimum number of hours that you need to be licensed?

11         A       Yes.

12         Q       What's that?

13         A       The minimum number for Illinois is five hundred, and I have over

14   seven hundred fifty some hours.

15         Q       Are you familiar with a full body massage?

16         A       Yes, I am.

17         Q       Does a full body massage include any contact on a female with her

18   vagina and her breasts?

19         A       No, not with the vagina, or I mean depending on the breasts, if

20   there's something in the breast that hurts okay, there are different parts of the muscles,

21   okay, those are the pectorals muscles in through your chest area.  Any type of pain

22   discomfort, anything like that, yes, I may have to go up underneath into the side of the

23   body underneath by the breast.  I may have to go up by the side up through right by

1    your clavicle area.  I may have to go—I may just, you know, press at certain points to

2    see if something hurts or not if they are complaining of that type of—

3              Q       If a complaint is raised by the patient, then you enter that particular

4    area referring to the breast?

5              A       Yes.

6              Q       Normally a full body massage, if the patient does not raise any

7    complaint like, look, I have a pain by my breast, would you do a full body massage?  Do

8    you actually fondle the breast or touch or press on the breasts?

9              A       I don't ever fondle the breast.

10             Q       And as far as—

11             A       I'm sorry.  I don't ever fondle the breast, okay?  If I have to touch

12   the breast, okay, in order to strip out a muscle, okay, that's completely different.  It's a

13   medical procedure that I have to do to accomplish getting rid of the pain in this area.

14             Q       And as far as the vagina area—

15             A       Uh-huh.

16             Q       Is there any—if a patient requests a full body massage and there's

17   no mention made of any pain in the vagina area, is there typically a massaging of the

18   vagina that a masseuse would do?

19             A       Typically, no.

20             Q       On October 16th of 2006, were you working at Dr. Brad's clinic?

21             A       Not on that day.

22             Q       So you don't know whether Ms. Kelley came into that clinic on that

23   particular day, correct?

24             A       No, I do not.

32

1          Q       And you don't know what room if she came in she would have gone

2   to, is that correct?

3          A       Correct.

4          Q       And you certainly can't attest to what the linens and the supplies

5   were in that room on that particular day because you weren't even there that particular

6   day, is that right?

7          A       I was not there that day, but we supply the linens for the rooms

8   ourselves.  We have sheets.  We have towels.  We have bath towels.  All of them are—

9   it's not like we count them.  It's just a stack of sheets, a stack of towels.  So on and so

10  forth.  If I need to go get more--

11         Q       Typically how would a patient use this towel in the room?

12         A       Depending on if I am just working on a female, if I'm just doing her

13  neck and shoulders, okay, I may put that over her, okay.  Usually they are underneath

14  the sheet, okay?  I may use that for warmth.  I may use it—do you know what I mean to

15  get more draping?  I may use it as a bolster if I need to raise the arm or, you know, any

16  part of the body.

17         Q       Is that the biggest towel or covering available in Dr. Brad's offices?

18         A       Besides the sheet?

19         Q       Besides the sheet that stretches out on the bed, right, or on the

20  table?

21         A       Yes.  This is on the table, yes.

22         Q       That sheet that you just pointed to, is a thin sheet spread out before

23  the person lays down, correct?

1          A      And I use it over them.  Sometimes I stack them on top of each

2    other.  Sometimes I have five or six sheets on the bed.  I mean, it just depends.

3          Q      But on October 16th, you weren't there so you don't know what was

4    going on in Dr. Brad's clinic?

5          A      Yes.

6          THE COURT:  Counsel has been holding up a bath towel from Defense

7    Exhibit Number Two for Identification.

8                Any other questions, State?

9    BY MR. KOUGAIS:

10         Q      Just to clarify a point.  We discussed this a few minutes ago.  As far

11   as the only time that you—that you would have contact with a patient's breasts

12   specifically is if they have made a comment to you there is pain or discomfort in that

13   area when you are doing a full body massage?

14         A      If I'm doing a full body massage and I know that there is pain in one

15   area, maybe up here, okay, by the pectorals muscles, okay, I may know that they also

16   have pain on the side of their body, or they may have pain on the side of their body that

17   they are not even aware of as of yet.

18         Q      But if somebody comes into you for a full body massage and they

19   don't have any pain or discomfort, they are coming to you for a full body massage,

20   would you have contact with their breasts and/or their vagina?

21         A      No.

22         Q      Thank you.

23                I have nothing further, Ma'am.

24         THE COURT:  Any redirect, Counsel?

1                          REDIRECT EXAMINATION

2                                    BY

3                             MR. AMIRANTE:

4          Q       Ma'am, if someone told you or you knew that for instance they had

5    a breast reduction—

6          A       Uh-huh.

7          Q       Would you ask that person or would it be unusual for a massage

8    therapist or doctor to ask that person if there is a sensitivity or any pain in the breast

9    area or in the breast because they have had that surgery?

10         A       Yes.

11         Q       It would be unusual?

12         A       No.  It would be usual to ask if there is any pain.

13         Q       If the breasts are sensitive or any sensation or pain if you knew that

14   they had a breast reduction, would you ask them?

15         A       Yes, yes.

16         Q       That wouldn't be unusual for somebody to do that?

17         A       No.

18         Q       Counsel brought this up in the vaginal area or in the vagina or pubic

19   area, are there muscles in this area?

20         A       Yes.

21         Q       If you're massaging say the thigh or somewhere close to the bikini

22   area, to your knowledge and your experience could there be a transfer of feeling to

23   those other muscles giving a sensation that those muscles are being touched?

24         A       Very possible.  It happens quite often.

1          Q       So somebody could come close to the vagina area and not touch it

2    and there is a feeling that the vagina is being touched?

3          A       It can happen, yes.  It will happen for instance if you're touching

4    somebody's neck and shoulder, you're touching someone's shoulder, they may feel it in

5    their hand down to the fingers  There is—can be a tingling sensation, so definitely

6    depending upon their sensitivity level, yes.

7          MR. AMIRANE:  No further questions, Judge.

8                              RECROSS EXAMINATION

9                              BY

10                             MR. KOUGAIS:

11         Q       So what type—Where would you have to press near or anywhere

12   on the female body in order to mimic fondling of the vagina?  What other part of the

13   body would you have to touch in order to duplicate the feeling that somebody is fondling

14   or manipulating or touching your vagina?

15         A       The only type that I'm aware of is the adductor muscles that are in

16   the inside muscle of the thigh area.  (phonetic)That's an extremely sensitive area in the

17   body.  Most people don't, you know, get touched there.  When you go ahead and rub

18   the leg though you rub the outside of the leg, you rub the inside of the leg and, yes, you

19   do go up, you know, and you're touching the adductors which can trigger certain

20   sensations or, you know, feelings in the body, yes.

21         Q       You're talking about a tingling sensation though, right?

22         A       A pain sensation.

23         Q       Or a pain, but are you saying that you can touch certain areas and

24   it would actually feel like something is actually touching and manipulating the vagina?

1      A     No. I'm saying there would be a sensation that could go up the leg,

2  down the leg. Is that what you're asking?

3      Q     But that is distinguishable. My question was, is there any touching

4  that can occur that would mimic or make it feel on woman that someone is actually

5  manipulating or rubbing or fondling the actual vagina, but the person is actually touching

6  another part of the body?

7      A     I can't answer that.

8      Q     Have you ever had that experience happen to any of your patients?

9      A     No.

10     Q     Have you ever massaged a particular area where you were by the

11  inner thigh and somebody told you, hey, stop touching my vagina?

12     A     No, I have never had them tell me to stop touching their vagina. I

13  had people tell me this is a lot of pain. It feels like it's traveling. Am I supposed to feel

14  this or anything like that, yes, I have had those questions asked to me.

15     Q     But you have never had it put towards you based upon your

16  experience that touching the inner thigh and somebody would say, hey, don't touch my

17  vagina, stop touching it?

18     A     No. No one has ever said that to me.

19     Q     Thank you.

20     MR. AMIRANTE: No further questions.

21     THE COURT: Thank you. You may step down.

22     Counsel?

23     MR. AMIRANTE: I will call Valerie Taft.

1          THE COURT:  If you would come and have a seat in the witness box.  You

2   have been sworn this morning?

3          THE WITNESS:      Yes.

4          THE COURT:  Counsel, you may proceed.

5          MR. AMIRANTE:  Thank you, your Honor.

6                              VALERIE TAFT,

7       Called as a witness, having been first duly sworn, was examined and testified as

8   follows:

9                              DIRECT EXAMINATION

10                             BY

11                             MR AMIRANTE:

12          Q      Please state your name and spell it for her Honor Judge Hanlon.

13          A      Valerie Taft, T-A-F-T.

14          Q      What is our business or occupation?

15          A      I'm a massage therapist.

16          Q      And where are you presently employed?

17          A      I'm not.

18          Q      Have you ever been employed for Dr. Bradley Hayashi?

19          A      Yes.

20          Q      When were you so employed?

21          A      For three-and-a-half years starting August to-- I just quit the end of

22   February.

23          Q      And you're here today pursuant to a subpoena from the State's

24   Attorney's office?

1    A    Yes.

2    Q    And did you ever have occasion to have a massage patient by the

3 name of Melaina Romano or Melaina Kelley?

4    A    Yes.

5    Q    How is it that she was your patient?

6    A    She was just a chiropractic patient and scheduled me for a

7 massage.

8    Q    You performed massage therapy on her?

9    A    Yes.

10    Q    What type of massage therapy?

11    A    The deep tissue clinical massage.

12    Q    When you perform deep tissue massage, can you be more specific.

13 Can you explain that to her Honor?

14    A    On her?

15    Q    Yes.

16    A    On her back from the low back, the way through her neck.

17    Q    When you performed deep tissue massage, do you ever ask the

18 patient any questions?

19    A    Yes.

20    Q    Like what?

21    A    If she's comfortable with what I'm doing, if I'm using too much

22 pressure or not enough pressure, or pain at all.

23    Q    Did you ever ask those questions of Ms. Kelley?

24    A    Yes.

| | | |
|---|---|---|
| 1 | Q | And did she ever answer your questions? |
| 2 | A | Yeah. |
| 3 | Q | Would she tell you if you had too much pressure? |
| 4 | A | Yes. |
| 5 | Q | Would she tell you if she was uncomfortable? |
| 6 | A | Yes. |
| 7 | Q | For how long have you been a massage therapist? |
| 8 | A | For almost four years. |
| 9 | Q | Do you have any type of formal training in that area? |
| 10 | A | Yes. |
| 11 | Q | What type of formal training? |
| 12 | A | I went to the Solna Institute located downtown where I took |
| 13 | | massage classes. |
| 14 | Q | And how much- - what did that involve? |
| 15 | A | It was all clinical work that we were trained in. |
| 16 | Q | For how long? |
| 17 | A | For a year.  It was a year. |
| 18 | Q | You go through normal classes and take tests? |
| 19 | A | Yes. |
| 20 | Q | Do you get a license? |
| 21 | A | Yes. |
| 22 | Q | Are you a licensed massage therapist for the State of Illinois? |
| 23 | A | Currently I have to get it reinstated.  I missed the expiration time. |
| 24 | Q | At the time you were with Dr. Hayashi, were you licensed? |

1     A     Yes.

2     Q     And when you worked with him and before you worked with him,

3  were you familiar with his reputation in the community?

4     A     No.

5     Q     Did you ever talk to anybody about him?

6     A     No.

7     Q     Ever hear anybody talk about him?

8     A     No.  Before I started working there, no.

9     Q     Afterward?

10    A     Afterward, just generally with his patients if they liked him.

11    Q     Ever hear anybody complain about him?

12    A     No.

13    Q     As a massage therapist, did you ever touch one part of the body

14    and there is a feeling or sensation in another part of the body?

15    A     Yes.

16    Q     Is that unusual?

17    A     No, it's pretty common.

18          MR. KOUGAIS:  I'll object.  I don't believe this woman is qualified or

19          has she been qualified.  Did she indicate her license was expired.  She

20          said she was licensed in the State of Illinois but she missed an expiration

21          date so she no longer is licensed but she was licensed.  She went through

22          her training and clinical work.

23          THE COURT:  Overruled.  She may answer.

24          THE WITNESS:  I'm sorry?

41

1      BY MR. AMIRANTE:

2          Q      Is it unusual you can feel sensation in one part of the body

3      touching another part?

4          A      Yes.

5          Q      It is unusual?

6          A      No, it's pretty common.

7          Q      Did that ever happen when you were massaging somebody

8      where they would tell you that?

9          A      Yes.  It's called referral pain.

10         Q      Only involuntary pain or any other kind of sensation?

11         A      The tingling sensation can involve that too.  Sharp pain.

12         Q      Now, you were not in the clinic on October 16th of last year

13     were you, or were you?

14         A       Yeah.

15         Q      Are you familiar with the day that Ms. Melaina went in to get

16     a full body massage?

17         A      Yes.

18         Q      Were you working that day?

19         A      Yes.

20         Q      What were you doing?

21         A      I was working massage.

22         Q      At the time Dr. Brad was giving a massage to Melaina

23     Romano or Kelley, were you doing another massage in another room?

24         A      Yes.

1    Q     Did you have occasion to see Melaina that day?

2    A     Briefly.

3    Q     Do you know when you saw her?

4    A     No, I don't know.

5    Q     When you saw her briefly, did she appear to be upset or

6    nervous or anything?

7    A     No.

8    MR. AMIRANTE:  Nothing further of this witness, Judge.

9    THE COURT:  Thank you.

10         Cross examination.

11              CROSS-EXAMINATION

12                   BY

13              MR. KOUGAIS:

14   Q     You have examined Ms. Kelley in the past, is that correct?

15   A     I have massaged her, yes.

16   Q     Do you ever fondle or rub her vagina when you did a

17   massage on her?

18   A     No.

19   Q     I believe you testified you focused on her lower back and

20   upper neck?

21   A     Yes.

22   Q     How many occasions have you massaged her?

23   A     I don' recall.  Usually every time she came in.

24   Q     And is it fair to say until actually—strike that.

1          Counsel asked you if you remember the date that Ms. Kelley

2     had come in there.  What was that date?

3          A     I don't know the exact date.

4          Q     Well, did you assume he was talking about, did something

5     happen on a particular date involving Ms. Kelley?

6          A     I don't remember.

7          Q     You indicated your license hasn't been renewed at this point,

8     correct?

9          A     Correct.

10          Q     Counsel asked you some questions about when you

11     described, I think, referral pain or tingling sensation?

12          A     Yes.

13          Q     Any part of the body you touch on a woman which would

14     cause sensation to go directly to her vagina where the woman would feel

15     she's touched or massaged or rubbed in the vaginal area?

16          A     Not that I know of.

17          Q     And when you're referring to referral pain or tingling, that's

18     some type of a transfer if you press somebody in one spot, it may send a

19     tingling sensation or pain in other areas, correct?

20          A     Yes.

21          Q     That doesn't mimic someone actually grabbing or twisting

22     another it just—

23          A     No.

1          Q        On October 16th of 2006, on that particular date, do you

2    remember seeing Ms. Kelley?

3          A        Very briefly.

4          Q        How do you remember that particular day?

5          A        If she was in, I don't—

6          Q        Does that stick out from any other day?

7          A        No.

8          Q        At any time that you gave Ms. Kelley a massage, did she

9    ever accuse you of any wrongdoing?

10         A        No.

11         Q        In fact, she was a nice lady?  You got along with her?

12         A        Yes.

13         MR. KOUGAIS:  Nothing further.

14         THE COURT:  Anything based upon that, Counsel?

15         MR. AMIRANTE:  Just a couple.

16                        REDIRECT EXAMINATION

17                        BY

18                        MR. AMIRANTE:

19         Q        The room you worked in, the massage room, do those doors

20   have locks on them?

21         A        No, not that I recall.

22         Q        You don't lock those doors?

23         A        No.

24         Q        They are open?  Anybody can walk in and out?

1          A        Yes.

2          Q        And the items you have in front of you—

3          A        Yes.

4          Q        Are those-- any of those items you use in massage therapy

5    or you used at Dr. Brad's office?

6          A        The towel, the sheet.

7          MR. KOUGAIS:  I'll object.  Beyond the scope of cross.

8          THE COURT:  Sustained.  Beyond the scope.

9          MR. AMIRANE:  May I reopen for these purposes?  I simply forgot

10   these.

11         THE COURT:  Are you going to ask her on the particular day that

12   she was there that day?  If you want to direct it to 10-16-06, that day and

13   that day only.

14   BY MR. AMIRANTE:

15         Q        You were present in the office on October 16th, right?

16         A        Yes.

17         Q        You actually performed massages that day?

18         A        Yes.

19         Q        You performed in both rooms or just one?

20         A        Usually just the one room.

21         Q        The room you were in, what items, massage items were

22   contained in the room?

23         A        The sheets, the towels, massage creams, the lotions.

24         Q        Now, the towel that's in front of you—

1    A    Yes.

2    Q    That white towel.

3    A    Uh-huh.

4    Q    Is that the type of towel that was in the room?

5    A    Yes.

6    Q    Were any other types of towels in there?

7    A    The smaller ones like the blue one here, like the hand

8    towels.

9    Q    Take a look at that blue one and take a look and see how big

10    it is.  The towel like that, a hand towel?

11    A    Yes.

12    Q    Any towel bigger than that?  A towel between that size and

13    the hand towel?

14    A    A white hand towel a little longer than this.

15    Q    How much longer?

16    A    I'm not exactly sure how much longer.

17    Q    And anything else?  How about the sheets?

18    A    The sheets, yes.

19    Q    In the room that day were the sheets on the bed when you

20    went in there to massage?

21    A    Yes.

22    Q    And how were the sheets set up on the bed?

23    A    There's two sheets on the bed with a towel draped over the

24    end of the bed, the foot of the bed.

1       Q     Two sheets, one is the bottom sheet, one is the top sheet?

2       A     Yes.

3       Q     On both beds in both rooms?

4       A     Yes.

5       Q     That was like that that day on October 16th?

6       A     I believe so, yes.

7       MR. AMIRANTE:  No further questions, Judge.  Thank you.

8                RECROSS EXAMINATION

9                BY

10              MR. KOUGAIS:

11      Q     On that date did you perform a massage on Ms. Kelley on

12    October 16th?

13      A     On that day, no.

14      Q     So is it fair to say that you don't know what was in the room

15    that Ms. Kelley had the full body massage in?

16      A     I just know how they are usually set up.

17      Q     How they're usually set up, right, but on that particular date

18    you don't know what, if anything was in that room, do you?

19      A     No.

20       MR. KOUGAIS:  Nothing further.

21       MR. AMIRANTE:  Nothing further.

22       THE COURT:  Thank you very much.  You may step down.

23         Counsel?

24       MR. AMIRANTE:  One more short witness, the officer.

1          THE COURT:  Officer, if you'd like to step up and have a seat in the

2     witness box, please.

3               Counsel, you may proceed.

4               OFFICE ERIC VILLANUEVA,

5     called as a witness, having been first duly sworn, was examined and

6     testified as follows:

7                    DIRECT EXAMINATION

8                    BY

9                    MR. AMIRANTE:

10         Q     Could you please state your name and spell it for her Honor

11    Judge Hanlon?

12         A     Officer Eric Villanueva.

13         Q     Officer Villanueva, were you one of the investigating officers

14    in the matter involving Dr. Bradley Hayashi?

15         A     Yes, I was.

16         Q     And did you have occasion to interview a person by the

17    name of Melaina Kelley in regard to this alleged incident?

18         A     Yes, I did.

19         Q     And did you interview her at approximately 7:30 at night on

20    October 16th, 2006?

21         A     That's correct.

22         Q     And she came to the station with her husband and sister-in-

23    law?

24         A     Sister-in-law.

49

1    Q    And her husband wasn't there?

2    A    He was there.

3    Q    Did you have occasion to generate a the police report

4    regarding an interview you conducted with her?

5    A    Yes.

6    Q    And you entered that on a police report.  You took notes and

7    entered it into the computer the following day?

8    A    That's correct.

9    Q    Do you remember exactly what she told you?  You took

10    notes what she told you when she came in to see you?

11    A    Yes.

12    Q    You questioned her specifically about what had occurred or

13    what she told you occurred earlier that morning?

14    A    Yes.

15    Q    Do you recall she told you she had this full body massage

16    from Dr. Hayashi?  She made certain allegations regarding that?

17    A    Yes.

18    Q    Did you ask her what she did right after she had the full body

19    massage?

20    A    Yes.

21    Q    And what did she say to you?

22    A    She said that she was upset and she was going to leave the

23    doctor's office.  Prior to leaving that she made an appointment for the, I

24    believe, the following Monday.

1      Q     So after she had the massage she told you that she made

2  an appointment?

3      A     Correct.

4      Q     And then after she made the appointment, did she tell you

5  that she went back in to get an adjustment from the same doctor?

6      A     Yes.

7      Q     You are absolutely sure she told you that?

8      A     On the same day?  Are you saying on the same day?

9      Q     Yes.  She came out of the room and told you she came out

10  and made an appointment?

11      A     After the massage.

12      Q     She waited in the waiting room and while she was waiting

13  there, she set up another appointment?

14      A     She said she skipped the electrotherapy part.

15      Q     While she skipped that, while she was waiting there for the

16  doctor to come out for her adjustment, she set up another appointment?

17      A     Correct.

18      Q     And after she set up that appointment on that day she went

19  back in and had Dr. Hayashi adjust her, right?

20      A     I think it was all about the same time, yes.

21      Q     She told you that and you put that in your police report?

22      A     Yes.

23      Q     What you put in your police report is absolutely true and

24  correct, and you swear to it?

1     A     Yes.

2     Q     Did you have occasion to go to doctor-- the doctor's office

3     and look at the massage rooms at all?

4     A     Yes, just one room.

5     Q     You looked at the room.  Did you do that the same day?

6     A     No.

7     Q     The next day?

8     A     It might have been several days after the initial report.  I

9     went to go pick up Dr. Hayashi.  I looked into the room.

10    Q     Did you take any items from the room?

11    A     No.

12    Q     Did you look to see what was in the room?

13    A     The one room I was in, yes.

14    Q     She described to you a towel during your conversations with

15    her that went from her breast down to about her vagina.  Did she tell you

16    about the towel?

17    A     She said she was covered with a towel which she called a

18    half-towel.

19    Q     She called it a half-towel?

20    A     Yes.

21    Q     Did she tell you how big that towel was?

22    A     She just described it as a half-towel.

23    Q     When you went into that room to look, did you look for this

24    item called a half-towel?

1    A    No, I did not.

2    Q    Did you see anything that fit that description?

3    A    No, I did not.

4    Q    Do you recall asking her if Dr. Hayashi said anything

5    sexually explicit or made any comment about her body during the

6    massage?  Do you remember asking her that?

7    A    Yes.

8    Q    And she told you that he made no such comments?

9    A    That's correct.

10    MR. AMIRANTE:  Judge, no further questions of this witness.

11    THE COURT:  Cross.

12                              CROSS-EXAMINATION

13                              BY

14                              MR. KOUGAIS:

15    Q    Officer, was it on October 16th of 2006 at about 7:30 about

16    seven and a half hours after the incident occurred that the victim, Ms.

17    Melaina Kelley, came to the police station, is that right?

18    A    Yes.

19    Q    She came with her husband, James?

20    A    Yes.

21    Q    And her sister-in-law, Rita?

22    A    Yes.

1           Q     How would you describe the condition of how Ms. Kelley was

2    when she came to meet with you? Was she calm, hysterical, excited?

3    What were her emotions?

4           A     Obviously upset.

5           Q     I don't know. I wasn't there. What do you mean obviously

6    upset?

7           Q     She couldn't tell me the story without being very

8    embarrassed about it.

9           Q     When you say embarrassed, was she crying, was she

10   laughing?

11          A     Crying. She was crying.

12          Q     Okay.

13          A     Emotionally upset. Unable to tell me the story.

14          Q     Did it take a while to get the story out as to what had

15   transpired?

16          A     Yes.

17          Q     She did tell you there was contact between the Defendant's

18   fingers and her vagina?

19          A     That's correct.

20          Q     Did she tell you that?

21          A     Yes, she did.

22          Q     You put that in the report. Was there contact with the

23   Defendant's fingers and her buttock?

24          A     Yes.

1    Q    And did she tell you anything that she was weirded out at the

2    time and didn't say anything about that at the office?

3    A    Yes.

4    Q    Was she being consoled by her husband and her sister-in-

5    law at that time as well?

6    A    Her sister-in-law, yes.

7    Q    How long have you been a police officer?

8    A    Since 1990.

9    Q    Your position was what, a detective?

10    A    Yes.

11    Q    And have you-- based on your review of the victim in her

12    condition at that time, was the way she was acting consistent with victims

13    of sexual assault type cases?

14    A    Yes.

15    MR AMIRANE:  Objection.  Ask that it be stricken.

16    THE COURT:  What's your objection?

17    MR. AMIRANE:  It's a conclusion.  People act all different kinds of

18    ways under different circumstances under any means.  Consistent with

19    sexual assault?

20    THE COURT:  I'll sustain it.  The answer will be stricken.

21    Anything else, State?

22    BY MR. KOUGAIS:

1    Q    When she was explaining the details of the incident that

2    occurred a few hours earlier, what was her emotional state?  Did it change

3    at all?

4    A    No.

5    Q    At the conclusion of the interview that you had with her—

6    Strike that.

7         Did you have to go over the events on more than one

8    occasion?

9    A    Yes.

10   Q    How many times approximately did you go over the events

11   as they transpired?

12   A    Several.

13   Q    And were you just taking notes at that time or actually typing

14   them on the computer as she was talking?

15   A    Taking notes.

16   Q    Like a G.P.R., general progress report, handwritten notes?

17   A    Yes.

18   Q    And Counsel asked you whether the victim told you that she

19   had made another appointment with the Defendant after she had a portion

20   of her massaging done, is that correct?

21        MR. AMIRANTE:  Objection.  That was not the question.  Not a

22   portion of the massaging.

23        THE COURT:  I'll overrule the objection.

24        Did you hear the question, officer?

1          THE WITNESS:  Can you repeat it, please?

2     BY MR. KOUGAIS:

3          Q       Do you recall being asked the question by counsel as to

4     when and where the victim had made another appointment with the

5     Defendant?

6          A       Yes, I do.

7          Q       And when she told you this, you indicated in your report that

8     the victim stated that after a portion of her massage was done, that she

9     then went to make the next date, appointment?

10         A       That's correct.

11         Q       That is what you indicated in your report?

12         A       Yes.

13         Q       Counsel asked you if you were sure that was how this

14    transpired?

15         A       Yes.

16         Q       Do you remember the victim ever telling you—

17         MR. AMIRANE:  I'll object.  The victim as far as its concerned, the

18    victim is Dr. Hayashi.  He keeps calling her the victim, and she has a

19    name.

20         THE COURT:  Overruled.  Ask the next question.

21    BY MR. KOUGAIS:

22         Q       Did the victim, Ms. Kelley, ever tell you that when she arrived

23    for her appointment there was a delay and she had made the next

24    appointment while she was waiting there?

1          A      Yes, she did.

2          Q      Did she say that?

3          A      Yes.

4          Q      So then in effect is it inaccurate on your report as it's written,

5    or you're not certain?

6          MR. AMIRANTE:  Objection.  Wait.

7          THE COURT:  Overruled.  Sit down.  Sit down.  Overruled.  You

8    may answer.  Answer the question.

9          THE WITNESS:  Can you repeat the question again, please?

10          THE COURT:  Read the last question back, please.

11                              (Whereupon the last question was read back

12                               by the court reporter.)

13          THE WITNESS:  She had told me—

14          MR. AMIRANTE:  Judge, may I object to that again?

15          THE COURT:  Yes, you may.  It's overruled.  Answer please.

16          THE WITNESS:  She told me that she had made an

17    appointment after the massage.

18    BY MR. KOUGAIS:

19          Q      After the massage?

20          MR. AMIRANTE:  Excuse me.  I did not hear it.

21          THE COURT:  She said she had made the appointment after the

22    massage.

23    BY MR. KOUGAIS:

24          Q      And that appointment was for the following date, is that correct?

58

1          A     The Monday, yes.

2          MR. KOUGAIS:  Nothing further.

3          THE COURT:  Counsel, redirect?

4                        REDIRECT EXAMINATION

5                        BY

6                        MR. AMIRANTE:

7          Q     In her entire statement to you in your interview, did she ever tell you Dr.

8     Brad had ever left the room while she was in there?

9          A     During the massage?

10         Q     During the massage.

11         A     I believe at one point he may have.

12         Q     Did she tell you he gave her a couple of gowns to put on when she went to

13    the bathroom?

14         A     Yes, when she asked for them.

15         Q     She asked for them.  She went to the bathroom and came back to get

16    massaged further?

17         A     Correct.

18         Q     She told you all that?

19         A     Yes.

20         Q     Did you put that in your report?

21         A     Yes.

22         Q     And you said she appeared to be upset when you were talking to her?

23         A     Correct.

24         Q     Did you have occasion to interview any other witnesses besides her?

1    A    That evening?

2    Q    That evening.

3    A    Besides her--

4    Q    During the course of your investigation?

5    A    In the course of my investigation, yes.

6    Q    Did you interview any witnesses that were present at the time immediately

7    after her getting this massage?

8    A    I believe the receptionist, Karen Muir.

9    Q    You interviewed her?

10    A    I talked to her.

11    Q    But you didn't include that in your report that you talked to her?

12    A    I spoke to her.  It was to call and confirm.

13    Q    And did you ask her if Melaina appeared to be upset at all?

14    MR. KOUGAIS:  Objection.

15    THE COURT:  Sustained.

16    BY MR. AMIRANE:

17    Q    You've been an officer and investigator for quite a while as you told

18    Counsel, and you said in your view she appeared to be upset.  When she was in the

19    station and she told you that she made another appointment after she had this

20    massage, right?   That is what you told us and that is what you wrote in your report?

21    A    Yes.

22    Q    Did you ask her why you made another appointment?

23    A    That was part of her routine after being his patient for over two years.

24    Q    She wasn't too upset not to make another appointment?

1          MR. KOUGAIS:  Objection.

2          THE COURT:  Sustained.

3               State, anything else?

4          MR. KOUGAIS:  No, Judge.

5          THE COURT:  Does anybody have any objection to me asking one question?  If

6     you do, I won't ask it.  It's unorthodox.

7               Officer, when she made the appointment on October 16th before leaving

8     for that following Monday, did she make the appointment with the Defendant or with

9     Val?

10          THE WITNESS:  I believe she made it with the receptionist.

11          THE COURT:  When she made the appointment to come back on October

12    23rd, did she specifically make the appointment to see Dr. Brad or did she make the

13    appointment to see Val?

14          THE WITNESS:  That I do not know.

15          THE COURT:  Anything based upon that, gentlemen?

16          MR. KOUGAIS:  No, your Honor.

17          MR. AMIRANTE:  No, your Honor.

18          THE COURT:  You may step down.

19               Mr. Amirante, how many more witnesses do you anticipate calling,

20    sir?

21          MR. AMIRANTE:  The only other witness I have is the Defendant.

22          THE COURT:  State, do you have any rebuttal witnesses anticipated at

23    this time?

24          MR. KOUGAIS:  Yes.

1    THE COURT:  How many?

2    MR. KOUGIS:  One.

3    THE COURT:  All right.  It's approximately 6:00 p.m.  We started this trial earlier

4   this morning.  I'm of the opinion we should commence and continue this trial, and I

5   really don't want to do this in the morning time.  Mr. Kougais cannot be here tomorrow.

6   What about Monday, gentlemen?  Can you bring in your witness for rescheduling, the

7   ones you anticipate calling?

8    MR. AMIRANTE:  Judge, in the morning, the 21st?

9    THE COURT:  Monday is the 21st.  And it's really difficult to anticipate a time.  If I

10  thought we could finish this in thirty minutes, we'd stay, but I don't know.  I'm

11  anticipating at least an hour to two hours more.

12    MR. AMIRANTE:  If we can do it in the afternoon?

13    THE COURT:  Mr. Kougais, are you available in the afternoon of

14   Monday the 21st?

15    MR. KOUGAIS:  I am in the building.  I'll make myself available.

16    THE COURT:  Is your witness available?

17    MR. KOUGAIS:  Are we talking to have the witness arrive at two

18   o'clock or 2:30?

19    THE COURT:  We'll start the trial at 1:30.

20    MR. KOUGAIS:  Okay.

21    THE COURT:  And then we'll see.  I don't know how long the

22   witness will be.

23    MR. KOUGAIS:  Monday at 1:30 is fine with the State.

1                THE COURT:  The trial will be commenced to 5-21-07, 1:30 p.m. in

2       room 108.

3                MR. AMIRANTE:  1:30 or 2:00?

4                THE COURT:  1:30.  Thank you.

5                MR. AMIRANTE:  Thank you for your time.

6                MR. KOUGAIS:  Judge, I would just ask if the witness could be on

7       the record just to have her subpoena continued to Monday?

8                THE COURT:  Sure.  All right, this is your witness?

9                MR. KOUGAIS:  Yes, Judge.

10             THE COURT:  Her name, please?

11             THE WITNESS:  Heather.

12             THE COURT:  You were subpoenaed to be here today for trial.  We

13    have commenced and continued the trial because of the late hour.  Your

14    subpoena is continuing until Monday the 21st at 1:30 in the afternoon.  Do you

15    understand that?

16             MR. AMIRANTE:  Judge, I apologize but could we have the witness

17    step out for a minute?

18             THE COURT:  Sure.

19             MR. AMIRANTE:  Judge, under Schmidt and under Brady again,

20    we are entitled to know things in advance.  I had no idea—I mentioned this

21    earlier.  Now they are calling this witness in the case.  It was never disclosed.

22             MR. KOUGAIS:  It's rebuttal.  Her name appears on the record.

23    Her first name is Heather.

24             MR. AMIRANTE:  Do you know how many Heather's there are?

1      THE COURT:  It's rebuttal testimony as far as the State is telling

2   me.  I'm not going to bar her testimony at this juncture.  If you want to renew the

3   objection.  I don't know what's being offered.

4      MR. AMIRANTE:  I will move to exclude her testimony.

5      THE COURT:  Denied.  See you Monday.

6                              (Whereupon no further proceedings were had

7                               in the above-entitled cause on this particular

8                               date.)

9

10

11

12

STATE OF ILLINOIS )
                  )SS:
COUNTY OF COOK )


        I, Sandra Lio, Official Shorthand Reporter of the Circuit Court of

Cook County, County Department-Third Municipal Division, do hereby certify

that I reported in shorthand the evidence had in the above-entitled cause and that

the foregoing is a true and correct transcript of all the evidence heard.


Sandra Lio
Official Shorthand Reporter
License No. 084-001897
Circuit Court of Cook County