1    STATE OF ILLINOIS

SS:

2    COUNTY OF C O O K

3            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - THIRD MUNICIPAL DISTRICT

4

5    THE PEOPLE OF THE STATE OF
     ILLINOIS,

6

                        Plaintiff,

7                                          No. 06 MC 3  007145

             -vs-

8

9    BRADLEY HAYASHI,

                   Defendant.

10

11

                        REPORT OF PROCEEDINGS, had and testimony taken at the

12

     hearing of the above-entitled cause, before the Honorable KAY HANLON, Judge of said

13

     Court, continuing on the 21st day of May, A.D., 2007, at the hour of 2:15. p.m.

14

15    PRESENT:

16              HON. RICHARD DEVINE, State's Attorney of
                Cook County, by

17              MR. THOMAS KOUGIAS,
                Assistant State's Attorney,

18              appeared on behalf of the People of the State of Illinois.

19

20              MR. SAM AMIRANTE,
                appeared on behalf of the Defendant.

21

22    Kathleen Jackson, CSR
      Official Court Reporter   084-000973

23

THE COURT:  Let's call the case.

THE CLERK:  Bradley Hayashi.

THE COURT:  For the record, this is Case 06 MC 3  7145.  Defendant is charged with Misdeanor Battery.  He is out on Bond.

Counsel, your name?

MR. AMIRANTE:  Good afternoon, for the record, Sam Amirante, A-M-I-R-A-N-T-E, on behalf of Mr. Hayashi, who stands before the Bench.

THE COURT:  On May 17th of 2007, we began a trial in this matter.  The State rested.  The Defense was presenting evidence.  We commenced and continued the trial to today's date, at 1:30.

It is approximately almost 2:15, and we are waiting for the State's Attorney who has not shown up.  State, you are not the State's Attorney trying this.  Where is Mr. Kougias?

STATE'S ATTORNEY:  I just called our office.  They were on their way down.

THE COURT:  All right.  We will give them a few more minutes.  We can't start without the State.

MR. AMIRANTE:  I am the last person in the world to complain about a person not being on time.

THE COURT:  You asked if we could start later.  I knew what my schedule was, and I opened up my afternooon so we could finish this trial today, and Mr. Kougias didn't say anything about running late or being late.

I said 1:30 promptly in this room, and you were here and your client was here, and he is not here.  We will wait for him.  Have a seat with your client, Counsel.

MR. AMIRANTE:  Thank you, your Honor.

1          (Whereupon said case was passed)

2          MR. KOUGIAS: We both had to do Court calls, otherwise we would have been

3    down here earlier.

4          THE COURT:   It is about 2:20, State is now ready.  I was here at 1:30, Counsel

5    was here, trial was commenced and continued to 1:30, better late than never.

6               Both sides ready to proceed with this trial?

7          MR. KOUGIAS:  Yes, Judge.

8          THE COURT:  We are in the Defense case.  Mr. Amirante, you have any further

9    witnesses to call?

10         MR. AMIRANTE:  At this time, if I may, I would like to recall a witness who I

11   have already called--she did not come into the courtroom, she remained excluded--for the

12   purpose of laying a foundation to admit an exhibit which I previously marked.

13         THE COURT:  All right.  Who is the witness you are asking to recall?

14         MR. AMIRANTE: Karen Muir, M-U-I-R, the Receptionist.

15         THE COURT:  She was the first Defense Witness you called.

16         MR. AMIRANTE:  Right.

17         MR. KOUGIAS:  Judge, I am objecting to this, to foundation.  What is it,

18   business records?

19         MR. AMIRANTE:  Business records.

20         MR. KOUGIAS:  She has the book?

21         MR. AMIRANTE:  She has the book.  I had her bring the book back.

22         THE COURT:  You are asking to recall Karen Muir?  State, any objection to her

23   being recalled?

24         MR. KOUGIAS: Absolutely, Judge.

3

1      THE COURT:  All right.  And Counsel, you are recalling her for what purpose?

2      MR. AMIRANTE: For the limited purpose of introducing Defendant's Exhibit

3   into evidence, Number One into evidence, Judge.

4      THE COURT:  One was marked as an exhibit?

5      MR. AMIRANTE:  I need to lay a foundation as to business records.

6      THE COURT:  What exhibit are you speaking of?

7      MR. AMIRANTE:  The three pages of the appointment book.  I have the whole

8   appointment book with me today.  Three pages, I used at the time for the purpose of

9   refreshing her recollection, but I would like to have those records admitted as part of the

10  evidence.

11     THE COURT:  All right.  State?

12     MR. KOUGIAS:  I don't know if Counsel now wants to put the book into

13  evidence or those three pages he made reference to, which were Xerox copies of it.

14     MR. AMIRANTE:  Your Honor, I am going to ask that the book be placed into

15  evidence; however, due to privacy laws, as I indicated earlier, I made copies.  Counsel

16  can compare the copies with the book.  I made copies of those three pages, which are

17  relevant, and I redacted last names of all of the other appointments.

18     MR. KOUGIAS:   Judge, I certainly do not object to the anonomity of the book.

19  If Counsel is asking leave, the book is into evidence, as well as the Xerox sheets, and the

20  Court can certainly look at the Xerox sheets and compare them.

21          Counsel has some confidentiality as to the other names.  I trust the Court

22  to look and compare and see.  We are talking about three pages that he is talking about.

23  They have the entire appointment book. They brought it in as well.

24

1          THE COURT:  This is something that can be worked out by whatever stipulation

2   or you want to recall this witness for business record foundation?  Let the State know

3   what you are trying to get in and perhaps they will stipulate.

4          MR. AMIRANTE:  Judge, I brought the book.

5          THE COURT?  Any other witnesses you are going to call?  We can reserve the

6   ruling on this particular witness.

7          MR. AMIRANTE:  If we do call her, I wanted to get her out of here.  She was

8   here all day.

9          THE COURT:  It is not my problem.  Do you have any other witnesess?

10         MR. AMIRANTE:  She is here by subpoena.  At this time, I am going to call Dr.

11  Hayashi.

12         THE COURT:  You may do so.

13                          B R A D L E Y   H A Y A S H I,

14  called as a witness herein, having been first duly sworn under oath, was examined and

15  testified as follows:

16                          E X A M I N A T I O N,

17  BY MR. AMIRANTE:

18         THE COURT:  Sir, keep your voice up loud and clear.  That mike does not work.

19  THE WITNESS:  Okay.

20         THE COURT:  Okay, have you been sworn?

21  THE WITNESS:  Yes.

22  THE COURT:  The Witness has been sworn.  Counsel, you may proceed.

23         MR. AMIRANTE:  May I take one moment while they are looking at this, they

24  are looking at this book?

1        THE COURT:  Well, we will reserve that issue, so I will rule on that after they

2   have had a chance to look at it.

3            Let's proceed with your Witness.

4        MR. AMIRANTE:  Q Sir, please state your name,and spell it for your Honor,

5   Judge Hanlon and the Court Reporter?

6        A        Bradley, B-R-A-D-L-E-Y, Hayashi, H-A-Y-A-S-H-I.

7        Q        And you are the Defendant in this case?

8        A        Yes.

9        Q        And I advised  you regarding your right to remain silent; you wish to

10   testify today, is that correct?

11        A        Yes.

12        Q        And sir, what is your business or occupation?

13        A        I am a chiropractor.

14        Q        You are a licensed chiropractor in the State of Illinois?

15        A        Yes

16        Q        For how long have you been so licensed?

17        A        Licensed since 2000.

18        Q        And are you presently a practicing chiropractor?

19        A        Yes.

20        Q        What is the address of your business?

21        A        18802 Irving Park Road in Hanover Park, Illinois.

22        Q        And are you married, sir?

23        A        Yes.

24        Q        Do you have any children?

1    A    Yes.

2    Q    For how long have you been married?

3    A    Four years.

4    Q    And how many children do you have?

5    A    I have two and a half, two and one on the way.

6    Q    And approximately how many patients do you treat a week as a

7    chiropractor?

8    A    It depends on the week; probably between 75 and 150.

9    Q    And in the year since 2000, year 2000, approximately how many patients

10    have you treated, if you know?

11    A    We have 3000 patient's files at least.

12    Q    During that entire time, have you received any complaints, criminal

13    complaints, complaints with the Department of Registration and Education?  How many

14    complaints have you received?

15    MR. KOUGIAS:  Objection.

16    THE COURT:  Basis?

17    MR. KOUGIAS:  Relevance.

18    MR. AMIRANTE:  It is a credibility issue, Judge.

19    THE COURT:  I will overrule it.   You may answer.

20    THE WITNESS: One patient.

21    MR. AMIRANTE:  Q  Besides this one--can you explain that to the Judge?

22    A    That was a patient I was treating.  She was--she made a complaint to the

23    Department of Professional Regulation for patient abandonment.  I treated her for years,

24

1    and she was coming in approximately once a month, once every other month, and she no

2    longer wanted to pay her bill.

3                    She wanted free treatment, and because I would not, after about three or

4    four visits and her not paying, I told her I could not treat her anymore as a free patient.

5          Q       What happened with that complaint?

6          A       The Department of Professional Regulations threw it out.

7          Q       Other than that one complaint and this matter before Judge Hanlon, have

8    you received any other type of disciplinary or similar --or any type of complaint at all

9    about your performing your duties as a Doctor of Chiropractic?

10         A       No.

11         Q       Calling your attention, specifically, Sir, to October 16th of last year, 2006,

12   do you recall that day?

13         A       Yes.

14         Q       And that was a Monday?

15         A       Yes.

16         Q       And do you recall on that day having a patient in your office by the name

17   of Malina Kelly?

18         A       Yes.

19         Q       Formerly known as Malina Romano?

20         A       Yes.

21         Q       Was she a first-time patient?

22         A       No.

23         Q       For how long had Mrs. Kelly been your patient?

24         A       Approximately two, two and a half years.

1    Q    And her name changed from Romano to Kelly when she got married, is

2    that right?

3    A    Yes

4    Q    Do you know approximately when she was married?

5    A    End of May, toward the end of May, I believe it was May 27th.

6    Q    Before May the 27th, or May of 2006, she was a single person?

7    A    Yes.

8    Q    And after that day, October 16th, you were treating her for what purpose?

9    A    For her scoliosis, lower neck pain, depending on the week.

10    Q    Do you have a history or medical records on her?

11    A    Yes.

12    Q    And you brought those with you to Court, did you not?

13    A    Yes.

14    Q    And could you please explain or describe to Judge Hanlon the course of

15    treatment for that type of ailment?

16    A    Typically, because she is over the age of 18, it is more of a maintenance to

17    try to control pain and other symptoms that she might be having like numbness or

18    tingling or other conditions like that.

19        You can't really correct the scoliosis, but you can help with the symptoms

20    of it, and so that is what she was being treated for.

21    Q    What do you do as part of your treatment?

22    A    Usually key adjustments.

23    Q    Which involved what?

24

1       A     Manipulation of the spine with her, because the condition was throughout

2 her neck, upper back and lower back, all three regions of the spine, and then she would

3 typically get electrical stimulation.

4       Q     Adjustment of the spinal cord?

5       A     Yes.

6       Q     And how was that performed, physically?  What do you do?

7       A     It is a hand-on approach, where you are actually palpating the area of

8 concern, for instance, the lower spine, to see if the bones are moving properly, and if you

9 can correct the fixation, for lack of a better word.  If a bone isn't moving correctly, you

10 use hands-on to move that bone or region.

11      Q     Prior to doing that, do you have X-rays performed or taken and things of

12 that nature?

13      A     Yes.

14      Q     Did you do that in this case?

15      A     Yes.

16      Q     And what else, what other ways do you treat scoliosis?

17      A     Sometimes I use electrical stimulation. That is the process of using

18 electrodes on the back in order to relax the muscles around the spine, that makes it easier

19 for manipulation and remove some of the pain in the area.

20      Q     And besides the adjustment and electrical stimulation, is there any other

21 technique?

22      A     We use heat also, what we call hydroculation pads.

23      Q     When you say you "use heat," did you use heat on this particular patient?

24      A     Yes, and we use, a lot of times, massage or soft tissue work on a patient.

1    Q    Pardon me?

2    A    Massage or soft tissue.

3    Q    Did you personally perform massage?

4    A    Occasionally.

5    Q    And do you have other massage therapists to work with you?

6    A    Yes.

7    Q    Were those the people who testified earlier?

8    A    Yes.

9    Q    You have other massage therapists who work also?

10    A    Yes.

11    Q    And that is part of the treatment you give?

12    A    Yes.

13    Q    Does that ever involve a full-body massage?

14    A    Occasionally.

15    Q    Are you licensed to perform that as a chiropractor?

16    A    Yes.

17    Q    And I assume you had consent forms for authorization, signed by your

18    patients, particularly this patient?  She signed a consent form?

19    A    Yes.

20    Q    And you were treating her for in excess of two years; about how often did

21    you see this patient?

22    A    Depending on her symptoms, as often as two or three times a week.

23    During that period of time, it was once a week, once every ten days.

24

1    Q       Okay.  And did you ever socialize with her?  When I say "socialize, I

2    mean, did you ever go out with her as friends?

3    A       No.

4    Q       So, you just had contact with her in your office?

5    A       Yes.

6    Q       Okay.  Did she ever have occasion to meet your wife, Debbie?

7    A       Yes.

8    Q       Do you know when that was?

9    A       That was October 13th, Friday before this incident we are talking about

10   today.

11   Q       So, the Friday before the Monday she met your wife.   Was that for the

12   first time, to your knowledge?

13   A       Yes.

14   Q       And how is it that she met your wife, Debbie?

15   A       On that Friday, she was completing treatment, and she walked to the front

16   office, and my wife met me there with our two kids.

17   Q       And you introduced them?

18   A       Yes.

19   Q       And prior to that, that was--okay.  Prior to that, you said she had married

20   in May, and how is it that you knew she got married in May?

21   A       I got sent an invitation to her wedding.

22   Q       I am going to show you what I am marking as--if I may, Judge?

23   THE COURT:  Sure.

24

12

1          MR. AMIRANTE:  Q  --Defendant's Exhibit Number 4 for identification.  I

2   skipped over Number 3 for now, Number 4 for identification, a Group Exhibit.  It is an

3   envelope containing an invitation.

4                    May I approach?

5          THE COURT:  You may.

6          MR. AMIRANTE:  Q  I am showing you what I will mark, in total, as

7   Defendant's Group Exhibit Number 4 for identification purposes.

8                    Do you recognize that document?

9          A      Yes.

10         Q      And what is that?

11         A      This is the wedding invitation I was sent.

12         Q      And where did that invitation go?  To your house?

13         A      It went to the office.

14         Q      And did you or, if you know, your wife respond to that invitation?

15         A      We did not.

16         Q      Did you go to the wedding?

17         A      No.

18         Q      And why is it that you did not go to the wedding?

19         MR. KOUGIAS:  Objection.

20         THE COURT:  Basis?

21         MR. KOUGIAS:  Relevance.

22         THE COURT:  Overruled.  He may answer.

23         THE WITNESS:  I felt it was inappropriate to go to a patient's wedding, so we

24   didn't go.

1          MR. AMIRANTE:  Q  Do you get invitations from other patients?

2          A      Yes.

3          Q      Do you ever go?

4          A      No.

5          Q      Doctor, specifically calling your attention to October 16th, for what

6    purpose was Mrs. Kelly in your office on that day?

7          A      On that day, she made an appointment for chiropractic adjustment and

8    massage.

9          Q      And did you have occasion to see her on that day?

10         A      Yes, I did.

11         Q      And please tell Judge Hanlon, where was the first place, first time you saw

12   her on October 16th?

13         A      The front office, when I went to bring her back for her massage.

14         Q      Okay.  And that was the first thing she was getting that day?

15         A      Yes.

16         Q      Why is it that you were going to perform a massage on her?

17         A      The massage therapist was booked for the day.  That was an hour-long

18   procedure.  On occasions when my therapists are booked, I will do the massage.

19         Q      Had you ever done a massage on Mrs. Kelly prior to that day?

20         A      Yes.

21         Q      How many times?

22         A      Four to five.

23         Q      Had you ever done a full-body massage on her before that day?

24         A      No.

1       Q       On that day, was she scheduled for a full-body massage?

2       A       Yes.

3       Q       And do you remember about what time she came into the office?

4       A       Approximately 11:00.

5       Q       When she came in initially, do you remember what you said to her and

6       what she said to you, first thing you said?

7       A       Hi.

8       Q       Okay.  And then what happened?

9       A       I lead her back to the massage room.

10      Q       How many massage rooms do you have?

11      A       We have two.

12      Q       Was she--when she went back there, I assume she was fully clothed?

13      A       Yes.

14      Q       When she got to the room, what did you say to her and what did she say to

15      you?

16      A       I said, here is a massage room.  I said, go ahead and get ready for the

17      massage.  I will be back in a  few minutes.  I have a couple of more patients I need to

18      adjust before we start.

19      Q       And then what happened?

20      A       She asked the question, everything?  And I said, yes, we are doing a full-

21      body massage.  She said, even my socks, and I said, yes, I usually do the feet, why?

22      Because I am cold.

23      Q       Okay. And then after she said, "because I am cold," what did you say or

24      what happened?

1          A          I just put her in the room.  I got down one of the full bath sheets that we

2    have.

3          Q          I am going to show  you what has previously been marked as Defendant's

4    Group Exhibit Number 2 for identification, and if I may, Judge, spread them out in front

5    of the witness?

6                    THE COURT:  Sure.

7                    MR. AMIRANTE:  Q  Okay.  I have spread a number of items in front of you,

8    Doctor; you recognize those items?

9          A          Yes.

10          Q          Okay.  At that particular time after there was a conversation regarding her

11    being cold, you had this other conversation.  Did you offer her anything?

12          A          I offered her this sheet, to go ahead and place over her.

13          Q          A sheet?

14          A          I am sorry, the bath towel.

15          Q          Was she clothed at that time?

16          A          Yes.

17          Q          This is before?

18          A          This is before.

19          Q          Okay.  And was she standing up?

20          A          She was standing.  We were standing in the doorway of the massage room

21    until I went inside and got the towel.

22          Q          You went where to get a towel?

23          A          Inside the massage room to get the towel.

24          Q          And then what happened?

1    A    And then I told her, don't worry about your feet being cold.  I will get a

2    hot pack from my therapy suite, and we will get that to keep you warm.

3    Q    Did you, in fact, do that?

4    A    Yes.

5    Q    Did you leave the room?

6    A    Yes.

7    Q    And did you offer--what did you when you left the room?

8    A    When I left the room, I went and adjusted two patients and then I went

9    back into the therapy suite and put a hot pack in between the hydroculation pad and a

10    terry cloth towel, and put it in between this and went into the room.

11    Q    You put what?

12    A    The hot pack in between here--

13    Q    Between--

14    A    In between here so that it was in here, and then you fold it over.

15    Q    Are you referring to the item which is--has a blue border around it?

16    A    Yes.

17    Q    And it has some adhesive material on it to stick together?

18    A    Velcro.

19    Q    Some Velcro on it, and you did that and you went--

20    A    I went to the--into the therapy suite, which is located across the hallway

21    from the massage rooms.

22    Q    Did you get anything else, or just get that?

23    A    I just got the one hot pad.

24    Q    Did you go back into the massage room?

17

1      A      I walked to the massage room, knocked.  She said she was ready, and I

2  entered the room.

3      Q      Are there locks on the door, by the way?

4      A      No.

5      Q      So you went in, and then was she still dressed when you went in there?

6      A      When I returned, no, she was lying, face-down, with a bath towel over her.

7      Q      Face down?  How do you know she was not dressed at that time?

8      A      I assume she was not dressed; the towel was covering the gluteus region.

9  She might have been wearing underwear at that point.

10     Q      What towel was over her?

11     A      The bath towel was over her.

12     Q      That is which way across her?

13     A      Across her, like you would put on a bath towel.

14     Q      So, her back was here?  (Indicating)

15     A      Her back was bare; lower, starting from the lower lumbar, was covered

16  with the towel.

17     Q      So, how far down her legs was the towel?

18     A      Probably went to mid-thigh.

19     Q      What about a sheet?  Do you have two sheets on the bed?

20     A      There are two sheets on the bed.

21     Q      Was she under the sheet?

22     A      No, she was not.

23     Q      She laid on top of the sheet?

24     A      Yes.

18

1    Q    And do you offer those little things for the head?

2    A    Head rest, yes.

3    Q    She was face down?

4    A    She was face-down, yes.

5    Q    And then when you went in, what did you do?

6    A    I rearranged the towel. I rotated it so it was lengthwise on the patient, and

7    placed the hot pack on her back.

8    Q    Lengthwise on the patient? Where was the top of the towel?

9    A    Top of the towel was like this, on the patient.

10   Q    Okay. Where on her?

11   A    So her head--this was covering her upper back so this started--if this is on

12   my back, it started like this on her back.

13   Q    Top of the towel was on her back, and how long is that towel?

14   A    It is probably a good four feet.

15   Q    Okay. And then after you rearranged the towel on her, what did you do?

16   A    I placed the hot pack on her upper back.

17   Q    Were you having any conversations with her at the time?

18   A    Just normal conversation. I ask about patients' families, how they are

19   doing. I know her brother and her Father were patients at my clinic. I asked how they

20   were doing. Besides that, I don't remember.

21   Q    Did you ask her about any apprehensions she had about having a body

22   massage?

23   A    I always ask, are you okay with everything? We can have a female

24   massage therapist do this. I say that to all my patients every time I walk into the room.

1    Q    You said that to her?

2    A    Yes.

3    Q    You recall what she said to you?

4    A    She said, that is fine.

5    Q    And then what did you do?

6    A    She was laying face-down.  I placed the hot pack on her.  I told her I

7    would be starting with her legs and save her feet for the end, if we had time.

8    Q    Did you begin a massage?

9    A    Yes.

10    Q    As you were performing this massage therapy, were you talking or saying

11    anything to her?

12    A    Probably making small talk, like I said, seeing how her family was doing,

13    how her Dad was doing because I don't believe I had seen him much at that point, how

14    her brother was doing.

15    Q    Did you ever ask her about her comfort level, if anything hurt her?

16    A    Once the massage starts, I always inquire about that.

17    Q    You always do?

18    A    Yes.

19    Q    Did you do that for this patient?

20    A    Yes.

21    Q    You started on her legs?

22    A    Yes.

23    Q    Where on the legs do you start?

24    A    I start on the Achilles tendon.

20

1      Q      Right above the foot?

2      A      Right above the heel of the foot.

3      Q      And--

4      A      It is directly superior to the heel.

5      Q      Right above the heel?  She is on her --she is laying on her front side.  You

6    are going up the back of her leg?

7      A      Yes.

8      Q      Were you using both hands?

9      A      On that part, no.  I use my left, just for that one area, because it is so

10    natural.

11      Q      Do you remember what leg you started with?

12      A      With the right leg.

13      Q      And then how does the massage progress from there?

14      A      I move up to the peroneus and the gastrocnemius.

15      Q      Would you tell me what you did that day?

16      A      I moved up to the gastrocnemius, also known as the calf muscle, worked

17    on that area for probably a good three to four minutes.

18      Q      How long does a full-body massage last?

19      A      In our clinic, fifty minutes.

20      Q      Five-o?

21      A      With this massage, it probably lasted forty, forty-five; I had other patients

22    scheduled.

23      Q      And as you progressed up the back of the calf, now then what do you do?

24      A      Then, on that day, I moved up to her upper leg.

1    Q    One leg only?

2    A    One leg only.

3    Q    Right leg?

4    A    Right leg; at that point, the towel was covering her leg.  I then folded it

5    over and turned it over her right leg.

6    Q    Were you doing this with your bare hand or using oils?

7    A    Lotion, it is like a cream lotion, a mixture.

8    Q    And why do you use that lotion?

9    A    To make the massage, your hands can glide over the skin, otherwise it

10   could be very painful, especially if you do deep tissue work.

11   Q    What is deep tissue work?

12   A    Deep tissue?  It is more than skin stimulation; you are stimulating the

13   muscles themselves, deeper into the muscle groups in order to relax them.

14   Q    As you proceeded up the leg, how far up the right leg did you go?

15   A    When I first started, I started with the hamstring and I went up within, I

16   would say, four to five inches of the gluteal region.

17   Q    Gluteal, meaning the butt?

18   A    Yes.

19   Q    So you say--did you ever get closer than four or five inches from the butt?

20   A    No.

21   Q    And that was her right buttock?

22   A    Yes.

23   Q    And how are your hands at that time, using your thumbs or using your

24   finger?

22

1       A       On the legs, using both hands, and using pressure on one thumb or the

2    other in order to stretch out the muscles like a motion like this.  (indicating)

3       Q       Did you ask Miss Kelly how that felt, if there was any pressure there?

4       A       I asked how the pressure was doing, and if she was okay, and she stated it

5    was, and the pressure was fine.

6       Q       And then what did  you do?

7       A       After working on the hamstring, I worked on the outside of the leg, the

8    tensor fasciae latae, and iliotibial band in the same fashion.

9       Q       What is that?

10      A       That is part of the abductor group on the side of it.

11      Q       Abductor?

12      A       Abductors, currently abductors, also adductor; when you speak to another

13   doctor, you just have abductors.  Sometimes they get it wrong.

14      Q       Abductor muscles?

15      A       Yes.

16      Q       Where is that group at?

17      A       On the outside of the leg.  It goes from the knee to the hip on the outside

18   of the leg, the lateral portion of the leg, the adductor, and abductor.

19      Q       They are all in that same group of muscles around the leg?

20      A       Yes.

21      Q       Did you massage both groups of muscles?

22      A       Yes.

23      Q       On the inside and outside?

24      A       Yes.

1          Q          On the inside of the leg, you get pretty close to the labia area, or the

2     vaginal area?

3          A          About five inches, you go up to about five inches from where the genitals

4     are, the towels covering that group.

5          Q          You never go closer than five inches?

6          A          No.

7          Q          How do you know that?

8          A          The towel is covering that.

9          Q          You still had the towel on her?

10         A          Yes.

11         Q          When you are doing the massage, where was it?

12         A          Upper back portion is held down by the hot pack, it is coming down off

13    the gluteal region at that point, toweled, and put under the leg, her left leg would be

14    covered, the right leg would be exposed, with the towel draping over the top third portion

15    of the thigh of the right leg.

16         Q          And where are you, physically?

17         A          I am on the right side of the table.  I am in a pensive stance, with my left

18    leg being close to the table.

19         Q          And the towel was on her this entire time?

20         A          Yes.

21         Q          By the way, did you ever remove that towel from her?

22         A          Just when we shift.   I get the patient to flip over, I pin the towel down to

23    the table, shift it over here this way.  I am facing the table, over this way, and had her flip.

24         Q          By the way, how tall are you?

1       A       About five, six.

2       Q       How high is this table?

3       A       Table goes just below my belt line.

4       Q       And you--so now you rub both of these legs; did you ever go up into the

5  groin area or--

6       A       No.

7       Q       Did you ever touch her vaginal area or labia?

8       A       No.

9       Q       Are you sure about that?

10      A       Yes, absolutely.

11      Q       And after you finished this part of her legs, then what do you do?

12      A       Then I refold the towel a little bit here over the region, and I work on the

13  group in that area, so the towel is still--

14      Q       You work on the group, you mean the buttock, as I said before?

15      A       Yes.

16      Q       How do you massage that part?  How do you massage that part?

17      A       I use my fists like this, and pull down and stretch the muscles.  I use my

18  knuckles.

19      Q       So, instead of having your open hand, you had a closed fist?

20      A       Or you use your palm, if the patient is here, and you stretch down this

21  way, this way.

22      Q       Stretch down?

23      A       She is stretched medial to lateral on the muscle group, with your palm, it

24  would be my left hand.

1    Q    So, your left hand, you would have pushed on the side of her butt?

2    A    No, pushed from where the towel is, outside lateral.

3    Q    Okay.  And the towel was where, then?

4    A    Folded up,so it was still tucked under her right leg, and partially folded

5    back over her gluteal region.

6    Q    Okay.  And did you ever, in the course of that massage, have to put your

7    hand, for purpose of massage or any other purpose, into the crease of her buttocks?

8    A    Absolutely not.

9    Q    Did you ever do that?

10    A    No.

11    Q    And then what happened?

12    A    And then I went to the other leg and did the same thing with that leg, same

13    procedure with that other leg.

14    Q    Identical procedure?

15    A    Just shift the patient and work on the left leg in the same fashion.

16    Q    What do you do?

17    A    Once that is done, I took the hot pack off at that point, because I was going

18    to be working on the lower and upper back, folded the towel, towel was half-way folded,

19    covering her legs and folded a little back over so I could get to her lower back and the

20    fold mark was probably around the s.joint, which is the lower back.

21    Q    You keep talking about a hot pack; you had a hot pack on her?

22    A    The whole time.

23    Q    Where was that hot pack?

24    A    On her thoracic region, or upper back.

1    Q    So the upper back, when she was on her front side--

2    A    So when she was on her back, this would be something like this, towel

3    underneath it.  (indicating)

4    Q    And what was the purpose of that?

5    A    She was cold, to relax the muscles of the upper back when I got there.

6    Q    The hot pack, what do you put in there?

7    A    It is a mixture of clay.  It is a flat pack that is heated to 185 degrees, with

8    clay.  You have to cover this, plus another padding or you will burn the patient.

9    Q    So, you finished the second leg and you worked on her--

10    A    Lower back.

11    Q    Lower back?  What did you do with the towel?

12    A    I took the hot pack off, put it on the side, and folded the towel down from

13    her belt line so it would be exposed for massage.

14    Q    She was naked from her waist on up to her--

15    A    Yes, through her shoulder.

16    Q    And what type of massage do you perform on the back?

17    A    Deep tissue.

18    Q    With your fist again?

19    A    I used my hands on that, usually in a femur contact with additional

20    pressure from this hand, so if I am working on the righthand side, this would be here, this

21    guides your hand, guides your thumb all the way up the spine, and take this contact, put

22    pressure so I don't hurt the thumb, and go all the way up the back with pressure.

23    (indicating)

24    Q    How long do you do that for?

27

1          A          Depending on how it was that day, probably her lower back, mid back, a

2   good fifteen minutes, yes, ten to fifteen minutes.

3          Q          You do the whole back, right?

4          A          Yes, I do from the belt line up, at that point, all the way to her shoulder.

5          Q          Did you have any conversation by the time you got to this point in the

6   massage?

7          A          I don't remember, it may have been small talk.  I don't remember the

8   conversation.

9          Q          What about asking how she felt?

10         A          I always ask that on each region, and I asked her how the pressure was and

11  how she was doing.

12         Q          Okay.  Was she responding to you at all?

13         A          Yes.

14         Q          Was she objecting to the form of pressure or anything?

15         A          Pressure was great, and everything was fine.

16         Q          Never complained about anything?

17         A          No.

18         Q          And then after you finished the back, what do you do?

19         A          Once I finished the lower back, mid back and some of the shoulder

20  muscles like the upper "trap," some of the other muscles, then I work on the other side,

21  and do the same thing and then what I said was, we are going to work on her neck and I

22  just wanted her to flip over.

23                   I held the towel up and she flipped over.

24         Q          Where were you when you held the towel up?

1          A        It would be like this, (indicating) and she would be flipping, of course.

2    My legs would be pushing against the massage table.  You told the towel so the patient is

3    not exposed.

4          Q        Okay.  And she did, in fact, flip over?

5          A        Yes, she did.

6          Q        You placed the towel back on her?

7          A        Yes, I did.

8          Q        And after she flipped over, then what happened to the hot pack at that

9    time?

10         A        It was still over to the side at that point.  By that point, it had been about

11   twenty minutes, total, twenty, twenty-five minutes, and the hot pack only stays warm for

12   about fifteen.

13         Q        By the way, were you sweating during that time?

14         A        Yes.

15         Q        Okay.  Do you often sweat?

16         A        I always sweat in massage rooms.  They are kept at such a warm

17   temperature, the office is kept at 68, massage rooms are kept at between 75 and 76

18   degrees.

19         Q        It is not unusual for you to be sweating?

20         A        No, I sweat in my dressing room, and that is at 68.

21         Q        After she flipped over, what did you do?

22         A        At that point, I was going to start on her lower legs and work up the legs

23   again.  She inquired and asked if she could go to the bathroom, and I said, yes, so I said,

24   we are about half way done.  This is a good point.

29

1    Q    She just simply asked like that, I have to go to the bathroom?

2    A    Is it okay if I go to the bathroom before we start up again. I said that is

3    fine, so then I left the room, closed the door, and I went and got her--actually, when I was

4    in the room, I said, let me go get you a gown so you don't have to get dressed again so

5    you won't be exposed. I will go get you two so that way you can wear one with the one

6    in the back and one in the front. You will be fully-covered.

7    Q    You gave her two gowns?

8    A    I left the room, went to my therapy suite, got two gowns, brought them

9    back, knocked on the door.

10   Q    She was still laying face-up, with the towel laying over her?

11   A    Yes.

12   Q    What did you do with the gowns?

13   A    I left them on the table.

14   Q    And then after you left the towels on the table, what did you do?

15   A    I exited the room, I went and adjusted another patient.

16   Q    How long were you gone?

17   A    Five minutes.

18   Q    When you got back there, was she back in the room?

19   A    Yes.

20   Q    Do you know if she ever left the room?

21   A    I couldn't tell you; I was in another room.

22   Q    She said she had to go to the bathroom. You gave her the gowns?

23   A    Yes.

24

1      Q      After you adjusted the other patient, you came back, was she still standing

2      there with the gowns on?  What was she doing?

3      A      She is laying back down on her back, with the bathroom towel covering

4      her.

5      Q      She had a towel covering her in the same manner you had covered her?

6      A      Yes.

7      Q      This towel is the same type of towel--

8      A      All the towels are the same in the clinic.

9      Q      And do you have any half-towels?

10      A      No, these are the size of the towels we have.

11      Q      That is what you have in the clinic?

12      Now, after you got back in there, then what did you do?

13      A      At that point, I just said we are going to start up again.  She said she was

14      cold, and I said, okay, I will be back in a minute, and left the room and retrieved another

15      hot pack from the therapy suite.

16      Q      How long were you gone at that time?

17      A      Just a minute or two.

18      Q      And when you came back, what did you do?

19      A      Knocked on the door, entered the room and placed the hot pack on her

20      chest and stomach area.

21      Q      And what did you do?

22      A      And I then started on her lower leg again.

23      Q      On which part of the lower leg at this time?

24      A      This would be the left lower leg.

1    Q    What about the foot?  Did you do the feet?

2    A    I saved the feet for the end, and I told her that.

3    Q    Why is that?

4    A    That is usually the most relaxing.

5    Q    So, you started on the lower leg, around her ankle?

6    A    Yes.

7    Q    And can you demonstrate from the witness stand there how you do that

8    massage, from the ankle up?

9    A    With the lower leg, you take your hand like this, and massage up.

10    Q    Do you use both hands?

11    A    You use both hands a lot of times on the peroneus, which are all on the

12    lower side; you actually use the same thumb contact, and you get deeper into the leg.

13    Q    Did you do that on this patient?

14    A    Yes.

15    Q    And do you do one leg first all the way up, or switch over to the other leg?

16    A    I do one leg and then the other.

17    Q    Is that what you did to her that day?

18    A    Yes.

19    Q    How far up the leg do you proceed in that regard?

20    A    Two-thirds of the thigh.

21    Q    About how far from the bottom of the vaginal area?

22    A    Maybe five inches, maybe five inches, the same as when the patient is

23    faced down.

24    Q    Could you have gone up farther, not realizing it, by mistake?

32

1      A      The towel was draped in the same fashion, so it was covering.

2      Q      You are sure you didn't touch anything?

3      A      Absolutely, I did not.

4      Q      And then you finished one leg and went to the other leg?

5      A      Yes.

6      Q      Massaged in the same manner?

7      A      Yes.

8      Q      Were you having similar conversation with her at that time?  Were you

9      saying anything at all?

10     A      I don't remember.   I don't think I was saying much at that point. I was

11     just massaging.

12     Q      How far into the massage would you be, time-wise, at that time?

13     A      Probably a good, at that point, half hour, thirty-five minutes.

14     Q      Okay.  And after that point, did she object to anything you were doing at

15     all?

16     A      No, the pressure was fine and she was okay.

17     Q      Did she complain or was she upset?

18     A      No.

19     Q      After you finished both legs, then what did you do?

20     A      Then I went to her neck.  We were starting to run short on time, I had

21     other patients that were waiting, so I went to her neck.

22     Q      Okay.  And you had other patients waiting in the office?

23     A      Yes.

24

1        Q     As a matter of fact, your other patient was there, a receptionist there, your

2    office manager?

3        A     Yes.

4        Q     Other massage therapists?

5        A     At that point, I don't know if Val had gotten there yet.  I think she had one

6    or two more patients.

7        Q     When Mrs. Kelly arrived, the other massage therapist, she was busy?

8        A     Oh, yes.

9        Q     All these other people were in the office there?

10      A     Yes.

11      Q     And then you were--you started to do her neck, you said?

12      A     Yes, she was face-up.

13      Q     Laying on her back?

14      A     Face-up.

15      Q     How do you do the neck?

16      A     You use your hands in this fashion.  (indicating)

17      Q     Your hands are--

18      A     Flat, and go underneath the upper back into this area.  You just go this

19    way, where you are actually pulling the neck a little bit.  You are massaging the neck and

20    then, depending on the patient, with this one, with this Malina, I turned the head a little

21    bit and stroke down with your thumb going over the upper "traps" and go right down here

22    and down the upper "trap."

23      Q     You did that with her?

24      A     Yes.

1        Q        Did you do anything else with her back?

2        A        I did work on this portion of her chest.  (indicating)

3        Q        The chest?  What region is that called?

4        A        Pectoral region.

5        Q        Is that in the same area that the breasts are located?

6        A        Yes.

7        Q        And for what purpose do you massage that area where the breasts are?

8        A        Depending on the patient, because of the tightness, a lot of them with

9    scoliosis and upper back pain, these muscles are tight.  It is attached to the same areas as

10    the others in the back.  You are working on the muscles in through this area.

11        Q        And you were standing--were you standing on the side of the table or the

12    head of the table at that time?

13        A        You stand just next to the head.  It depends.  Just, if you are woring in this

14    area, you are at the top.  If you are working on this area, actually stand to the side,

15    absolutely.

16        Q        How long were you working on the pectoral area?

17        A        Just a couple of minutes, if that.

18        Q        And does that involve the upper chest, or do you something on the side

19    muscles here?

20        A        You can go on the side.  On this particular visit, I did not.  You can go on

21    the side, because the muscles correspond over on the side here, which often cause pain,

22    but on that visit, I just worked in through this area.

23        Q        You never went on the side of the breasts?

24        A        No.

35

1    Q    You never touched her nipples?

2    A    No.

3    Q    Did you at any time touch her clitoris?

4    A    No.

5    Q    You never did that?

6    A    No.

7    Q    Did--after you massaged her pectorals, what did you do then?

8    A    After I do that, I finished up a little about the neck, finish with the scalp

9    massage, like a hair wash, you work around the head.  That was the end of the massage.

10    Q    Did she ever get up and attempt to leave?

11    A    To go to the bathroom.

12    Q    Just that one time, asking to go to the bathroom?  Did she ever get up and

13    attempt to leave?

14    A    No.

15    Q    Did she ever tell you she was uncomfortable with what you were doing?

16    A    No.

17    Q    Did she object to anything you were doing that day?

18    A    No.

19    Q    After you finished massaging her hair, her head, then what did you do?

20    A    I told her I was done and that I would be waiting for her when she got

21    dressed, and I left the room.

22    Q    Did that complete your treatment of Mrs. Kelly on that day?

23    A    No.

24    Q    You did further treatment?

1      A      Yes.

2      Q      Okay.  And did she proceed to get dressed?

3      A      Yes.

4      Q      Were you in the room when she got dressed?

5      A      No.

6      Q      You left her in the room, and you went to do what?

7      A      I went to go to adjust another patient.

8      Q      Did you, in fact, do that?

9      A      Yes.

10     Q      And after you adjusted that patient, what did you do?

11     A      I came back to the room.

12     Q      What room?

13     A      The massage room,and she was already opening the door, so--

14     Q      Mrs. Kelly was still in there?

15     A      She was coming out of the room.

16     Q      Was she clothed at that time?

17     A      Yes.

18     Q      Okay.  And at that point in time, did you talk to her, say anything to her?

19     A      At some point, I said, if you want, we can do electrical stimulation.  Sylvia

20     has gone over.  You would have to wait ten or fifteen minutes until I am done with my

21     patient.

22            At that time, she would just skip it, and I lead her up to the front of the

23     office.

24     Q      Front of the office?

37

1       A       Yes.

2       Q       When she got to the front of the office, did she walk out the door?

3       A       I just lead her up to the front; I didn't see what she did.

4       Q       And then you proceeded to do other--your other adjustments on your other

5   patient?

6       A       Yes

7       Q       After you finished that adjustment, what did you do?

8       A       I went up to the front.

9       Q       Was she still there?

10      A       Yes, she was sitting.

11      Q       And was anybody else up there at the time?

12      A       I don't recall, I know Karen was up there and I believe "toots."

13      Q       Karen is your receptionist?

14      A       Toots is Bernice Musgraff.  (phonetic)

15      Q       These are two people that testified earlier in the trial?

16      A       Yes.

17      Q       Did you have any conversation with Mrs. Kelly when she was in the

18   waiting room at that time?

19      A       I just told her to come on back for an adjustment, come on back when you

20   are ready.

21      Q       Did she come back?

22      A       Yes.

23      Q       Did you perform the adjustment?

24      A       Yes.

1    Q    And how do you perform the adjustment?  What do you do as far as an

2    adjustment?

3    A    I had her lay face-down, I palpate the lumbar spine, the sacroiliac joint and

4    thoracic spine before I do anything.  At that point, I just--

5    Q    What did you do that day?

6    A    What did I do that day?  Oh, I adjusted her thoracic spine, her upper back,

7    I did a posterior-anterior manipulation on her, pushing the back and the upper spine to

8    make sure it is mobile, and that takes care of the thoracic spine.  You go all the way up to

9    the thoracic spine.

10    Q    You did this after the massage was completed?

11    A    Yes.

12    Q    Did she make any complaint to you or object or say she is uncomfortable

13    about something?

14    A    No.

15    Q    Did she appear to be upset to you?

16    A    No.

17    Q    And after you finished your adjustment, what happened?

18    A    That adjustment or all the adjustments?

19    Q    That adjustment?

20    A    I proceeded with the other adjustments.

21    Q    How long did that take?

22    A    That takes a minute or two.

23    Q    After you did that, what happened?

24    A    All the adjustments or that one?

1      Q      That one that day.  Is there another adjustment?

2      A      I worked on her lower back.  I then did her lower back and sacroiliac joint.

3             I had her lay on her side and then you basically pull the bottom of the arms

4      of the patient.  You pull this arm, get a little bit of a torque in the back, and you can also

5      adjust the lower spine a lot easier and then you basically pin the patient's shoulder, upper

6      shoulder, which is--you pin that backward and thrust the lower spine, or the s. joint in a

7      rotation manner to get the movement.

8      Q      Did she object to any of that?

9      A      No.

10     Q      Out of curiosity, why didn't you do that when you are doing the full-body

11     massage?

12     A      It is a lot easier on the adjustment table.

13     Q      It is a different table?

14     A      Different type of table.

15     Q      And then after you did that adjustment, what did you do?

16     A      I had her lay on her back and I worked on her neck for just a minute,

17     maybe, and I adjusted her cervical spine.

18     Q      Did she object to laying on her back at all?

19     A      No.

20     Q      Did she seem uncomfortable and embarrassed?

21     A      No.

22     Q      After you adjusted her neck and cervical spine, what did you do?

23     A      I helped her up, grabbed both of her hands, and helped her up and she was

24     done for the day.

40

1    Q    Did she say anything, thank you, or goodbye or anything like that?

2    A    She said goodbye, thanks, goodbye, I will see you in a week.

3    Q    She said, I will see you in a week? Okay. And then what did you do?

4    A    I went up to the front and got my next patient that was waiting.

5    MR. AMIRANTE: If I could have one second?

6    THE COURT: Sure.

7    MR. AMIRANTE: I have no further questions.

8    THE COURT: All right. Thank you. Cross-examination?

9                    C R O S S   E X A M I N A T I O N ,

10    BY MR. KOUGIAS:

11            May I, Judge?

12    THE COURT: All right, State?

13    MR. KOUGIAS: Q How long have you been a practicing chiropractor?

14    A    Since 2000.

15    Q    And you are licensed from the Department of Professional Regulation?

16    A    Yes.

17    Q    You testified there is one other complaint against you, and that was for

18    some type of patient abandonment, is that correct?

19    A    Yes.

20    Q    The patient that went to the Department of Professional Regulation called

21    in and reported you?

22    A    The patient did.

23

24

41

1        Q        The patient did?  In this particular case, accusations are against you right

2  now, you contacted the Department to let them know you have been accused of

3  something, and  you are in Court on this matter?

4        A        No, they contacted me.

5        Q        They have--

6        MR. AMIRANTE:  Objection.

7        THE COURT:  Overruled.  I will let the answer, "they contacted me" stand.

8        MR. KOUGIAS:  Q  Now, you have known--you knew Malina Kelly as Malina

9  Romano, I believe you have known her for a--how long of a time, two and a half years?

10       A       Yes.

11       Q       In fact, you knew that she had worked at the very office you work at

12  before you were even there, is that right?

13       A       Yes.

14       Q       It was a previous doctor, right?

15       A       Yes.

16       Q       You testified that you knew her father?

17       A       Yes.

18       Q       And you had treated him?

19       A       Yes.

20       Q       And you knew her brother?

21       A       Yes.

22       Q       And treated him?  Do you remember their names?  What is the Dad's

23  name?

24       A       Frank.

1    Q    Brother's name?

2    A    Adam.

3    Q    Any other family members you treated?

4    A    Adam's wife.

5    Q    What is her name, do you remember?

6    A    I don't remember that; she had only seen me twice, two or three times.

7    Q    In the two and a half years you were treating Malina and her family, did

8    the Kellys have trust in you as their doctor?

9    A    I hope so.

10    Q    You weren't lead to believe, other than this incident that occurred, prior to

11    October 16th, you never had anything called into question where you thought the Kellys

12    or the Romanos were upset with you or didn't trust you?

13    A    The only time I knew she was upset, when I got a phone call from her

14    regarding her husband being treated by Dr. Natalie.

15    Q    And that actually became a feather in your cap, she wanted you to treat her

16    husband, correct?

17    A    Yes.

18    Q    She was upset there was some other doctor going to handle her husband, is

19    that correct?

20    A    Yes.

21    Q    Is it fair to say she wanted you to massage her husband?

22    A    Yes, not to massage, to adjust.

23    Q    That was the only incident that you recall that Malina became, as you said,

24    upset?

1    A  Yes.

2    Q  Is that right?  Now, you testified, and in fact, we saw the invitation here to

3 the wedding, marked Defendant's Group Exhibit 4.  Miss Kelly and her husband sent you

4 a wedding invitation, right?

5    A  Yes.

6    Q  And you turned it down, you did not attend, is that correct?

7    A  Yes.

8    Q  Did you send a reply card back?

9    A  I don't believe so.

10    Q  Did you send them a gift anyway?

11    A  No.

12    Q  You did not?  Now, you testified that the reason you didn't go to the

13 wedding is because you believed it would be inappropriate as far as doctor-client

14 relationship, is that correct?

15    A  Yes.

16    Q  You also testified that at some point, when Counsel asked you questions

17 about having a massage, that you offered or suggested to Malina that with this type of

18 massage, that you could have a female massage therapist perform the massage, is that

19 right?

20    A  Absolutely.

21    Q  Yet, in your professional opinion, licensed as a doctor, you did not find the

22 appearance of impropriety to have a naked woman lying on a table, and you, a male,

23 massaging her?

24    MR. AMIRANTE:  Objection.

1          THE COURT:  Sustained.

2          MR. KOUGIAS:  Q  You found it inappropriate to go to her wedding, send a gift,

3    send a response card back, but not lying naked, on a bed, you massaging her?

4          MR. AMIRANTE:  Objection.

5          THE COURT:  Sustained, you can ask another question.

6          MR. KOUGIAS:  Q  When you gave her this massage on October 16th, she was

7    naked, lying on the bed, is that correct, in the massage room?

8          A     She was naked, under a sheet, yes, under the towel.

9          Q     Now, you testified, I believe, when Counsel asked you if you ever touched

10   her vagina, absolutely not, right?

11         A     Absolutely not.

12         Q     Other questions were answered no; when it came to the vagina, is there

13   some difference between no and absolutely not?

14         MR. AMIRANTE:  Objection.

15         THE COURT:  Sustained, ask another question.

16         MR. KOUGIAS:  Q  Now, you testified that when you were massaging this young

17   lady, you had normal conversation with her, is that right?

18         A     Yes.

19         Q     And your wife is in the courtroom here today, is that right?

20         A     Yes.

21         Q     Now, you had had conversations with her about your wife and her

22   preference for Brazilian wax?

23         MR. AMIRANTE:  Objection.

24         THE COURT:  Your objection is--

45

1      MR. AMIRANTE:  Well, Judge, relevance unless the conversation took place on

2    that day, October 16th.

3      THE COURT:  No foundation, sustained, lay some foundation, Counsel.

4      MR. KOUGIAS:  I have to call another person to substantiate it, but this is--

5      THE COURT:  You can lay a foundation for this conversation through him.  I

6    need to know when, what time, a foundation, when you are talking about.

7      MR. KOUGIAS:  Q  You said, in the process of massaging Miss Kelly, you were

8    having normal conversation, which you couldn't recall, but you absolutely would always

9    ask her if she has any pain or discomfort, yes?

10     A      Yes.

11     Q      What were those normal conversations you were having?

12     MR. AMIRANTE:  Objection, when, where?

13     MR. KOUGIAS:  We are talking about the date of October 16th of 2006.

14     THE COURT:  During the body massage we are talking about, after 11:00 a.m.,

15   okay.

16     MR. KOUGIAS:  Anywhere from 11:00 to where the massage ended.

17     THE COURT:  You may answer.

18     THE WITNESS:  I asked her about her family, how her brother was doing.

19     MR. KOUGIAS:  Q  Did you ever have a conversation with her about your wife's

20   preference of having a Brazilian wax?  Did that conversation ever come up?

21     A      On that day?

22     Q      Did it ever come up?

23     A      Yes, it did; not on that day.  May I explain?

24     Q      No, I am just asking you.

46

1          A       Okay.

2          MR. AMIRANTE:  Judge, he is trying to answer the question.

3          THE COURT:  Hang on a second here.  Yes, but not on that day.  Next question.

4          MR. KOUGIAS:  Q  Can I ask you--I am not too clear about this--what is a

5     Brazilian wax?

6          A       A Brazilian wax, they basically take all the hair, they leave a strip, but

7     they remove all the pubic hair from the vaginal region.

8          Q       Now, as a chiropractor, does that have any effect on the massage that you

9     are performing?

10         A       Absolutely not.

11         Q       And Miss Kelly--you said you were aware she has scoliosis, and that is

12    curvature of the spine?

13         A       Yes.

14         Q       Did you ever have conversations with Miss Kelly about going to Bachelor

15    Parties and strippers being present?

16         MR. AMIRANTE: Objection.

17         THE COURT:  I need to know a foundation, on October 16th, or are you talking

18    about any time, in the history of him knowing her for two and a half years.  You need to

19    hone into some foundation for the conversation.

20         MR. KOUGIAS:  Very well  Q  On this particular date, on October 16th, did you

21    ever have a conversation while you were performing the massage on Miss Kelly?  Did

22    you ever have a conversation with her about going to Bachelor Parties and strippers?

23         A       No.

24

1      Q      Had you ever had a conversation with her in any of the two and a half

2      years you were involved in giving Miss Kelly a massage?

3             MR. AMIRANTE:  Objection, relevance.

4             THE WITNESS:  Yes, may I explain?

5             MR. KOUGIAS:  I don't need an explanation, just yes or no.

6      Q      On that date, you knew that on October 16th--was she married at that time

7      or not married?

8      A      She was married.

9      Q      She was married?

10     A      She was married.

11     Q      Did you ever have a conversation with her on this date, while you were

12     giving her the massage, that you have a special massage that you would perform if she

13     and her husband wanted to have a child?

14     A      On this particular day?

15     Q      On this date.

16     A      Yes, I did, and--but that is phrased wrong.  That is not what I said.

17     Q      Well, let me ask you this.  Did you indicate to Miss Kelly that you

18     performed this procedure many times, and you stated that you were six for six?

19     A      I said I have done the procedure.  It was not proven, and that the two

20     patients I had done, the two happened to get pregnant.  I am not a fertility clinic.

21            I cannot say that.  If there are other--other alternatives don't work, there

22     are some pressure points in the spinal region that you can do, along with a lumbar

23     adjustment.

24

1     Q     Let me ask you, Sir, is there any type of massage that you perform that

2     would result in a massage where you do not touch anywhere on the vaginal area, but

3     actually mimic groping someone's vagina?

4     A     Not that I am aware of.

5     Q     Now, once again, two and a half years' relationship with this lady,

6     professional relationship, and were you wearing gloves when you were performing this

7     massage?

8     A     No.

9     Q     Were you using oils on this young lady?

10    A     Correct.

11    Q     Now, you actually performed--I think this was the fourth or fifth massage

12    you have performed on Malina?

13    A     Yes.

14    Q     Who normally does the massages for Miss Kelly?

15    A     Depending on the day, it was usually Val at that point.

16    Q     Val is usually the preferred, that is what you normally do, who is a female

17    and does a massage?

18    A     Yes.

19    Q     One of these unusual massages is a full-body massage, is that right?

20    A     Unusual in what way?

21    A     The is the first time in two and a half years of Miss Kelly going to your

22    office she ever had a full-body massage?

23    A     Unusual in that way, she had never received one before, yes, she normally

24    received a half-hour massage.

1          Q       Now, I am going to show you what is marked as Defense Exhibit Group,

2     which is three pages.  Do you recognize this document, Sir?

3          A       Yes.

4          THE COURT:  What is it, Defendant's Group Exhibit One?

5          MR. KOUGIAS: Yes, I am sorry, Defense Group One.

6          MR. AMIRANTE:  So far, it is only an Exhibit; I haven't admitted it.

7          THE COURT:  I understand, I understand.

8          MR. KOUGIAS:   Q  You recognize that?

9          A       Yes.

10          Q       Now, these are just Xerox copies of the actual appointment book, is that

11     right?

12          A       Yes.

13          Q       Do those appear true and accurate, to the best of your knowledge?

14          A       Best of my knowledge.

15          Q       Are you familiar with the handwriting?

16          A       Yes.

17          Q       Whose is it?

18          A       Karen's.

19          Q       Karen's handwriting, right, and these were actually--were premarked on

20     May 17th, when we started this trial, do you remember that?

21          A       Yes.

22          Q       These documents, do you recall, did you see these documents on May

23     17th, when Counsel presented them to the Court, when Karen testified?

24          A       I didn't see them on that day; I have seen them.

1      Q      Okay.  You testified your wife--you remember the date, on October 13th,

2      that your wife had been in  your office on that day?

3      A      Yes.

4      Q      On the 13th?

5      A      On the Friday, yes.

6      Q      How do you remember that?

7      A      She doesn't come in that often.

8      Q      How do you remember that it was Friday the 13th?

9      A      It was Friday the 13th.

10     Q      What was unusual about it?

11     A      She was meeting me for lunch.

12     Q      And would that normally have been booked into the appointment book?

13     A      No.

14     Q      I am going to show you what I am going to mark as People's Exhibit

15     Number One for identification, the book.

16     MR. AMIRANTE:  People's Number One?  Hold on a second, I would object.  I

17     gave that to Counsel.  There is a lot of private information here, Judge.

18     THE COURT:  Well, right now he is marking it as People's Exhibit One for

19     identification.  I don't know what he is going to do with it.  I will allow him to mark it,

20     and allow him to question.

21             You may proceed.

22     MR. KOUGIAS:  Thank you, Judge.

23     Q      Is there more than one appointment book in the office?

24     A      No, there is one.

1    Q    Okay.  I am going to show you this book.  Take a look at that.  Do you

2    recognize that appointment book?

3    A    Yes.

4    Q    Just hold it on the date of October 13, 2006, is that correct?

5    A    Yes.

6    Q    Now, this is the original, correct?

7    A    Yes.

8    Q    This says in writing, "Deb was here with girls," is that right?

9    A    Yes.

10    Q    Is that Karen's handwriting?

11    A    I couldn't tell you; I believe so.

12    Q    Now, I am going to show you what is marked Defendant's Group Exhibit,

13    the same page.

14    I want you to point and take my pen and circle where it has this writing,

15    "Deb was here with girls."

16    A    It doesn't.

17    Q    It doesn't have that?

18    A    No.

19    Q    Is it fair to say that the original document, once trial started, somebody

20    else wrote in the book and altered it?

21    A    I would say so.  It is there.

22    Q    Is it fair to say the handwriting, "Deb was here with girls," is consistent

23    with the other handwriting?  Take a look at it.

24    A    Yes, I would say so.

52

1          Q        It looks like Karen's, right?

2          A        I believe so.  Karen has similar handwriting.  It looks like Karen's and--

3          Q        Karen and who?

4          A        Bernice; Bernice and Karen have similar handwriting.

5          Q        So, is it fair to say that if the document that we have here, that are kept in

6     the ordinary course of business, which I assume they are, this appointment book is kept in

7     the ordinary course of your business?

8          A        Yes.

9          Q        If I have copies that were presented to the Court on May 17th, and here we

10    are on May 21st, and they appear different, that there have been alterations here, is that

11    right?

12         A        To the actual appointments made, or to the book?

13         Q        To the book.

14         A        The writing on top is an alteration.  The patients that are there, are there.

15    Those are not being altered.

16         Q        Were you aware there was additional information put on the book?

17         A        I was not aware; I was not aware.

18         Q        Are you also licensed in gynecology, Sir?

19         A        Specifically, as a gynecologist, am I legally able to do gynecological

20    examinations?

21         Q        Well, are you a licensed gynecologist?  Are you a licensed doctor?

22         MR. AMIRANTE:  Objection, there is no such thing as a licensed gynecologist.

23         THE COURT:  Let him finish the question.  Finish your question, State.

24         MR. KOUGIAS:  Q  Let me ask you this.  I will rephrase the question.

1                Do you perform any gynecological examinations at the chiropractic clinic?

2        A      In mine, no.

3        Q      And where did you go to medical school?

4        A      Chiropractic College at Los Angeles College of Chiropractic.

5        Q      Is it a medical school or not a medical school?

6        A      It is a chiropractic college; it is considered a graduate school in

7    Chiropractic.

8        Q      Let's take a step back here:  Four years of college?

9        A      Yes.

10       Q      What is your degree in?

11       A      It is not--I was one class short of Biology.

12       Q      Okay.  So you don't have an actual degree in Biology?  You are one credit

13   short?  You went on to Chiropractic School.  What does that consist of?  How many

14   years?

15       A      Three and a third, four academic years.  It is like medical school.  You do

16   not have a Summer break.

17       Q      And are the examinations, the boards, are they like medical school?

18       A      Yes.

19       Q      Do you do your Internship and Residences and all that?

20       A      You do it at the school.

21       Q      You don't do rotations?

22       A      I do, but at the school.  That school has four separate clinics that do

23   rotations through, but it is not at a clinical hospital.

24

1        Q     Is it fair to say that you said that you never had contact with Miss Kelly's

2   vagina on this occasion or any other occasion for that matter, correct?

3        A     No.

4        Q     Have you ever had contact with any other patient's vaginas in your entire

5   practice?

6        A     No, we don't do gynecological examinations in my office; there is too

7   much liability.

8        Q     Now, is there a reason that you would have had Miss Kelly completely

9   naked, on a bed, to give her a full-body massage?

10       A     Sure, you are working on all parts of the body.

11       Q     Let me ask you this.  And you have done this with other patients as well?

12       A     Yes.

13       Q     And do you find a woman's underwear to be able to block, not allow you

14   to perform an appropriate massage?

15       A     If the woman feels she is uncomfortable and wears the underwear, if I get

16   to the gluteal region, she will move them down so I can work on the area.

17       Q     Is it fair to say you have many female patients that prefer to completely

18   disrobe, completely naked, rather than have to have their undergarments on?

19       A     Most patients I have worked on completely disrobe, not all, but most.

20       Q     I am sorry?

21       A     Not all but most.

22       Q     You had Miss Kelly remove her socks as well?

23       A     Yes.

24       Q     Will you do any type of foot massage?

1          A     I was going to.  I didn't have time to do it.

2          Q     What kind of stockings was she wearing that she had to remove them, do

3    you remember?

4          A     She was wearing shoes.  I have no idea.

5          Q     Now, you have a good memory of this massage, as you have testified

6    today.  Do you remember all the other massages in detail as you did this one on October

7    16th, involving Miss Kelly?

8          A     Not with this detail.

9          Q     Is it fair to say that you had more than just a professional client-doctor

10   relationship with Miss Kelly?

11         A     One more time?

12         Q     A more personal relationship?

13         A     No.

14         MR. KOUGIAS:  When I asked you on the two occasions earlier, you did have

15   conversations about a Brazilian wax and bachelor parties--

16         MR. AMIRANTE:  Objection.

17         MR. KOUGIAS:  I will tie it up.

18         THE COURT:  Let the State finish his question, and then you may object.  Finish

19   your question.

20         MR. KOUGIAS:  Q  You testified earlier you admitted you had spoken to Miss

21   Kelly about a Bachelor party and strippers, is that correct?

22         A     Yes.  May I explain?

23

24

1    Q    There is no need to.  And a Brazilian wax, and you defined that.  Well, is

2    that part--or does that sound to you that that is part of your professional doctor-client

3    relationship?

4    MR. AMIRANTE:  Objection--

5    THE WITNESS:  If the Patient brings it up.

6    MR. KOUGIAS:  Q  If a patient brings it up?

7    A    Absolutely.

8    Q    Is it your testimony that Miss Kelly, she brought up a conversation about

9    strippers and Bachelor Parties?

10    A    Absolutely.

11    Q    And she brought up conversations about having a Brazilian wax?

12    A    Yes.

13    Q    You felt you had to oblige her, and respond to them?

14    A    She asked me questions; I responded to the questions.

15    Q    And you felt, not only presuming the professional, licensed doctor you are,

16    you also talked about your own wife?

17    A    In--if you let me explain, I could tell you what that was in regard to.

18    Q    I am sure your Attorney will have plenty of time to bring that up.

19    MR. KOUGIAS:  If I may have one moment, please?

20    THE COURT:  Sure.

21    MR. KOUGIAS:  I have nothing further.

22    THE COURT:  Redirect, Counsel?

23    MR. AMIRANTE:  Yes, thank you, Judge.

24            R E D I R E C T   E X A M I N A T I O N,

1    BY MR. AMIRANTE:

2         Q      Doctor, Counsel asked you about whether or not this lady out here or Mrs.

3    Kelly ever was upset and you said you recall only one time she was upset with you or

4    your business or practice, isn't that right?

5         A      Yes.

6         Q      And one time is in regard to her husband having made an appointment

7    with your female partner instead of with you, who she wanted to make an appointment

8    with?

9         A      Yes.

10        Q      She wanted him to see you as opposed to your female doctor or partner?

11        A      Associate, yes.

12        Q      She was upset about that?

13        A      Yes.

14        Q      And in regard to the Brazilian wax Counsel asked you about, you didn't

15    talk to Mrs. Kelly on October 16th about a Brazilian wax?

16        A      No.

17        Q      Would you please explain to Judge Hanlon what and where and why and

18    how that conversation took place?

19        A      This was a week before her wedding, and she said she was getting a

20    massage and doing this all at a spa, and that she was getting the Brazilian wax and I had

21    asked her--

22        Q      Excuse me, under what circumstances was she telling you this?

23        A      This was in my Adjusting Room.

24        Q      She was talking about this?

1    A    She was talking about this.

2    Q    Okay.

3    A    And she said that yes, she did, and I had told her a story about a friend of

4    mine who had had one done, had never had it done before.  She said it is so painful, she

5    couldn't go through with it,and that is how the Brazilian wax is, and I said, but if you tell

6    them a lot, and I had mentioned my wife, then it shouldn't be a problem and that is how

7    that conversation started and ended.

8    Q    Did you initiate the conversation?

9    A    I did not initiate the conversation.

10    Q    And Counsel also asked you about a conversation regarding some

11    Bachelor Party, and you wanted to explain that, and can you explain to Judge Hanlon the

12    circumstances of that?

13    A    That was in regard to her husband's Bachelor Party weeks prior to the

14    wedding, and I had just--I don't recall the exact conversation--but I know that she was

15    worried or concerned about her husband's Bachelor Party.  It depends, I didn't do any of

16    that, I didn't have the strippers or I didn't ever go to a Strip Club, but I have had friends

17    that have had crazy ones, so maybe you ought to talk to your husband about that.

18    I don't remember, I don't remember how long or details of it.  That was

19    months and months before.  That was early May.

20    Q    Is this a conversation she initiated with you?

21    A    Yes.

22    Q    And you responded to her?

23    A    Yes.

24

1       Q      And as a matter of fact, you did have a conversation, you heard her testify,

2   when you were sitting here in Court, right?

3       A      Yes.

4       Q      She said something about a bottle of wine and a massage, do you

5   remember that?

6       A      Yes.

7       Q      As a matter of fact, you did have a conversation with her regarding a

8   special type of massage or massage and wine, and so forth, and becoming pregnant,

9   didn't you?

10      A      Yes.

11      Q      When did you have that conversation with her?

12      A      That was probably about a month before the 16th.

13      Q      She was married at that time?

14      A      Yes, she was.

15      Q      What were the circumstances of that conversation?

16      A      She told me that she was going off the pill, and she was--

17      Q      She was going what?

18      A      Off birth control pills, and she--

19      Q      She told you this?

20      A      Yes.

21      Q      Did you ask her about birth control?

22      A      She brought it up.

23      Q      She brought it up that she was going off birth control?

24      A      Yes.

1      Q      And then what happened?

2      A      She had voiced concerns about getting pregnant and or, you know, since

3      she just got off the pill, she had questions on whether or not it would be easier for her to

4      get pregnant, how it is not easy for her to get pregnant.

5      Q      Okay.  And did you answer her questions?

6      A      I responded there are two schools of thought on it, that some people say it

7      is more difficult, once you get off the pill, birth control, to have kids, but there is another

8      thought that the hormones are released naturally after a patient has been on the natural

9      hormones, that their body actually releases more eggs and are more prone to twins.

10     Q      You told her this?

11     A      Yes.

12     Q      Did you tell her anything else about massage?

13     A      I told her if she is having trouble--

14     Q      Getting pregnant?

15     A      --yes, and there are other alternatives, there are some pressure points you

16     can do with a lumbar adjustment that may help.  It is not proven, there are trigger points

17     to help stimulate the ovaries to release eggs.

18     Q      And did you tell her that that kind of advice has helped, just in your own

19     opinion, your other patients get pregnant?

20     A      I told her it helped a couple of other patients.

21     Q      And did you tell her that having wine with her husband in a situation like

22     that would help, too?

23

24

1        A       It was actually a joke, because that has happened with my wife, where you

2    know, she had the massage and relaxed, and a glass of wine, and she got pregnant that

3    night.

4        Q       That is what you related to her?

5        A       Yes.

6        Q       Okay.  And that was also in response to her questions when she started

7    that conversation?

8        A       Yes, yes.

9        Q       And this was her fourth or fifth massage?

10       A       Yes.

11       Q       And she had had other massages with other therapists you worked with?

12       A       Yes.

13       Q       This was her first full-body massage?

14       A       Yes.

15       Q       She set up the appointment, and she had asked to have that full-body

16   massage?

17       A       Yes.

18       Q       And Counsel asked you about now what is marked as People's Exhibit

19   One for identification, your appointment book, and he pointed to a section in that book on

20   October 13th, were it said, "Deb and the girls were here."

21       A       Uh huh, yes.

22       Q       That was put in there, to your knowledge, if you know, prior to Deb

23   coming there or after she was there?

24       A       I don't know.

1       Q       Did you put that in there?

2       A       I did not.

3       Q       And showing you this book that Counsel has shown you, People's Exhibit

4    One, is this your appointment book?

5       A       Yes.

6       Q       And this is the book kept in the normal course of business, right?

7       A       Yes.

8       Q       And I show you what I have previously marked as Defense Exhibit, Group

9    Exhibit Number one, containing three pages dated October 13th, 14th--I am sorry--13th,

10   16th and 23rd.

11              Now, did you--did I ask you for copies of this?

12      A       Your office requested it from my office.

13      Q       When we requested that, at the time we requested that, do you remember

14   how long ago it was?  Was that after October 16th?

15      A       It was after October 16th.

16      Q       After October 23rd?

17      A       Yes.

18      Q       At the time, were those pages a true and accurate representation of what

19   appeared on that October 16th, 20th and 23rd?

20      A       Yes.

21              MR KOUGIAS:  Objection.  How could he possibly ask that question after being

22   confronted with two separate sets of documents?

23              THE COURT:  I am going to sustain the objection.  Ask another question.  I think

24   I know where you are going.

1          I am going to sustain it as to the way you phrased that question.

2          MR. AMIRANTE:  Q  You have in front of you Defendant's Group Exhibit

3    Number One for identification?

4          A     Yes.

5          Q     And that Group Exhibit, does that Group Exhibit truly and accurately

6    represent the pages of your record book as they appeared on October 13th, October 16th

7    and October 23rd of 2006?

8          A     Yes.

9          Q     And calling your attention to People's Exhibit One, where there is the

10   added notation of "Deb was here with girls," on the date of October 13th, you see that?

11         A     Yes.

12         Q     First of all, is that page, October 13th, still an accurate representation?

13   That is the original minus that "Deb was here with girls," as it appeared on October 13th?

14         A     Yes.

15         Q     Is the written part in there, "Deb was here with girls," was that in the book

16   on October 13th?

17         A     I don't think it was.

18         Q     Do you recall if it was there on October 16th?

19         A     I don't think it was there.

20         Q     Do  you remember if it was there on October 23rd?

21         A     I don't believe it was there.

22         Q     Do you think somebody might have put it in there to remind them Deb

23   was there?

24         A     Yes.

64

1        Q      Was Debbie, your wife, and children there, in fact, on October 13th?

2        A      Yes.

3        Q      And was it on that day, to your knowledge, that Mrs. Kelly, formerly

4  known as Mrs. Romano, for the first, very first time ever, met your wife and children?

5        A      Yes.

6        Q      And do you remember that because shortly after October 16th you were

7  contacted by the police, you were forced to remember the events of the last few days

8  before that?

9        A      Yes, and because my wife doesn't come in very often.

10       Q      Did we go over these facts with you?  Did we go over them a number of

11  times, you and I?

12       A      No.

13       Q      I am talking about since this happened, didn't we talk about this?  We

14  have talked about what happened on October 16th, October 13th, right?

15       A      Yes, yes.

16       Q      Isn't that right?  You have a clearer memory of this than you would have

17  ever, being with other patients?

18       A      Yes.

19       Q      One last thing, Doctor.  Counsel specifically asked you if you were

20  licensed to perform gynecological examinations, and you said yes, you were?

21       A      Yes.

22       Q      You are, in fact, licensed by the State of Illinois to perform those

23  examinations, is that correct?

24       A      Yes.

1      Q      As a matter of fact, you are licensed to do anything that a medical doctor,

2  M.D., could do, except for prescribing medication, is that correct?

3      A      Anything but prescribe medications or do surgery.

4      Q      And you are considered, in some instances, for insurance purposes, of

5  being the family or primary care physician, is that correct?

6      MR. KOUGIAS:  Objection.

7      MR. AMIRANTE:  You went into it.

8      THE COURT:  Your question is, are you considered, for insurance purposes?

9  Would you--

10     MR. AMIRANTE:  Or for any purposes a primary care physician?

11     THE COURT:  I am going to let the witness answer.

12     THE WITNESS:  Chiropractors, in the State of Illinois, are considered primary

13  care physicians without the ability to prescribe medications.  We are allowed to admit

14  people into the hospital, to do everything, all the powers an MD has.

15     MR. AMIRANTE:  Q  Being licensed to perform gynecological examinations,

16  you are licensed by the State to touch a woman in the parts which are the subject of this

17  trial, yes?

18     A      Yes.

19     Q      You don't do it, right?

20     A      Yes.

21     Q      You have never done it?

22     A      No.

23     Q      Now, you took over this office from another chiropractor, is that right?

24     A      Yes.

1          Q        Counsel asked you about Dr. George, didn't he?

2          A        Yes.

3          Q        Isn't it a fact that Dr. George conducted gynecological examinations in

4    that office?

5          A        Yes.

6          MR. KOUGIAS:  Objection--

7          THE COURT:  Hang on a second, a little slower.

8          MR. KOUGIAS:  --relevance as to what Dr. George did.

9          THE COURT:  Sustained.

10         MR. AMIRANTE:  He opened the door.  I didn't ask about it on direct

11   examination.  He opened the door on cross about Dr. George.

12         THE COURT:  Hang on, hang on.

13         MR. AMIRANTE:  And the Complainant and her Mother used to work for the

14   doctor.

15         THE COURT:  That objection will be sustained.  Next question.

16         MR. AMIRANTE:  Q Is it your testimony that you never have performed that

17   kind of work?

18         A        Only in school.

19         Q        And you, on this day, October 16, 2006, or any other day, did you touch

20   this woman, Mrs. Kelly, in a manner in which she said you did so?

21         A        No.

22         MR. AMIRANTE:  Judge, I have no further questions at this time.

23         THE COURT:  Thank you.  Anything else, State, based on that?

24         MR  KOUGIAS:  I have a couple of questions.

1                    R E C R O S S   E X A M I N A T I O N,

2    BY MR. KOUGIAS:

3        Q      You said earlier, when you were discussing with Miss Kelly, that there

4    were two schools of thought about getting pregnant, having been on birth control--

5        A      Yes.

6        Q      Are these--what are these schools of thought?

7        A      One, that it is more difficult to get pregnant after being on an extended

8    period of birth control pills, and the other is that once you actually stopped taking the

9    birth control, the hormone levels change, it actually affects the ovaries, and the body

10   produces more eggs and therefore, it is actually easier to get pregnant.

11       Q      Now, are these medical studies that have names attached to them, or is it

12   you and your barroom buddies talking about this stuff?

13       A      Medical studies, we were taught in school.

14       Q      Name the first school of thought, name--

15       A      I actually can't.

16       Q      You cannot?

17       A      I don't remember. I don't remember.  My first--my first year in

18   chiropractic school, when it comes to that, I just know there are two schools of thought

19   on it.

20       Q      And  you know you indicated that having wine with your husband and the

21   wife becomes pregnant, you said that was kind of a joke because it happened in your

22   situation?

23       A      Yes.

24

1      Q      So, you weren't giving a medical opinion, you were goofing around with

2   her?

3      MR. AMIRANTE:  Objection.

4      THE COURT:  Sustained as to the form.

5      MR. KOUGIAS:  Q  Well, you testified that you told Miss Kelly that maybe if

6   she had wine with her husband, she could become pregnant, that is what happened with

7   you, is that right, did you not testify to that?

8      A      I don't know if it was my exact words, but--

9      Q      What were your exact words?

10     A      I don't remember the exact wording.  All I said was that with my wife, that

11  did happen and I was joking with her because she just had a massage.

12     Q      That wasn't medical opinion, you were just joking around with her?

13     A      That was a joke.

14     MR. KOUGIAS:  Permission to approach the Witness?

15     THE COURT:  Sure.

16     MR. KOUGIAS:  Q  I am looking here now, and I see Defendant's One, Group

17  Exhibit, three pages, and there are some items blacked out by highlighter and yellow

18  highlighter.

19           Now, I see a second set of Defendant's Group Exhibit, pages which does

20  not have the yellow highlighter, appear to be the same--

21     MR. AMIRANTE:  Hold on, Judge, that is not--

22     THE COURT:  Hang on, this record is going to be confused, because I am

23  confused.

24

1          There is a Defendant's Group Exhibit One, which I assume consists of

2     three pages, an appointment book, yes or no?  Yes?

3          MR. KOUGIAS:  That is what I thought, Judge.

4          THE COURT:  So now, Counsel, you are going to have to identify that for the

5     record.  There appears to be two Defendant's Group Exhibit One.  I let Counsel mark one,

6     and that is what is of record.

7          If you are showing something else, you better clarify that for the record

8     and for me.

9          MR. AMIRANTE:  Judge, what he has--

10         MR. KOUGIAS:  I never had a copy, to be honest.

11         MR. AMIRANTE:  I have a copy for Counsel, copy for me, which did not pick up

12    the yellow and blue highlighter on my original Group Exhibit.

13         THE COURT:  Which one did you mark?

14         MR. KOUGIAS:  I took a copy--

15         THE COURT:  The one with the highlight or the one without?  Wait, that is a

16    very easy question.  Stop.  Which of those two documents has Defendant's Group Exhibit

17    One on the top of them?  One of them has it and one of them doesn't have it.

18         MR. KOUGIAS:  They both have it.

19         THE COURT:  That is a fine how do you do.  You have one marked; which one

20    of those two did you mark?

21         MR. AMIRANTE:  Judge, the one I marked, the original is the Defendant's

22    Number One, Group Exhibit, three pages, there is a yellow marker on it, orange marker

23    and a pink marker, and that was the original document which I introduced in Court.  The

24