1    other one which Counsel took off my table is a copy of that exhibit that I made for my

2    own purposes and for his purpose.

3              I wrote on there Defendant's Exhibit One, for--three pages, one for him

4    and one for me I made at the office thus far.

5         MR. KOUGIAS:  In all fairness, when I went to Counsel's desk, I picked it up,

6    the book that was on the top, it was in the book.

7         THE COURT:  You take that one back to your table.  That is not an official

8    Exhibit One.

9              You may inquire as to this exhibit.

10        MR. KOUGIAS:  Judge, just for the record, I would just like the record to be

11   clear, I would actually have all the documents submitted to the Court at the conclusion so

12   the Court can verify what the Court needs to document, so we are on the same page.

13             That document also has some highlighting which is different from that

14   highlighting on this document.  I don't really know.

15             On May 17th, when I--Miss Karen Meyer-- Muir, the young lady who

16   testified, she was the one that was presented these documents.  She authenticated the

17   document of what the copies of what the document is.

18             We are presented with the book, and the book has additional writing on it.

19   At some point, I want to ask the witness some questions about this, and I want to clarify a

20   couple of things, but before this matter is resolved, the Court needs to look at all the

21   documents.

22        THE COURT:  That document is not marked?  I am going to do that, give

23   Counsel all the documents on the table to look at.

24

71

1          MR. KOUGIAS:  It is marked the same way as this document, baby blue

2     highlighter.

3          MR. AMIRANTE:  I was kind enough to give him a copy.

4          THE COURT:  Court Reporter and both Counsel, in the back.

5

6                                        (Whereupon the foregoing proceedings were had

7                                        outside the presence of the Courtroom)

8

9          THE COURT:  I am going to start over by asking one question.  Is there anything

10     different between the two documents that are marked Defendant's Group Exhibit One in

11     baby blue, three pages?  Is there anything different?

12          MR. AMIRANTE:  The only thing which is different is that doesn't copy on a

13     copy machine, this is what is here.

14          THE COURT:  This is what you have introduced, with the highlighter?

15          MR. AMIRANTE:  This, and this is a copy of this, but the highlighter doesn't

16     come through, just the black comes through.

17          THE COURT:  You are telling me, as an Officer of the Court, that the document

18     with the markings is the one that you offered?  It has not even been offered into evidence

19     yet, but marked as Defendant's Exhibit One.

20          MR. AMIRANTE:  And that was a copy for him and me.  I marked them because

21     I never marked the original, so when I was in my office this morning, I marked this

22     because I never marked the original.

23          THE COURT:  State, what is your position on these documents?

24

1      MR. KOUGIAS:  Well, Judge, you know from last week, I don't remember if that

2  had any highlighting on it.  When I went up and first used the document, it did not have

3  any highlighter on it.  I don't know which is which.

4          He handed me a copy or put it on our desk.  When I got it, I got all the

5  copies off Counsel table.  I also want the record to reflect the original document, which

6  has been authenticated, I will stipulate that is the original document.  However, there is

7  additional language put on here.

8          Normally, you would think once a trial starts, whatever the copy is, the

9  Best Evidence Rule says you have the original if you have the Best Evidence.  The Xerox

10  copies, there is a conflict here at this time.  There is writing that was put in here.  God

11  knows when it was put in, "Deb was here with girls."

12          And obviously, among other issues in this trial, that is a point that

13  consistently has come up and here we have a document, whether it is this one or this one,

14  this does not have it on the top here.

15          That consistently comes up, Judge, whether or not, how well the

16  receptionist recalls that particular day.

17      THE COURT:  I have heard that evidence.  You can argue that if you have

18  Rebuttal.  I have clearly heard the Defendant even testified to that, that that was not on

19  the document that was marked as Defendant's Group Exhibit One.  He doesn't know

20  when it was put there.

21          I heard it.  I get it.  My question is now this.  Two other documents that

22  purport to be identical to Defendant's Number One are now, I assume, inadvertently

23  picked up from Counsel table, one may be tendered to you.  I don't know.

24

1          What my question is, is this.  State, you are going to try to offer these

2    other two documents that I assume are identical?

3          If there is something different, then you have to question him about that or

4    find a witness to question.  I am assuming they are just duplicates that Counsel made for

5    whatever reason, giving you one, keeping an extra one on his desk, and the one that was

6    shown to the Witness is the one with the highlighted markings.

7          Am I missing something?  They are the same, yes?

8    MR. KOUGIAS:  Judge, even the two--I just want it to be clear, I don't know that

9    the one with the highlight here is the one that was presented to Miss Muir.  As far as I am

10   concerned, we can submit both of these.

11         What Counsel says is one or both of them should come into evidence.  If

12   he doesn't offer them, I will, as well as I would submit to the Court, the original

13   appointment book, as far as the dates that are in question, with the additional language on

14   here when it happened, who did it, I don't know.

15         Now, I have an issue here with an original existing, you know, record kept

16   in the ordinary course of business, obviously has been altered.    I don't know if it was

17   one sentence or word.  It is not on the Xerox copy presented.

18         Counsel can say yes, I got these documents six months ago, whatever the

19   time frame was.  This not only puts Karen into question and her testimony, but also puts

20   every one of these documents into question.

21         Counsel was looking for a stipulation.  There is no stipulation.

22   MR. AMIRANTE:  Hold on, don't put words in my mouth.

23

24

74

1      THE COURT:  Let's make this easier.  Do you have any objection, Mr. Amirante,

2  this isn't offered yet, it is just an identification exhibit.  I don't know if you are going to

3  offer this or not.

4          If you are going to offer this, are you going to have any objection to

5  offering both of these?  I assume they are identical documents.  I don't know what we are

6  arguing about here.  It seems crazy to me.  This, I understand the book is different than

7  the sheet, I get it, but these two sheets here, this is going to be an issue.

8          You have any problems with me looking at both of them?  Are they the

9  same?

10      MR. AMIRANTE:  This is much ado about absolutely nothing, Judge.  I don't

11  understand what their problem is.

12          When we started the trial, all I had available to me were these copies of

13  these dates.  These are relevant dates.  They are highlighted in there, the date that the

14  complaining witness was in the office, or highlighted on my copies that I had.  Those

15  were the copies that I had when I refreshed the recollection of Karen Muir.

16          I used those to refresh her recollection.  In the meantime, Judge, you

17  asked--I can't remember the police officer--I think something about who the next

18  appointment was made, who the next appointment was made for, Dr. Hayashi or someone

19  else.

20          When you asked that question, Judge, I thought it became incumbent upon

21  me, I asked to call Miss Muir today, and brought the book in to ask her if she was a

22  Keeper of the Record, since we only had copies, so I could bring in the original book.

23  She identified the book and who the next appointment was made with Dr. Hayashi.

24

1    The original purpose I was bringing the book in today, I shared it with

2    Counsel, to show him that it was the same as these.  I didn't realize that there was,

3    apparently, a change here, and I could inquire as to Miss Muir as to whether she did that.

4    I suspect that she did that, because I asked her, when we had conversations, if she

5    remembered when Debbie Hayashi was there, because I had evidence she was there that

6    Friday.

7    One thing I can figure, Karen Muir put that notation in the book afterward.

8    We can ask her about that.

9    As far as these three, the highlighter doesn't show on the copies; they are

10    my copies.

11    MR. KOUGIAS:  What do you say the reason is that you brought all of this stuff

12    in?

13    MR. AMIRANTE:  To explain it.  It was much ado about nothing.

14    THE COURT:  Here is what I am going to do.  You are going to be allowed to

15    question, continue your examination of the Witness.  We are going to use Defendant's

16    Group Exhibit, three pages with the highlighted portion.

17    At this time, Counsel is telling us this is the one that he offered and

18    nothing else being offered into evidence.  I am not ruling on anything else at this point.

19    You will be allowed to use this document to ask the Doctor questions.  All right.

20    MR. KOUGIAS:  Just so we are on the same page, Counsel can object.  The fact

21    this document was presented to us, I marked it People's Exhibit One.  I am going to ask

22    to have this document brought into evidence so the Court can take Judicial Notice of the

23    discrepancies on the book.

24

1          THE COURT:  You usually mark exhibits in your Case in Chief.  You rested

2     when  you offered this.  We are going to hear the arguments.  I am not going to rule on

3     that right now.

4          MR. AMIRANTE:  The reason I didn't bring in the whole book originally, it

5     contains names of all these patients and notice hasn't been given to any of them as to

6     their names.   If they go in the public record, I think that violates their rights.

7          THE COURT:  We will cross that bridge when we come to it.

8               Let's go finish.

9

10                    (Whereupon the foregoing proceedings were

11                         had in open Court)

12

13          THE COURT:  Okay.

14          MR. KOUGIAS:  Q  You testified that you remember October 13th, your wife

15     and children came to your clinic, is that right?

16          A     Yes

17          Q     Was that the first time they came to your clinic?

18          A     No.

19          Q     How many other times had they been to the clinic in the two and a half

20     years you have had a practice there?

21          A     Maybe fifteen, twenty times.

22          Q     Can you give me specific dates on any one of these other fifteen or twenty

23     times?

24          A     No.

1        Q       Yet, October 13th seems to ring a bell?

2        A       Yes.

3        Q       October 13th, incidentally, is where it is written in, in the original

4    appointment book, is that right?

5        A       Yes.

6        Q       You saw that?

7        A       Yes.

8        Q       I show you what is marked as People's Exhibit One, but I am going to

9    show you because I don't believe I showed you earlier.

10               This was Defendant's Group Exhibit, which has three pages.

11       A       Okay.

12       Q       And I am going to show you this document.  Does this document,

13   Defendant's Group Exhibit, three pages which you will agree with me has some yellow

14   highlight on there, is that correct?

15       A       Yes.

16       Q       Does this document show, "Deb was here with girls," this one show it?

17       A       No.

18       Q       Just so the record is clear, I put it on the table in front of you, Defendant's

19   Group Exhibit 1, with the yellow highlighter as well, People's Exhibit One for

20   identification, which is the original appointment book for your clinic, is that correct?

21       A       Yes.

22       Q       And just so we are in agreement, or we are clear, on this October 13, 2006,

23   Friday, next to that box with the date, it says, "Deb was here with girls," right?

24       A       Right.

1      Q      You remember I showed you that before, whether it is Karen's writing,

2  you are not sure?

3      A      It was either hers or Bernice's, yes.

4      Q      One of the two secretaries that are your employees?

5      A      My Office Manager or my receptionist, yes.

6      Q      And that large mark does not appear on the documents that are marked

7  Defendant's Exhibit, three pages?

8      A      No.

9      Q      As you look to the right of the documents, do they appear consistent?

10      A      Except for the yellow highlighting, yes.

11      Q      In fact, you said fifteen to twenty other times, your wife and the kids came

12  in.  Would it help--would it refresh your recollection if you look through the book to see

13  if there are any other dates where it was indicated, "Deb was here with girls?"

14      A      In the book itself, it would not show that.

15      Q      Although, it does show it on October 13th.

16      MR. AMIRANTE:  Objection, it is irrelevant whether it was on that day.  She met

17  the complaining witness' wife.

18      THE COURT:  Asked and answered, sustained.

19      MR. KOUGIAS: I have nothing further.

20      THE COURT:  All right, Counsel, anything else?

21      MR. AMIRANTE:  Nothing further.

22      THE COURT:  Thank you, Sir.  You may step down.

23

24                          (Witness excused)

1

2          THE COURT: Do you have any further witnesses?

3          MR. AMIRANTE:  I would just like to call--recall Karen Muir, for the reason I

4   brought her here today.  She is the receptionist, and also to explain Counsel's issue.

5          THE COURT:  State, any objection?

6          MR. KOUGIAS:  I do object, absolutely.

7          MR. AMIRANTE:  After that examination, he just asked how that notation got in

8   there.  I have a right to explain.

9          THE COURT:  Over State's objection, I will let you recall her for a very limited

10   purpose.

11          MR. AMIRANTE:  Thank you, your Honor.

12                              K A R E N    M U I R,

13   having been previously sworn under oath, was examined and testified as follows:

14                        D I R E C T    E X A M I N A T I O N,

15   BY MR. AMIRANTE:

16          THE COURT:  All right, Miss, please keep your voice up so everyone can hear

17   you.  You have been sworn?

18          THE WITNESS:  Yes.

19          MR. AMIRANTE:  Q  Good afternoon, Ma'am, please state your name for the

20   Court Reporter?

21          A      Karen Muir.

22          Q      You are the same Karen Muir who testified earlier in this case?

23          A      Yes, I am.

24          Q      You have been sworn to testify truthfully?

1          A      Yes, I have.

2          Q      You understand, you are still under oath?

3          A      Yes, I am.

4          Q      And by the way, when you came into Court Thursday and again today,

5   how is it or why did you come to Court?

6          A      I was subpoened.

7          Q      By who?

8          A      By you.

9          Q      And that was hand-delivered by an investigator?

10         A      Yes.

11         MR. KOUGIAS:  Objection.  I will stipulate she was subpoened.

12         THE COURT: I will let the answer stand.

13         MR. AMIRANTE:  Q  Ma'am, previously, you testified that you were the

14   receptionist, maker of the appointments, and you testified to certain appointments being

15   made on October 16th by Mrs. Kelly, you understand that?

16         A      Yes.

17         Q      And I showed you three pages of an appointment book, which I marked as

18   Defendant's Group Exhibit Number One for identification, you remember that?

19         A      Yes.

20         Q      And those were shown to you to refresh your recollection as to what

21   appointments you made, for who and when?

22         A      Yes.

23         Q      You looked at those, and you testified after you looked at those documents

24   as to what you remembered, correct?

81

1          A      Yes.

2          Q      Now, I am going to show you what has been marked, previously marked

3    as People's Exhibit One for identification, and I guess I am going to mark it as

4    Defendant's Exhibit Number 5 for identification.  Do you recognize that book?

5          A      Yes.

6          Q      This is a book; you are the keeper of that book in the office?

7          A      Yes.

8          Q      Is this book kept in the ordinary course of business in your office?

9          A      At my desk.

10         Q      At your desk?  That is the appointment book?

11         A      Yes.

12         Q      And are you primarily responsible for what goes in that book?

13         A      Yes.

14         Q      You make most of the notations in there?

15         A      Yes.

16         Q      You mark the appointments down in there?

17         A      Yes.

18         Q      As a matter of fact, if you look on October 16th, if you look at the book, if

19   you don't have to, you don't have to, on October 16th, you set up an appointment with--

20   for Dr. Hayashi with Mrs. Kelly for October 23rd?

21         A      Yes.

22         MR. KOUGIAS:  Objection.

23         THE COURT:  What is your objection, Counsel?

24

82

1        MR. KOUGIAS:  This is testimony that we have all gone through when this

2    young lady first testified; in fact, Counsel is leading her through all of that.

3        THE COURT:  Leading will be sustained.  You can't lead, Counsel.  This is your

4    witness.

5            I am going to allow a little bit of questioning here.  Reask the question

6    without leading, if you can.

7        MR. AMIRANTE:  Q  When this appointment--laying a foundation--when this

8    appointment was made, that was noted in that book, which is People's Exhibit Number

9    One, right?

10        A      Yes.

11        Q      And your appointments are always noted in that book when you make

12    them?

13        A      Yes.

14        Q      Now, if you look on the date of October 13th, you open that book and look

15    at the date of October 13th.

16            While you are looking at that, may I approach her with Defendant's Group

17    Exhibit One?

18        THE COURT:  Yes.

19        MR. AMIRANTE:  Q  I am going to approach you and ask you to look at

20    Defendant's Group Exhibit One for identification.  If you look to the October 13th date

21    on both of them, are you there?  Is there anything different in the copy than is contained

22    in the actual book?

23        A      Yes.

24        Q      What is different?

1    A    The top of it.

2    Q    And what is different?

3    A    I wrote something on here.

4    Q    What did you write?

5    A    "Deb was here with girls."

6    Q    When did you write that?

7    A    About two, maybe three weeks ago, when I was writing out a statement as

8    to what I remember.

9    Q    What you remembered from what?

10    A    From the whole case, what happened.

11    Q    You wrote that in?

12    A    Yes.

13    Q    Was that after you--did you--by the way, did you send the FAX copies of

14    the book to my office, or the copies?

15    A    Not I.

16    Q    So you don't know when I got those?

17    A    No.

18    Q    That was put in there two or three weeks ago?

19    A    Yes.

20    Q    Why did you put that in there?

21    A    Refreshing my memory.

22    Q    To refresh your memory as to the events of October 13th to October 16th?

23    A    Yes.

24

1     Q     As a matter of fact, you had given statements prior to two or three weeks

2     ago to my investigator, William Lloyd--

3     A     Yes.

4     MR. KOUGIAS:  Objection, this is all beyond the scope.

5     MR. AMIRANTE:  No--

6     MR. KOUGIAS:  It is the State's investigator--

7     THE COURT:  I am going to let him ask the entire question he is still asking, and

8     counsel, you may object.  If you desire to do that, do it after the whole question.

9          Ask the entire question.

10     MR. AMIRANTE:  Q --and to a Hanover Park Police Officer who questioned you

11     about the events of those dates on the phone, right?

12     A     Yes.

13     MR. KOUGIAS:  Objection.

14     THE COURT:  I will let the answer, "yes," stand.  Overruled.

15     MR. AMIRANTE;  Q  And excluding the notations at the top of the October 13th

16     date, and the actual book, which you keep in the normal course of your business,

17     excluding that, is Defendant's Exhibit One, Group Exhibit Number One, a true and

18     accurate representation of the book the way those pages were on October 13th, 16th and

19     23rd?

20     A     Yes.

21     Q     Minus the redacted part, where the other patients' names are blocked out?

22     A     Yes.

23     Q     What about the yellow highlight?  Were those in the back?

24     A     No.

1        MR. AMIRANTE:  Nothing further, Judge.

2        THE COURT:  Cross?

3                    C R O S S     E X A M I N A T I O N,

4    BY MR. KOUGIAS:

5        Q      You are looking at the original document that is in Court.  That has been

6    altered, is that right?

7        MR. AMIRANTE:  Objection.

8        MR. KOUGIAS:  People's Exhibit One.

9        THE COURT:  Identify the document, Counsel.  People's Exhibit Number One?

10       MR. KOUGIAS:  People's Exhibit Number One for identification, this document

11   here, this is the original book, right?

12       MR. AMIRANTE:  Objection, it was not answered after an objection.

13       THE COURT:  Overruled, overruled.  He may inquire.

14       MR. KOUGIAS:  Can I address the Court?   Instead of objecting, he starts

15   blurting out, suggesting answers for the Witness.

16       MR. AMIRANTE:  Objection.

17       THE COURT:  First of all, when someone is asking a question, they are going to

18   be allowed to finish the question.  As long as the question is completed, either side may

19   object, if they so desire, and state a basis.

20           I will then ask the other Attorney for a response.  I will rule.  I am not

21   going to have speaking objections.  We are going to have objection, basis, hearsay,

22   response.  It is not going to be speaking objections.

23           Ask your question.

24

1        MR. KOUGIAS:  Q  What is in front of you, marked as People's Exhibit for

2    identification, the book with the black cover, is that the appointment book in  your office?

3        A       Yes.

4        Q       The original appointment book, is that right?

5        A       Yes.

6        Q       In fact, you recognize most of the handwriting, if not all the handwriting in

7    that book, is that right?

8        A       Yes.

9        Q       The other documents to  your left are some Xerox copies, Defendant's

10   Exhibit One, Group Exhibit, three pages, is that right?

11       A       Yes.

12       Q       Do you remember seeing this document Thursday, May 17th, when you

13   testified?

14       A       Yes.

15       Q       Mr. Amirante showed it to you?

16       A       Yes.

17       Q       You recognized that as Xerox pages of this original book, is that correct?

18       A       Yes.

19       Q       Now, as you look at it today, they are not the same documents as are

20   these?

21       MR. AMIRANTE:  Objection.

22       THE COURT:  Overruled.

23       THE WITNESS:  With the exception of that at the top.

24

1       MR. KOUGIAS:  Q  Well, except on the top, yes, except on the top, what does it

2     say?  Can you read that for me?

3       A    "Deb was here with girls."

4       Q    You put that in sometime after October 13th, right?

5       A    Two weeks ago.

6       Q    And you said that you did that because you wanted to refresh your

7     memory?

8       A    Yes.

9       Q    Ever hear of a Post It?  In fact, I will flip to the next page.  There is a Post

10    It there, is there not?

11      A    Yes.

12      Q    Is it to refresh your memory or somebody else's?

13      A    That is to refresh someone else's.

14      Q    Now, you testified that the reason that you put this in two weeks ago is

15    because you wrote a statement?

16      A    Yes.

17      Q    For who?

18      A    For the police.

19      Q    Do you have that statement witih you?

20      A    A copy of it.

21      Q    Can you please present that?  What is the statement regarding?

22      A    Just to refresh my memory of what happened.

23     MR. AMIRANATE: Objection to her notes, notes that she wrote down for herself.

24     THE WITNESS:  Yes, I don't have it because I don't have my other purse.

1          THE COURT:  She doesn't have it.

2          MR. KOUGIAS:  Q  So, it is your testimony that you actually wrote out the

3    events that transpired from October 16th?

4          A       Yes.

5          Q       And in order to do that, you had to go back to the appointment book to

6    make that, to write out that statement, right?

7          A       To refresh my memory.

8          Q       You didn't remember everything?  You had to go back and look at the

9    appointment book to figure out the date?

10         A       I knew the date.

11         Q       And you knew that Deb and the girls had come to the office on October

12   13th, right?

13         A       Yes.

14         Q       But even though you knew that, you thought it best two weeks ago to

15   write it in the original book, right?

16         A       That was for myself.

17         Q       It was for yourself?

18         A       Yes.

19         Q       That is a book that is maintained in the office, is that right?

20         A       At my desk.

21         Q       You don't have more than one diary, do you?

22         A       No.

23         Q       Appointment book?

24         A       No.

1        Q        Any other little tidbit of information you might have had in this

2    appointment book to help refresh your memory?

3        A        On the different patients, yes.

4        Q        That you have written in, in regard to this case regarding Miss Kelly?

5        A        No.

6        Q        So, it is fair to say that you wrote that to refresh your memory as you have

7    testified to, because you didn't really remember the specific date until you looked back at

8    the appointment book, is that right?

9        A        No, I knew the specific dates.

10        Q        So, why would you have to refresh your memory for October 13th?

11    MR. AMIRANTE:  Objection.

12    THE COURT;  Overruled, she may answer.

13    THE WITNESS:  I was just doodling, and going through the book.

14    MR. KOUGIAS:  Q  That is not doodling.  There is no "smiley face" on there, is

15    there?

16        A        Not on that page.

17        Q        It has words on that, "Deb was here with girls."

18        A        Yes.

19        Q        In fact, on the date of October 16th, which is the date in question, you

20    didn't put a--put an asterisk on that page to highlight that particular date?

21        A        No.

22        Q        That just has a Post It on it?

23        A        That Post It was put there for the same thing.

24        Q        You have heard of Post Its, the little yellow tag there?

1          A      Yes.

2          MR. KOUGIAS:  Nothing further.

3          THE COURT:  Okay.  Counsel?

4                    R E D I R E C T   E X A M I N A T I O N,

5      BY MR. AMIRANTE:

6          Q      Miss Muir, you didn't want to be here Thursday or today, did you?

7          A      No.

8          MR. KOUGIAS: Objection.

9          THE COURT:  Okay, I am going to sustain the objection.  Unless you have some

10     questions that are directly related to the examination on cross, the redirect has to be

11     related to that, Counsel, anything related to what just came out of cross-examination.

12         MR. AMIRANTE:  Q  You say you were putting notations for yourself so you

13     could remember what happened in that book, right?

14         A      Yes.

15         Q      You also wrote down a little statement to yourself as to what you

16     remember from the events from October 13th, October 16th?

17         A      Yes.

18         Q      Actually, to October 23rd, is that correct?

19         A      Yes.

20         Q      And were those dates you were interviewed, along the way, all the way

21     from like October 17th--

22         A      Yes.

23         Q      --to today about this case, right?

24         A      Yes.

91

1      Q      October 17th, a police officer from Hanover Park interviewed you, right?

2      MR. KOUGIAS:  Objection.

3      THE COURT:  Sustained.

4      MR. AMIRANTE:  Q  And the police officer asked you what happened, and you

5      told him the same thing you told the Judge here, correct?

6      MR. KOUGIAS:  Objection.

7      THE COURT:  Sustained.

8      MR. AMIRANTE:  Q  You knew you were going to come in here and be called,

9      under oath, correct?

10     A      Yes.

11     MR. KOUGIAS:  Objection.

12     MR. AMIRANTE:  You would be sworn to--

13     THE COURT:  Overruled.  The answer may stand.

14     MR. AMIRANTE:  Q  You would be sworn to tell the truth, the whole truth and

15     nothing but the truth?

16     A      Yes.

17     Q      You wanted to make sure when you got on the stand, you told the truth,

18     the whole truth and nothing but the truth, is that exactly what it was?

19     MR. KOUGIAS;  Objection.

20     THE COURT:  Overruled.  She can answer.

21     MR. AMIRANTE:  Q  Is that why you made notes for yourself?

22     A      Yes.

23     MR. AMIRANTE:  No further questions.

24     THE COURT:  All right.  You may step down.

1          (Witness excused)

2          THE COURT:  Counsel for Defense, any further witnesses?

3          MR. AMIRANTE:  I would, at this time, have no further witnesses.

4          Before I rest, I would like to ask the Court to admit into evidence

5     Defendant's Exhibit Number One for identification.  Your Honor, I would ask to admit,

6     jointly, People's Exhibit Number one, and Defendant's Exhibit Number One, which your

7     Honor could read.

8          THE COURT:  All right.  People's Exhibit One for identification and also be

9     marked Defendant's Exhibit 5 for identification, you are offering that into evidence, that

10    is the book, yes?

11         MR. AMIRANTE:  But I would ask that only the parts, after your Honor reviews

12    it, that only pages dealing with October 13th 16th and 23rd, State's evidence, or in the

13    alternative, if Defendant's Exhibit 5 come into evidence, that would be sealed, because

14    again, it contains last names of many, many patients.

15         THE COURT:  Are you offering Defendant's Exhibit One for identification into

16    evidence, that is the three page Xerox copy?  You are offering that exhibit?

17         MR. AMIRANTE:  Yes.

18         THE COURT:  Any objection?

19         MR. KOUGIAS:  As to the relevant pages, which should be a true and accurate

20    representation of the actual record keeping book, but as Counsel pointed out, there

21    apparently was a change, so your Honor must consider the change.

22         THE COURT:  All right.  State, do you have any objection to Defendant's Group

23    Exibit One for identification coming into evidence?

24         MR. KOUGIAS:  No.

93

1      THE COURT:  It will be offered into evidence, without objection.  Are you

2    offering any other exhibit, Counsel?

3      MR. AMIRANTE:  Your Honor, I would offer Defendant's Exhibit Number,

4    Group Exhibit Two for identification, which you have seen, a group of towels which is

5    sitting on the bench.

6      THE COURT:  Any objection?  Any objection to Defendant's Group Exhibit

7    Number 2, which are the towels?

8      MR. KOUGIAS: No objection.

9      THE COURT: Without objection from the State, that would be admitted into

10    evidence.

11      MR. AMIRANTE:  Number 3, I offered, uh, 4, I would ask to offer that into

12    evidence,  the invitation.

13      MR. KOUGIAS:  No objection.

14      THE COURT:  Defendant's Exhibit 4, which is the wedding invitation, any

15    objection, State?

16      MR. KOUGIAS:  No objection, your Honor.

17      THE COURT:  All right.  No objection, that would be admitted into evidence, and

18    I think we have already done that, for the record, it is crystal clear, Defendant's Exhibit 5,

19    which is also marked as People's Exhibit 1, you are admitting that as well?  The book,

20    you are offering that as well?

21      MR. KOUGIAS:  Yes.

22      MR. AMIRANTE:  Yes.

23      THE COURT:  Any objection?

24      MR. KOUGIAS:  No objection.

94

1       THE COURT:  That will be admitted.

2              All right.  Anything else from the Defense?

3       MR. AMIRANTE:  With that, Defense rests.

4       THE COURT:  Defense rests?

5       MR. KOUGIAS:  Judge, I want to clarify, what is Defendant's 3?

6       THE COURT:  He did not offer Defendant's 3?  He offered 1, 2, 4 and 5.  Those

7    have been admitted into evidence.

8              All right.  State, do you have any rebuttal testimony?

9       MR. KOUGIAS:  Judge, I do not.

10      THE COURT:  You do not?  State rests in Rebuttal?  Very good.

11             All right.  Both sides ready for closing argument?  You gentlemen need a

12   bathroom break?  We will take a five-minute recess.  Everyone can use the restroom and

13   we will be back for closing arguments.

14

15                     (Whereupon a short recess was had)

16

17      THE CLERK:  Recalling Bradley Hayashi.

18      THE COURT:  All right.  Both sides ready for closing arguments?

19             State, you may proceed.  If you would like to use exhibits?

20      MR. KOUGIAS:  You certainly heard a lot of testimony about this case, and the

21   Defendant is charged with a battery, in that on October 16th of 2006, this Defendant had

22   inappropriate contact with the victim in this matter, Malina Kelly, and I heard from Miss

23   Kelly, as  you, Judge.  You certainly assess the credibility of all the witnesses, not just the

24   victim, not just the Defendant, who testified in this matter, but all the other witnesses, and

1    I would submit to you, Miss Kelly was straight forward and forthright and told you

2    exactly what happened.

3         Miss Kelly has had an ongoing professional relationship with the

4    Defendant for two to two and a half years, and all of a sudden, we come up to--we are

5    talking appointments two to three times a week.  By the Defendant's witnesses, we will

6    show at one point, she had the appointments once a week.

7         Miss Kelly was, nonetheless, in this office on a regular basis, at a

8    minimum, once a week, and usually it was--the masseuse was a woman named Val or

9    some other female, and in this entire two and a half year process, it was approximately

10   four to five times where the Defendant actually performed the massage.

11        On this occasion, it was the very first time that the Defendant performed

12   what has been called a full-body massage, and what the Court heard was that our victim

13   suffers from scoliosis and needs these treatments, and in addition to the adjustments and

14   the massage, some type of electrical treatment that also occurred, and it always was

15   routine, except on this occasion, October 16th, where you heard from the victim, who

16   relived this horrific experience again and again when she was testifying.

17        She told you that he first was brushing up against her vagina, completely

18   naked, flipped her around and fondled her breasts, and her vagina, and even the Defense

19   witnesses know of no treatment--the Defendant testified there is no reason to be fondling

20   the female vagina when you are doing a mid to lower-back massage.

21        Why we get to this particular area, other than for the Defendant's own

22   gratification?  I would imagine he had this woman, she was in a vulnerable position.

23        And to add insult to injury, the Defendant admits she invited him to the

24   wedding, he didn't go.  I would submit to the Court, that the relationship that they had,

96

1    she trusted this guy that much that she invited him and his wife to her wedding.  It was

2    their exhibit, they put it in there.  There was no objection to it.

3            If she didn't like the guy, she wouldn't have invited him.  She invited him

4    to the wedding.  He doesn't show up.  He thought it was inappropriate for a doctor to go

5    to a patient's wedding, although he is talking to her, whether it was on this occasion or in

6    the past, which had been brought out, about Brazilian wax, Bachelor Parties.

7            He claims, well, she brought that up, not me.

8            He also tells you that she had the option, if she preferred, to have a female

9    masseuse massage her, just to avoid the appearance of impropriety.  You would think this

10   guy would have enough sense?  You know what, I don't want to get close to the area on

11   the buttock or the vagina.  I don't need the aggravation, I don't need to lose my

12   livelihood, even being accused of something like that.

13           What happens here, he starts out, if you remember the painstaking

14   testimony of Miss Kelly.  She said he starts out, he is working her inner thighs, moving

15   up, slowly moving up, and he brushes up against her vagina on several occasions.  What

16   does Miss Kelly say?    She has done something wrong, she feels guilty about it.  She

17   doesn't know how to react.  Maybe this is a full-body massage, what have I got myself

18   into over here.

19           At some point, she flips around, he gropes her again, fondling her vagina.

20   At some point, she testified, she had to go to the bathroom, get this guy off of her, and it

21   became an extremely awkward situation.

22           She walks out of that clinic, wondering what the hell just happened here.

23   What is going on here?  I have known this guy.  It has been established the Defendant

24

1    knew Miss Kelly's brother, knew Miss Kelly's father. In fact, it was, I believe, the

2    brother's wife he had dealt with.

3              There was another incident they chose to highlight. Miss Kelly, the only

4    time she was ever upset was because an appointment was made involving her husband, to

5    have a massage by someone other than the Defendant, and that made her upset.

6              That tells the Court the value of the trust she had with this guy. She calls

7    up and she is upset because she wants the best, apparently, to give her husband a

8    massage, so he can experience what we would imagine would be appropriate massaging,

9    and on October 16th, it just all collapses. It all falls apart, because this guy, who is a

10   licensed professional, who should know better, is sitting there, groping her vagina and

11   fondling her. There is no mistake about that.

12             What may not be absolutely certain, Miss Kelly testified she thought he

13   had an erection. After he had fondled her vagina, she felt what appeared to be to her, he

14   had an erect penis. Her elbows were hanging off the table, when he touched her elbow.

15             She did an amazing job, testifying what happened. She was horrified.

16             After the exam, she left the clinic, confused, wondering what is going on.

17   She told you that she went to her Mom' house, nobody was there. She then made a

18   phone call, she goes to the police.

19             You heard from the Officer. The Officer tells you that the condition that

20   Miss Kelly was in when she was reporting this, and he said they had to go over it a few

21   times. She was crying. She had to gather her thoughts, and she told the police what had

22   transpired.

23             Now, the Defense witnesses--in fact, Counsel made light of the fact, we

24   did subpoena some witnesses, we didn't call them. He made it clear, he called them, but

1   all of these people stumble into the Court. They are under oath, they testify, and there is

2   much made about these towels.

3            You know what, the focus isn't on the towels. There were two people in

4   that room. The receptionist never went in, the other elderly lady never went in. No one

5   went into the room at the time the massage was being performed. Their testimony is

6   useless.

7            I would submit Karen, who is the receptionist, she got blown out of the

8   water here. She is presenting documents she prints on May 17th, which purportedly are

9   Xerox copies of a true and accurate reporting of the appointment book, and low and

10  behold, that appointment book makes its way into the courtroom today, and there is

11  additional writing on it, and it is not a smudge or mark, it is, "Deb was here with girls."

12           And how convenient, because that was one of the issues. Everyone seems

13  to remember October 13th, the appointment before the 16th, oh, yes. The Defendant's

14  wife was there, and Miss Kelly met the wife and the kids. How convenient that that

15  language just happens to be put on there.

16           We are not talking about numbering pages or keeping something on there.

17  This is something that is deliberately put on there, trying to rehabilitate her. I just wrote

18  that in to make mental notes. Mental notes? She made a statement about this. That tells

19  you that she didn't have any recollection of this, and who would expect that she would?

20           Although, I would tell you that they are biased. They work for the

21  Defendant. They are not going to say anything bad about him. Why would they? They

22  would be out of a job. It would never happen.

23           The police officer and Miss Kelly are the only two that were able to talk

24  about what her emotional level was, and somehow she felt threatened.

1    At this time, you have to ask yourself, why would she go through all of

2    this? Has there been any evidence presented by Counsel's extensive cross-examination

3    of Miss Kelly? Has there been--what would be the reasoning behind this? Why would

4    she come forward and say, this guy fondled me inappropriately. She looked up to this

5    guy, he was her doctor.

6    I would submit to the Court, if she wanted to stick this guy with a case,

7    couldn't she do a better job than just saying, he brushed up against my vagina, and later,

8    he fondled my vagina. Why not have him assault her. If she is going to go, why not go

9    all the way? Why stop there, and that tells you, because she is accurate, she is credible,

10    and telling the truth.

11    She didn't even want to be here, but she came here to do the right thing,

12    because if he did it on this occasion, God knows what else has been going on, or what the

13    future holds, and this is a licensed professional, as he said in his own words. I don't want

14    anything inappropriate between a doctor and a client.

15    Okay, don't go to the wedding, but have her strip down, naked, and fondle

16    her inner and upper thighs, and at a minimum, I would think, as a doctor who has

17    females, who has female masseuses and other female employees, if you are massaging a

18    member of the opposite sex on a bed, just to cover your own butt, you would have a

19    female in there to avoid this entire scenario, because when she is in the room with the

20    Defendant, by himself, what does she do? Where does she go? Does she pull an alarm?

21    How is she able to escape from there? She walks outside of the room.

22    As a matter of fact, she tells him, I have to go to the bathroom. I am cold,

23    I need a blanket. She is trying to get out.

24

1          The Defendant makes a lot of this, and Miss Kelly testified to this.  When

2     she went there, on the 16th, and she is always making these appointments, on the 16th,

3     there was some delay in her getting her appointment, so she had sometime, she made the

4     next appointment on the 23rd, there seems to be much ado, she did make the

5     appointment.  I remember specifically she made the appointment afterward, which would

6     indicate she must have enjoyed this massage.

7          I would submit to you, Karen herself has been caught in making notes,

8     adulterating and altering the appointment book.  She has zero credibility and again, why

9     would she ever have to lie about something like that?  What difference does it make?

10    Even if she wanted to maintain the scenario, she herself said, after the attack, she tried to

11    stay calm and cool and do the right thing and get out of there without causing any stir.

12         Even if she did make the appointment, she said she didn't.  It doesn't

13    matter.  That is what they focus on.  There was much focus, as I said, on these towels,

14    you know, unless there was an ongoing camera in the room, which shows a set of towels,

15    they are trying to impeach the credibility on some silly towels in there, and they present

16    to you what testimony, whatever exhibits, and that why would it make a difference, you

17    know.

18         She could have been wrapped like a mummy, and he could have put his

19    hand up and fondled her vagina.  It doesn't make a bit of difference.  That is as good as

20    their case gets.  That is all they have.  That is all they can grab onto.

21         You know what, she is obviously lying because there is no such thing as a

22    towel that can only partially cover her mid torso from her breasts to her crouch area.  That

23    is ridiculous.

24

1    I don't remember the other woman, I believe it was Karen, the elderly

2    woman who also works there.  She also testified she didn't see Miss Kelly leave.  She

3    doesn't know.  Well, I went in there to do some filing, whatever she did, so how do you

4    know when she left?  How can you testify as to what her mannerism was, or how she felt,

5    whether she was excited, emotional?  She was indifferent to it.  You weren't even there.

6    She was up there, testifying.  I didn't hear anything, I didn't see anything.

7    You are in the backroom, how can you hear anything, how can you see anything?

8    They paraded one witness after another, and then qualified, oh, yes, the

9    State subpoened you, but they didn't call you.  Okay, we will call you, get whatever we

10   can.  They are bringing out his character, which I would submit is inappropriate in this

11   matter.  Whatever his character is in the Community doesn't have anything to do with the

12   fact that he has been charged with commiting a battery upon Miss Kelly on October 16th.

13   Whether he was a nice guy five years ago, whether he has been a nice guy,

14   it doesn't matter.  This is a one-on-one situation, and the distinction here is that she has

15   this ongoing doctor-client relationship with him.  This isn't a date-rape, this isn't some

16   situation, she just met this guy at a bar, maybe she is mistaken, she is not sure.  This is a

17   situation where she had full trust in this guy, and he examined her, and he had massaged

18   her and she trusted him with putting electrodes on her, and she has stimulation to help her

19   muscles.

20   There is a series--a series of treatments that were performed, but on

21   October 16th, that all went awry, and here is another one, you are going to make the case

22   better, she didn't do this either, this is the one time and really, the final time she went to

23   this clinic, the clinic that in effect was her home, she did work there along before this guy

24   ever showed up there, her Mom worked there.  There were a series of family-ties.

1        Imagine what she feels and has to go through in order to accuse him of

2    commiting a battery upon her.  This is not just somebody, blurting some comments out,

3    some small attack; this is serious stuff, big business, because in effect, he is out of

4    business.  He is not going to have a license.  He is not going to be doing massages

5    anymore.  He is not going to have a clinic if he is found guilty, and I would submit to you

6    that this Court should find him guilty for battery, because he did, in fact, fondle this

7    young lady, and it wasn't an accident, because, you know, maybe you can argue, it was

8    brushing, maybe there was some contact, if any.  This guy never wears gloves, putting

9    some cream on her, but the testimony was clear, that after the brushing, at some point,

10   Miss Kelly was asked to flip over, and at that time, he fondled her breasts again, and he

11   fondled her vagina, and you know, as much as Counsel tried to bring out from these other

12   masseuses, well, is there any way you can touch or manipulate one part of the body, and

13   cause some type of sensation in the vaginal area?  Of course there is, when they are

14   asked, but what can you touch that is going to make it feel as if somebody is fondling,

15   manipulating your vagina?  No, it is just going to be a tingling sensation.

16       We are not talking about a tingling sensation.  We are talking about this

17   guy's hands on the victim's vagina.

18       The worse thing about this entire case is that, even as the victim sits here

19   today, she still feels, somehow, she is responsible, too.  She did something wrong there,

20   when, in effect, the Court needs to tell her she didn't do anything wrong.  This guy is the

21   one that did it.  He is the reason we are here, and that she was strong enough to come

22   forward and pursue this and relives the whole nightmare again and again and again.

23       Judge, you have certainly heard all the evidence; you have all the

24   documents in front of you.  For whatever they are worth, what this other testimony has

1    been from these, you know, people that weren't in the room at the time it happened, just

2    happened to be around, one was a receptionist, alterations were made to the documents.

3    We would certainly ask that you then, you afford what weight you feel appropriate.

4            What it comes right down to, it is her word against him, and again, this is

5    not just a one-time situation here, as far as she just met the guy.  There is an on-going

6    relationship, there is a family relationship, family ties and based on that, Judge, we ask

7    that you find the Defendant guilty, because if it is not you, then who, and if it is not now,

8    when?

9            THE COURT:  Thank you very much, Counsel.

10           Counsel for the Defense?

11       MR. AMIRANTE:  Thank you, your Honor.

12           May it please the Court, Counsel, Dr. Hayashi, your Honor, Defense

13   thanks you for your kind attentiveness to all of the evidence in this case.  This has been a

14   lengthy, lengthy trial, and much evidence, much arguing, and I know I appreciate it, my

15   client and certainly, the State's Attorney appreciates that, and the Complainant.

16           Your Honor, the last thing Counsel just told you is what it boils down to,

17   her word against his.  That is what he said.

18           The issue in this case, he would have you believe, Judge, that any type of

19   preposterous accusation should be proof enough for the Court.  That is not why we have

20   trials; that is not why the Constitution protects my client with a veil of presumption of

21   innocence until the State has enough evidence to prove him guilty, or any Defendant

22   guilty beyond a reasonable doubt.

23           I submit to your Honor, that if you go, just based on what Counsel asked

24   you, the last thing he asked you, it is her word against his.  There is no way, no way in

1    this courtroom, any place, that the State has proven my client guilty beyond a reasonable

2    doubt.

3              She makes an allegation; he denies it.  Your Honor has already, in my

4    Motion for a Directed Finding, said she was somewhat credible.  Look at the case most

5    favorable to the State.  At this time, you found that she was credible.  I susbmit my Client

6    was just as credible, if not more credible.

7              Dr. Hayashi was subject to the scathing cross-examination of this able

8    lawyer, and he remained unscathed in that entire cross-examination.  We can't say that

9    about the Complaining Witness, if you weigh his word against hers, or if you are going to

10   weigh the evidence and weigh the testimony of just these two witnesses, and nothing else,

11   Judge, I suggest to you that Dr. Hayashi was much more credible, and even if you find

12   her credible, he was much more credible.

13             Just a couple of things about her testimony, Judge.  She even said here,

14   under oath, that she made an appointment for October 23rd, to see Dr. Hayashi before any

15   of this ever happened.  That is what she told you, and she insisted that was true; however,

16   Judge, you heard from not one, not two, but three witnesses, two subpoened by the

17   Defense, one Karen Muir, and one Bernice, the Office Manager, and three State's

18   Attorney's witnesses, the police officer, who immediately interviewed the Complaining

19   Witness after this allegedly occurred, and what did she tell him, and you heard him,

20   Judge, loud and clear.

21             This is a State's witness, this is the interviewing, investigating officer.  He

22   said that she told me, the Officer, that after the massage was over, she went out there and

23   set up another appointment to see the Doctor the following week.

24

1    It wasn't our witness, it was the State's witness, that was the Investigating

2    Officer who charged my Client, Judge.  If that doesn't affect her credibility, I don't know

3    what would?

4    How does she try to explain this?  Sh tried to explain that the Officer mis-

5    interpreted her, that is what she said.  The Officer misunderstood what I said.  The Officer

6    mis-interpreted what I said.  That was her explanation.  After all these months, after all

7    these weeks, it was not brought to anybody's attention, the State's Attorney.  Suddenly,

8    the Officer misinterpreted what she said.

9    She wanted you to believe, Judge, she wanted you to believe that she set

10    up that appointment prior to the massage, so that you would believe the rest of her

11    testimony.

12    I submit to your Honor, that is wholly, wholly false, it just doesn't exist.  I

13    don't know.

14    Counsel asked what are the reasons, what are the reasons she would do

15    that?  Judge, your guess is as good as mine.  It could be money.  It could be the product

16    of a vivid imagination.  It could be fantasy.  It could be jealousy.  I mean, you did hear

17    some testimony there that she was upset.  Nobody contradicted this, Judge.  The State

18    brings in, in rebuttal, she was upset because her husband, new husband was given an

19    appointment, set an appointment up with a female chiropractor, not the male, being Dr.

20    Hayashi.  Why was she upset?  Because Dr. Hayashi was the better chiropractor, or a

21    little bit of jealousy there?

22    She started going to Dr. Hayashi before she was married.  I don't know if

23    it was before she met her now husband, before she was married.  Perhaps she had some

24

1    kind of crush on him?  I don't know.  There are any number of reasons, any number of

2    reasons we can think of she would make up the story, a story she believes now.

3              And Judge, how many times have you seen that, when you have listened to

4    witnesses or talked to people after they tell their story?  So many times, they believe it

5    themselves.

6              There is no doubt in my mind, this Witness believes what she was saying

7    up there, Judge.  The evidence doesn't add up, and if the State does convict my Client, to

8    have your Honor find him guilty, they need to show you evidence, proof, beyond a

9    reasonable doubt.

10             To take that type of bad allegation, and say that is true, without anything at

11   all, anything at all to corroborate it, Judge, if he were to be found guilty, would be a

12   travesty on our Criminal Justice system.  It would be a travesty.  There is nothing to

13   corroborate what she says.  There is more to corroborate that he is an innocent man.

14             Way back in the beginning, Judge, in opening statements, I asked you, as a

15   trier of fact, to bring your experiences of life in, which you are allowed to do as a trier of

16   fact, to bring your common sense in, which you do, your Honor, in your daily sitting as a

17   Judge.

18             The State would have you believe, and this complaining witness would

19   have you believe, that in spite of being insulted, violated, embarrassed, hurt, made upset,

20   put into a weird state, in spite of all this, during a, almost one hour massage, full-body

21   massage, as soon as this was over--let me just back up a second.

22             In assuming, if you believe what she is saying during that massage, Judge,

23   he touches her labia.  Does she say anything?  No.  He touches her breasts.  Does she say

24

1    anything?  No.  He touches her vagina area.  Does she say anything?  No.  Does she

2    object?  No.  He touches her clitoris.  Does she object?  Does she say anything?  No.

3           Even assuming that is true, Judge, let's assume that is true.  Let's say you

4    believe what she said.  At some point, shouldn't somebody say, no?

5           Say he was a doctor and--not a doctor, perhaps the issues here are

6    somewhat skewed, because he is a doctor.  There has to be knowledge of somebody's

7    lack of consent, and she even told you, Judge, somehow in her mind, he never testified to

8    this, in her mind she said, at the beginning of the full-body massage, Dr. Bradley said,

9    you may feel--you may be uncomfortable, this is your first massage like this, and this

10   may involve the pelvic region, and she told you that.  That was her testimony, not ours.

11          Assuming that is true, if that entails the pelvic region, go ahead and do

12   what you do all the time, she never had one.  How does she know what he does?  Maybe

13   he touches the pelvic region.  We say he does not.

14          Assume you believe that if he touches the pelvic region, she consented,

15   said you can give me a massage the same way you always do, whatever you do, and when

16   he allegedly touches this pelvic region, she doesn't say, don't, don't, stop.  I don't want

17   you to do that.  I feel uncomfortable.

18          He talks to her.  He asks, does this hurt, does that hurt?  How is your

19   brother?  How is your Father?  How is married life, making small talk.  Does she ever

20   say, I feel very uncomfortable, I want to leave?

21          He is in his office, Judge, in a massage room, in an office filled with other

22   women.  He has his receptionist, office manager, massage therapists in there, and he is in

23   an unlocked room with this other female.  This is a physician who has an impeccable

24   record, Judge.

1          We have very able lawyers representing this State here and the

2   Complaining Witness' interests.  Don't you think--don't you think if there was one other

3   complaint about him, one other person who says Dr. Bradley gave me a massage and

4   touched me or fondled me, that person would be in this courtroom?  As hard as this

5   lawyer works in this case, and everyone works as they do, as zealously as they

6   represented the State, if there was one other witness, a person to corroborate what she

7   said, that witness would have been in here.  That witness is not here because there is no

8   one.  There is no one.

9          Dr. Bradley told you that one time, one time in his entire career, this is

10  2000, he got a complaint because the complainant, a client or patient, didn't have any

11  more money, that is it.  Did the State come in with rebuttal, you are wrong, you have all

12  kinds of complaints?

13          We are talking about a man, a married man with two and a half children,

14  whose reputation is impeccable, now being accused by somebody, for whatever reason, of

15  touching her inappropriately.

16          If that happened, and it did not, she consented to it, she never objected to

17  it, out of her own mouth, did not object to this allegedly horrible conduct.

18          Now, she got out of the room, and she had an opportunity to go out of

19  there.  They both testified she went to the bathroom, they both testified that he gave her

20  two gowns to put on.  Why doesn't she get up and leave, I feel uncomfortable with this

21  guy.  This massage is over, Pal, I am going to leave, and we will deal with this some

22  other time.  Do something about it.  I mean, I think, give him a crack, is he stopping her

23  from leaving, and if somebody is too timid to leave, Judge, in God's name, would they go

24  back in and be touched by the same person?

1    Judge, I don't believe a reasonable person could fathom, if somebody is

2    violated, somebody is touched inappropriately, man, woman or anybody, even someone

3    who does not have the capacity to object, would then go right back into the same place

4    voluntarily, not by force, not by coercion, not by duress, but voluntarily, right back in to

5    get touched by this person again and be adjusted.

6    How is that believable, Judge? We suggest it is wholly and completely

7    unbelievable, and again the reasons, Judge, I don't know, I don't know, and then not only

8    go back in, and that is what the testimony was again from their witness and our witness.

9    Before she goes back into the room, she sets up another appointment to see him the

10   following week.

11   If you look at the evidence, the book, there is much ado about nothing

12   with these books. It is admitted to show she made another appointment. Who was it

13   made with? If you look in the book, it was made with Dr. Hayashi for a massage, not

14   with Val, who she usually gets massages from. She was going to see this doctor, who she

15   accused of this type of conduct. Right then, after this allegedly happened, she made

16   another appointment to see him. That is clear. That is uncontradicted testimony.

17   That book, which is admitted, is an official record. Counsel makes an

18   argument, it has been altered. Sure, Judge, it was written on by the Keeper of the Record

19   to help her recall what happened and what day. This isn't a professional witness, she is

20   not a police officer, she is a witness who, number one, was contacted by the police.

21   There is no record she was ever contacted by the police. She gave a

22   statement to the police. She is in here, nervous, and the other day, under oath, under

23   subpoena, not wanting to be here, not because she is here, because she was an employee.

24

1    She is here because she was upset. She told you that, and she told the truth and she

2    wanted to make darn sure that the truth was accurate.

3         She didn't go up there and say anything that was untrue or mistaken to

4    your Honor. She put a little note in there. I don't know when she put it in there, a few

5    weeks ago. That doesn't affect the credibility of what is in there. It is credible.

6         The State tries to make a smoke screen to hide the incredible testimony of

7    their witness. They create this smoke screen about the receptionist. That happened, there

8    is no denying that their witness made the appointment for October 23rd.

9         Another reason, Judge, why do we talk about Mrs. Hayashi, talk about

10   Debbie and the kids? Here is a woman who invites a man to her wedding, a man who--I

11   don't know if he ever met, yet he was--she wanted her husband to see him. I don't know

12   if that was before or after the wedding. I don't know if that evidence came out, Judge.

13        Here is a man she never socialized with, she had some small talk with him,

14   he obviously has a nice type of personality or bedside manner as a doctor, he talks nice to

15   his patients.

16        Whatever, maybe she took that as something, she sent him and his wife,

17   who she never met, a wedding invitation. They don't send a card, a reply or anything of

18   that nature.

19        Now, she gets married in May, never met the woman. Now, October 13th,

20   everybody remembers that because, Judge, October 16th, these allegations came out

21   October 17th.

22        Sure, these people are going to remember what happened that day. Debbie

23   was there with her kids. For the first time, for the first time, Malina Kelly, formerly

24   known as Malina Romano, meets Dr. Hayashi's wife. October 16th, October 16th, she

1   then makes allegations, not when it allegedly happened, but at night.  She had time to

2   think about it, that he inappropriately touched her.  That is coincidental.

3        Is there jealousy there?  I don't know if it is even relevant to the way she

4   was thinking.  There are a lot of reasons she could have made up these allegations, and

5   believes these allegations.

6        The question is not whether she believes the allegations, whether Counsel

7   believes the allegations.  The question is, Judge, whether or not, with the evidence that

8   has been presented, they have proven Dr. Hayashi, Dr. Bradley, is guilty beyond a

9   reasonable doubt.

10        There are no--oh, another thing, just a small part of her testimony, you

11   have to look at Counsel's argument about Mrs. Kelly saying there was an erection, that

12   her elbow brushed against.  She said at first, and I believe on cross-examination she said

13   that she told the police officer that she may--he may have had an erection, I may have

14   touched it with part of me, he may have touched me, or something.

15        If you remember, Judge, this is what she said, and then when prodded by

16   Counsel, she changed, she changed it from, it may have been to, oh, it was.  That is the

17   kind of witness we are dealing with here.

18        Judge, this is not a woman who was sure what happened.  She is helped by

19   the State, changed her testimony right then and there on the stand.  What may have

20   happened, something she said all along, to, oh, I am sure it was.

21        He also told you that everybody says there is nothing bad to say about this

22   guy, Judge, because there is nothing bad to say.  You would have heard about it if there

23   was.

24

1    He says that Dr. Bradley was dumb, stupid, for not having a female in

2    there with him.  There, I agree with Counsel, and sure as I stand here today, I am sure Dr.

3    Bradley, and there are doctors or gynecologists, I am sure you know, who examine

4    women without other females present.  He will never make that mistake again, giving

5    somebody a full-body massage or any other type of procedure without a female present.

6    I would just like to point out a couple of things, if the case boils down to

7    credibility, and I suggest, your Honor, that if you have to balance the credibility, even if it

8    is even, the State has not tipped those scales enough to find the Defendant guilty beyond

9    a reasonable doubt.

10    If you believe what she said over what Dr. Hayashi said, there is a legal

11    issue.  You have consent, and again, I submit that when there is a complete denial, and

12    we continue to assert his innocence, even assuming arguendo, you would believe her,

13    there is an issue of consent, that at some point, if you truly--if these things truly

14    happened, you just don't believe they just happened, or how does he know that he should

15    stop, that she consented.

16    The law is clear, I mean, there are no cases on all fours.  There are plenty

17    of rape cases, People versus Wilson, 55 NE 2d 527, People versus Borak, 301 NE 21--

18    MR. KOUGIAS:  I object to this.  If there is an alternative defense, Counsel

19    needed to file it and he didn't.  There is no evidence, no testimony presented of that, other

20    than Counsel's argument at this time.  It is inappropriate.

21    THE COURT:  I will overrule the objection and let you argue.  I do agree with the

22    State.

23    MR. AMIRANTE:  Judge, we didn't raise--we did not raise the consent.  When a

24    man is innocent, and he didn't do it, of course, he can't raise the defense of consent.

113

1          The State raised the issue of consent themselves, because the complaining

2    witness herself said, that I went in there, I consented to the full-body massage, here is

3    what he did, that is true, and we suggest to the Court it is not.

4          Somewhere along the line, she should have taken away that consent.  She

5    never withdrew that consent.  Even in the most horrible rape cases, Juries and Judges

6    listen to cases far beyond the accusations here.  Consent is an issue, and unless that

7    consent is withdrawn or there is an objection at some time or another, there is consent.

8          Again, Judge, that is not a legal issue.  We are certainly not relying on

9    that, but there are plenty of cases your Honor is familiar with, that indicate that

10   voluntariness by the female, when she has the power to resist, removes the act and

11   elements of the crime.

12         Again, Judge, these are involving forcible crimes, forcible rapes.  There is

13   nothing on all fours with the battery.  I suggest, Judge, consent is consent, and that is only

14   if you believe her.

15         We are relying on the fact, Judge, that you resolved credibility in favor of

16   the Defendant, or if you think credibility is equal on both parties, that the State has not

17   tipped the scales sufficiently, bringing in enough evidence to corroborate these

18   allegations against my Client, and find the Defendant not guilty of this charge.

19         Thank you, your Honor.

20   THE COURT:  Thank you very much, Counsel.  State?

21   MR. KOUGIAS:  So, I assume there is some knowledge, even though it is

22   inappropriate to argue an affirmative defense in this case, I will do it any way because

23   that is just in case you are leaning toward finding the victim incredible.  Let me throw it

24   out there to negate that whole thing.

114

1        It doesn't make sense.  I don't know why Counsel is going on this.  He is

2    not relying on it.  He mean, sure, it is inappropriate.  If he wanted to file it, it should have

3    been filed.  He should have argued that.  His client should have testified to that.  There

4    should have been a myriad of things that happened.  To sit here and bootstrap now, in

5    closing arguments, you know what, consent, the fact she didn't scream out, no, or slap or

6    kick him in the groin or do something somehow means that she somehow acquiesced to

7    all the conduct, all the accusations against this Defendant.

8        Somehow, because she didn't blurt out and say, stop, no, don't, you know

9    what, she did say it.  She didn't use those words.  At one point, she asked for the blanket.

10   She is too cold.  She wants to go to the bathroom.  It is overwhelming.

11       Again, this is a relationship with this guy.  It wasn't the first time in this

12   doctor's office.  This woman was there and she was completely appalled at what

13   transpired, and she handled it the best way she could.

14       Counsel tries to argue at the beginning what could have been, Judge.  We

15   don't have those answers.  It could be jealousy, it could have been a fantasy.  Give me a

16   break.  What are you coming up with here?  That she is jealous?  What?  That she is

17   fantasizing?  What?  That he is Fabian and she is going to get the massage of a lifetime?

18       What could be the scenario that Counsel can come up with to negate the

19   fact that this Defendant had inappropriate contact with her private areas?  I can't imagine.

20   He can't come up with it.

21       He tried to bootstrap by saying, the State can't answer the question.  We

22   can't either.  He talks about what is her motivation, if she was going to make up, make

23   the case a lot bigger.  There is no indication she was out to get money, secretly fantasized

24   about this guy.

1        You know, he talks about her appointment made on October 23rd, and it is

2   documented.  If your Honor looks at the document, it is 10:45, appointment was with Val.

3   Val was the regular masseuse.  This guy was only around for four or five occasions in

4   two and a half years.  This guy did the adjustments, that is all he traditionally did for her,

5   as Miss Kelly indicated.  There was a delay that morning, and you know, what would

6   anybody do if you are here in an office, and there is downtime, you know you are coming

7   back, you acknowledge you are coming back to this office.  Why not get it done now.  It

8   takes two seconds.

9        She knew Karen, she is the receptionist, and I would submit to you, if you

10  look at that book, as much as Karen swore up and down, that it was afterward that this

11  appointment was made, there is no time sheet that says when the appointment was made.

12       You fill the time sheet in there, 10:30, 11:00, as to who the individual is,

13  therapist, and that is all clear on there.  Again, to focus on, you know, Judge, you can't

14  believe her because it was after the massage, after she was inappropriatetly groped, and

15  attacked, and she said, you know what, let me come back on the 23rd, he did such a great

16  job with his fingers, I want more of this.

17       I would submit to you, if that is what they are going to prove, she would

18  be knocking on the door, on the 23rd, I want a massage with him again.  You didn't hear

19  that.  October 16th was the final date.

20       Again, they are trying to conjure up the whole issue with the husband, and

21  getting a massage from this woman.  Now, the argument seems to have gone to that

22  somehow Miss Kelly was jealous of her husband and Val giving her husband a massage.

23  Where is that coming from?  Now, they are grabbing accusations, there is nothing there,

24

1    and they are attacking a woman who was brave enough to come forward and tell you

2    exactly what happened.

3           And then, you know, does she say anything when he is touching her leg or

4    clitoris?  Is she not a victim because she didn't tell this guy, no?  She was in his presence,

5    she was powerless when she is on that bed, in a room with this guy, and you didn't hear

6    anything about there being any door or entrance or exit to this place.

7           The best she could come up with, and she told you, I was cold, I needed a

8    blanket.  I had to think what was going on.  I stopped.  I told him I had to go to the

9    bathroom.  I didn't have to go to the bathroom.  I wanted this guy to stop, so you know,

10   to sit here and argue, well, somehow she wanted it, or it was a dream of hers?

11          Yes, this is a horrific nightmare for her.  It has been, and continues to be.

12          You know once again, the wedding invitation, I just--I just don't see

13   where they are going with this stuff.  You would think, and you draw on your common

14   sense, and your knowledge, just being a human being, you are having a wedding, it is to

15   be the happiest day of your life, you invite people to a wedding, not because they got you

16   a deal on something, not because you have a secret crush on some guy or doctor, but

17   because it has meaning, and it has significance, and she sends the Defendant an invitation

18   with his wife, bring the wife, come over, and somehow to try to argue and parlay that into

19   something dirty or negative or somehow to be spiteful--I am getting married and a am

20   marrying a better guy, it doesn't make sense.

21          This woman had nothing but good intentions.  This was her doctor for two

22   and a half years.  She invited this guy, she wanted the guy there.

23          Again, Judge, I certainly would ask to adopt any argument in the motion

24   for a directed finding, as well as any earlier arguments.

1          Clearly, clearly, clearly this case is clear and concise.  You certainly have

2     all the evidence before you, and look at the credibillity of each of the witnesses and based

3     on what the Court has heard, the documents you have, the towels that are in evidence, we

4     ask that you find this Defendant guilty.

5          He got his break when he wasn't charged with sexual assault or abuse.  He

6     certainly is guilty of battery.

7          THE COURT:  All right.  The Court has considered all of the testimony, and all

8     of the exhibits that were entered into evidence.

9          Malina Kelly testified that she knew the Defendant for approximately two

10    years as her chiropractor.  She visited him, approximately two times a week, and

11    sometimes three times a week, because she had scoliosis.  She had received treatments

12    from the Defendant, adjustments.  She also received massage therapy, and had electrical

13    stimulation.

14         She testified on October the 16th of 2006 she had an appointment for a

15    full-body massage.  It was the first time she had made such an appointment.  She was also

16    going to get electrical stimulation and adjustments on that day.

17         She testified that approximately 11:00 a.m., she arrived at the office.  She

18    signed in and waited.  It was her testimony that because there was some down time, and

19    she was waiting, she went up to the desk to make an appointment for the following

20    Monday.

21         She then testified that approximately ten minutes later, the Defendant

22    waved her over and she entered into the massage room.  She said this time it was different

23    than the previous massages that she had, in that she was to disrobe completely.  She

24

1    asked the Defendant, even my socks, and he replied yes, I am going to do a foot massage.

2    He then left the room, and she changed.

3           She testified that there was only one sheet on the bed.  There was no

4    additional towels or no additional sheets, but there was, instead, a small towel, which she

5    testified covered approximately her chest area, down past her vagina.

6           She said while she was in the room, she disrobed, laid face-down and she

7    pulled the towel over her.

8           She said the Defendant reentered the room.  She did not hear a knock on

9    the door.  He then asked if there was anything she did not want.  She had responded,

10    whatever you normally do.

11           There was some question from the Defendant about her pelvic area, and if

12    she had any objections to the massage in the pelvic area.  She replied, "do what you

13    normally do."

14           The Defendant then began the massage on her left calf.  He worked up to

15    her hamstring.  It was her testimony he then moved the towel from her butt and began

16    working on it.  She said she did not expect that this full-body massage was going to go

17    this way.

18           She testified that the Defendant's finger tips entered into the crease of her

19    rear, as she called it, and then he did a massage on her left, inner thigh.  While he was

20    doing that massage, he would brush against her vagina.  She testified she was going into

21    shock, and was not comfortable with it.  She did not know how to question it.

22           She said that she didn't know if she was somehow getting in the way, but

23    she felt the Defendant touch her vagina.  The defendant then did that, approximately three

24    times.

1       While this massage was taking place, they were talking about her family.

2   The Defendant said he would bring in a bottle of wine on the next appointment.

3       The Defendant then moved over to her right leg and pretty much did the

4   same thing, massage her calf for a minute, then massage her thigh, move over the right

5   side of her buttock, and again, his fingertips went into the crease.  He did his massage on

6   the thigh, and approximately three times, she felt him brush her vagina.  She testified part

7   of the massage, Defendant had spread her legs apart when he first came in, and that

8   caused her butt to spread, feet were still on the table.

9       She testified, I was so nervous and scared, I was uncomfortable and I

10  didn't know the routine practice.  Who am I to question what the doctor was doing?  She

11  then testified that the Defendant massaged her back, her left side, her arms were on the

12  table.

13      She testified that the Defendant bumped into her with an erection.  He was

14  fully clothed.  She felt a touch on her elbow with his penis.  His penis was not exposed,

15  his pants were on, his hands were on her.

16      The Defendant asked, could you flip over.  He held up the hand towel and

17  she testified at that time she was exposed to the Defendant.  He then covered her with that

18  towel, which she testified, barely covered her chest and vagina.  She never asked for

19  additional towels.

20      She testified that the Defendant continued the massage, her lower legs,

21  below the knee, and a couple of minutes later he moved up to her left thigh, and he

22  moved a little higher and moved the towel.  He then massaged her bikini area for one to

23  two minutes.  At that time, he was massaging her labia for a few minutes.  He was talking

24  to her.  She was scared, embarrassed.  She did not want to say anything.

1    She testified that he was prodding her labia. He asked if it hurt, and she

2    said no.

3    She testified that her eyes were closed, because she did not want to see the

4    Defendant looking at her, naked. She could feel his hands on her. She was scared.

5    Then, she testified, basically, that either side of the body was massaged,

6    and pretty much the same thing. She said she was scared. She didn't know what to

7    expect. He was talking about her family.

8    The Defendant then started massaging her lower stomach, when she said

9    she had to use the bathroom. Then she told the Defendant, that is okay, I am going to

10   hold it.

11   He said, I am only half-way done, and she said, I don't feel like getting

12   dressed and undressed, whereupon, according to her testimony, the Defendant said, I will

13   get you some gowns. He left the room, he came back with two gowns. She put the

14   gowns on and walked across the hall and used the bathroom.

15   She subsequently came back and went under the towel again. This time,

16   she was face-up. The Defendant re-entered the room and began massaging her stomach

17   and upper body. At that point, she testified that the Defendant fondled her right breast.

18   He was massaging her breast with his hand. Her eyes were closed. That happened for

19   approximately a few minutes.

20   The Defendant was asking her about her breast reduction, whether or not

21   she had any sensitivity after surgery in that area. She said she had some.

22   The Defendant massaged the left breast, according to the complaining

23   witness. He then sat on a stool, cupped her head, and did some neck and scalp massages.

24

1    She said she covered up and he said he was done with that area.  He asked if it was okay.

2    She said, yes.

3         At that point, she heard the Defendant pulling out on his hands, and then

4    he began massaging her lower back.  The Complaining witness testified it would get her

5    endomorphins going, and she would feel the same way as after having sex.  She testified

6    she was face-up at that time.

7         The Defendant touched her vagina, she testified he actually massaged her

8    clitoris, or he was rubbing it with one hand for a couple of minutes.  He said, are you

9    okay?  No, I am really cold.  He then said he would get a blanket.  Her eyes were closed,

10   and he came back in the room.  She said she wanted to skip that part.  She testified that

11   the Defendant said, I am not hitting on you, this is going to help your lower back.

12        She said he seemed confused, and he said, are you sure you are okay, I

13   don't want you walking out of here all weirded out.  I may massage your scalp for a

14   couple of minutes, and the massage ended.

15        She testified she got dressed, left the room.  She passed by the other room

16   where the other procedure was done.  She saw Dr. Bradley in there, and she waited in the

17   Waiting Room.

18        The receptionist was at the desk.  She said she felt like she had done

19   something wrong.  She did not want Karen, the receptionist, to see her upset.  She

20   testified that then she went back into the other room with the doctor so he could adjust

21   her back and neck.

22        He told her at that point, according to her testimony, not to have sex with

23   her husband because she could get pregnant.  She left the office.  She went into her car,

24   drove to her parents' house, but they were not home.  She did not want to tell anyone.

1    She tried to call a friend named Heather.  There was no answer.  She left a

2    voice mail.  She drove twenty to twenty-five minutes home.  She was alone.  When she

3    entered the house, she hit the wall of the garage with her car.  She was upset, and felt she

4    had done something wrong.  She immediately took a shower.  Her friend called her back.

5    She didn't answer the phone.  She changed her clothes, throwing her clothes into the

6    laundry.

7    She called her Mother to tell her Mother what happened.  A friend came to

8    her house and later that day, she went to the police station.  She testified it was five to six

9    hours after she went with her husband and a woman named Rita, who was her sister-in-

10    law.  She spoke to the Officer and testified she never gave the Defendant permission to

11    have any contact with her vagina or her breasts.

12    On cross-examination, she testified that she did invite the Defendant and

13    his wife to her wedding.  She had met his wife the week before that Friday, October 13th.

14    She testified about Dr. George and how she had been a patient of his.  He was the owner

15    prior to the Defendant, operating the office.  Her Mother worked for Dr. George.  Her

16    Father and her brother had been to see the Defendant.  She did not have a friendship or a

17    social relationship with him.

18    She testified that typically she would get massages from Val or Nancy,

19    that there was some testimony about her husband getting a massage with a female,

20    making an appointment with a female masseuse, and whether or not she was upset about

21    that.  She testified that she was not.

22    She testified again she was nervous and scared.  She said if she would

23    have known what the pelvic involved, she would have never been okay with that, but she

24    did not object.

123

1          Counsel asked her on cross if she objected when the Defendant put his

2     hand on her butt. She did not. When he put his finger in her butt, did she object? She

3     did not object at all. She did not tell him that she was uncomfortable. She didn't tell him

4     to move his hand. She was scared. Her eyes were closed, and she said his erection

5     touched her briefly on her arm. She never saw him touch her; she felt it on her arm.

6          She testified there was a hand towel on the sheet, and there was nothing

7     else on the table. She didn't look for any additonal towels or any additional sheets. She

8     wasn't sure if they were in the room.

9          She testified on cross-examination that the Defendant massaged her

10    nipples, and fondled her entire breast. She also testified she was upset, she felt that

11    something was wrong, she didn't know what just happened, because she trusted him so

12    much. She did not feel guilty.

13         She talked to the police officer that night, and she told them that she had

14    testified in this courtroom, she told the police she made the appointment after, or she

15    made the appointment earlier before the whole body massage, even though the police

16    report said she made it afterward.

17         Karen Muir testified she was a receptionist, she worked for the Defendant

18    for approximately five years, that she knew Malina Kelly, she was a patient in the clinic.

19         She testified that on the 13th of October that the Doctor's wife and

20    children came into the office. Malina Kelly was there in the Waiting Room, and they

21    were introduced. She testified that the Defendant made an appointment for a full-body

22    massage, and it was booked with Dr. Bradley. She asked if that was okay, and Malina

23    said it was.

24

124

1      She said on the 16th of October, Malina Kelly was very talkative, that it

2   was somewhat unusual.  Typically, she was quiet.

3      She then identified the--she then testified that on 10-16 of '06, Malina

4   Kelly made another appointment for the following week, and that was done after the full-

5   body massage.

6      She also testifed to standard operating procedure. She acknowledged she

7   was never in that massage room prior to Malina's massage or directly after her massage.

8   She testified that she knew the Defendant, she trusted him, she received massages from

9   him, as did her daughter.

10      Bernice Musgraff (phonetic) testified she was the Office Manager for

11   approximately five and a half years.  She recalled the date of October 16th of '06.  She

12   had gone to the front desk, she saw Miss Kelly in the Waiting Room.  When the full-body

13   massage was done, she was waiting for her adjustment.  She came up and made an

14   appointment for the next week.

15      She, too, identified Defendant's Group Exhibit 2, the towels and all the

16   other things that were typically inside the room.  Again, she was not in that room before

17   or after Miss Kelly's massage.

18      Nancy Holgren testified that she was a massage therapist, that she worked

19   in the Defendant's office.  She was familiar with the Complaining Witness somewhat.

20   She said she looks familiar. She can't remember her that well.  She again testified the

21   full-body massage was typically in the room.  Again, she was not in that room prior to or

22   after the massage of Miss Kelly.

23      She was asked whether or not touching one part of a person's body would

24   allow that person to feel a sensation elsewhere, and she testified, yes.  She would then

125

1    testify, on cross-examination, that she has never had contact with a client or patient's

2    breasts or vagina.  She would not--she would not massage a person's breasts unless they

3    complained of pain, and then she would massage their "pects."  She has not ever done

4    that.

5            She testified that there would be no--that if someone was touched in

6    another part, say their thigh muscles, there would be pain or tingling in another body part,

7    but it would not feel like someone was touching a patient's vagina.  That never happened

8    to her.

9            The last witness, Valerie Taft, who was a massage therapist, testified that

10   she had worked for the Defendant for three and a half years, but yet in February, she was

11   familiar with the Patient.  She usually gave Miss Kelly her massages.  She would often

12   ask patients if they felt pressure or pain, felt uncomfortable, and she talked about referral

13   pain, and how there would be tingling sensations or a sharp pain in another body part.

14           Again, when she was asked on cross examination if there was anything

15   that could possibly simulate a fondling of a vagina from any other body part that would

16   be touched or manipulated, that would make a person feel the tingling of a vagina, she

17   testified no, in her opinion, there was not.

18           The officer then testified that he interviewed Miss Kelly on 10-16 of '06 at

19   7:20 p.m.  She came to the police station, that he filled out a police report from his

20   interview.

21           He testified that prior to leaving, she made an appointment for the

22   following Monday, and in his police report, and according to him that was made after the

23   full-body massage.

24

1    She testified that she was upset, she couldn't tell him without being

2    embarrassed and crying.  She was emotionally upset when she spoke to him.

3    The Defendant testified today that he is a licensed chiropractor in the State

4    of Illinois since the year 2000.  He is married, has two children, one on the way.  He has

5    approximately 3000 patients, seeing 75 to 150 a week.

6    He testified that he has had no other complaints, but for patient

7    abandonment.

8    On October 16th of 06, he recalled Malina Kelly being in the office.  She

9    was his patient for approximately two to two and a half years.  He has given her

10    adjustments in the past, electrical stimulation.  He testified, on giving her heat treatments,

11    that was all appropriate treatment for her pain.

12    He testified that he did not know Malina Kelly socially, didn't have a

13    social relationship with her, but did see her quite often in the office.  He testified that he

14    was invited to her wedding.  He did not go to her wedding.

15    He testified that approximately 11:00 a.m. on that day, Malina Kelly was

16    scheduled for a full-body massage.  He lead her back to the room.  They went into the

17    room, told her to get ready, he would be back.  She asked if everything had to come off,

18    yes.  Even the socks?  He usually does a foot massage.

19    He testified that he identified Defendant's Group Exhibit Number 2 as

20    being various towels in the room, and he testified that he got down a bath sheet from the

21    room.  He offered her a bath towel to go over her.  He said he was in the doorway and

22    went inside.

23    She was complaining of being cold, so he got down a bath sheet.  He

24    would get her a hot pack to keep her warm.  He left the room, he went to get the hot pack,

1    and he came back in. He knocked on the door, and when he entered, she was face-down,

2    with a bath towel covering her. It was across her, like a bath towel, and her head was in

3    the head rest.

4         He testified that he then began giving her a massage. He testified that he

5    never got any closer than four to five inches from her butt while she was laying on her

6    stomach. He asked her how the pressure was; she said okay. He testified that he never

7    went near the groin area. He never touched her labia, and he did work on her butt, using

8    his knuckles. He showed different methods as to how he was massaging her.

9         He testified that when she flipped over, he held the towel up so she was

10   not exposed. When she asked to go to the bathroom, he went to get her two gowns so she

11   would not be exposed. She put the gowns on and went to the restroom. When she came

12   back, when he came back, she was already back and on the table, about five minutes time.

13   He adjusted another patient.

14        He testified that he never touched her in the vaginal area. He said that he

15   did massage her pectoral area, upper chest, for a couple of minutes. He never touched her

16   nipples. He never touched her clitoris.

17        He said, after the massage was over, he did the adjustment. She said,

18   thank you, good bye, and that she would see him in a week.

19        On cross-examination, the Defendant admitted he had a conversation with

20   Miss Kelly about a Brazilian bikini wax, and his wife's preference was a Brazilian wax.

21   That conversation was not on that date of 10-16. There was also some conversation about

22   Bachelor parties, and going to see strippers, but that conversation was not on that date.

23        The Defendant testified thereafter that those conversations were had, if

24   you will, because of Miss Kelly, she brought up those topics, if you will, on prior dates,

128

1   asking his opinion, but she was also trying to get pregnant, and asking his opinion as to

2   how she could get pregnant, and that is when he was offering the testimony about the

3   wine, and was joking with her, his wife got pregnant after a massage when she was

4   drinking a bottle of wine.

5          Miss Muir was recalled, and she admitted that the two exhibits were

6   different, and that something was written in at the top about the Defendant's wife and

7   children being in the office on 10-13.

8          It is my job to view and judge, if you will, the credibility of the witnesses.

9   I must take into account any interest, bias or prejudice they may have, and the

10  reasonableness of their testimony.

11         Considered in the light of all of the evidence in the case, as far as all the

12  witnesses, other than the Complaining Witness and the Defendant, they really don't add

13  that much to this case.  In my opinion, I don't find Karen Muir credible at all.  I think her

14  testimony was wholly incredible, and I think she was lying.  I think she thinks so highly

15  of the Defendant, she would say and do anything to protect him.  She is not a credible

16  witness at all, in my opinion.  She has altered a document in a book.  She said it was done

17  before these documents were turned over to Counsel.  I don't believe her.

18         The other Witness, Bernice, I don't think she really adds much at all,

19  either.  She testifies to normal operating procedure in the office.  It doesn't matter how

20  normal operating procedure went down.  It matters what happened on 10-16.

21         This leaves me with the Complaining Witness and leaves me with the

22  Defendant.  The Defense Attorney says she has a motive to lie.  She is making this up,

23  she is lying, I am not sure why.  Jealousy, is she jealous because her husband had a

24

1    massage with a female masseuse, so somehow that upset her so much she is making this

2    up?

3                  Well, that is ludicrous.  There is no evidence to that at all in this record.  I

4    don't believe that she is maybe jealous of a wife, because she met the wife the week

5    before, she is making all this up.  There is no evidence of that in this record, and I

6    certainly don't believe that.

7                  So, what is her motive, bias or reason for lying in this case?  Counsel

8    brings up some inconsistencies, the fact she made this appointment, according to

9    everyone but her, after the full-body massage.  That is an inconsistency.  You also argue

10   she should have known, by not saying no, she consented.  Again, that, to me, is

11   preposterous argument.

12                 There is no evidence in this record for anything about a consent here.  I

13   believe Malina Kelly.  I believe she was credible. I do not believe she is making this up,

14   coming into the courtroom and lying about this.  Why would she do that?  She has known

15   this guy for two and a half years.  She trusted him.  She invited him to her wedding.  She

16   obviously trusted him, liked him, looks up to him, admired him.

17                 Why didn't she get off the table?  Why didn't she run out?  I don't know

18   why she didn't do those things.  She is a classic victim, in my mind.  The person that the

19   Defendant knew, the Defendant knew, trusted him.  The Defendant knew her family,

20   knew her Father, knew her brother, he had a very close contact with the family.

21                 I think she was very credible, and I believed her.  I do not believe the

22   Defendant is credible.  I do not believe him when he says this never happened.  He may

23   be a very nice man and everybody that works for him may love him and maybe no one

24   else made complaints about him in the past.

1          Why it happened to her, I don't know.  Why he picked her, I don't know.

2   Is there some kind of inappropriateness in the conversations they had prior to this date?

3   Absolutely, in my mind.  I mean, talking about Brazilian waxes and talking about

4   strippers is not appropriate.

5          However, however, the charge here is a battery, and this Defendant

6   knowingly, and without legal justification, made physical contact of an insulting nature

7   with Malina Kelly, by fondling her breasts and vagina during a chiropractic visit.

8          Based on all the information I have seen, especially the credibility of the

9   witnesses before me, I do not have a doubt, and I believe the State has proved their case

10  beyond a reasonable doubt; therefore, I am entering a finding of guilty.

11         Both sides ready for sentencing today, or do you want to take a date for

12  sentencing?

13         MR. KOUGIAS:  Judge, State is ready.

14         THE COURT:  Counsel, are you ready for sentencing today?

15         MR. AMIRANTE:  Can I speak to my client?

16         THE COURT:  Sure.

17         MR. AMIRANTE:  Your Honor desires to proceed to sentencing today?

18         THE COURT:  Sure, both sides are ready?  We can proceed to sentencing today.

19  Both sides ready?

20         MR. KOUGIAS:  Yes, Judge.

21         THE COURT:  All right.  Why don't you come up to the podium, please,

22  Counsels.

23         MR. AMIRANTE:  Judge, may I have one minute?

24

1      MR. KOUGIAS:  Judge, there is no prior felony convictions.  Certainly, the facts

2  of this case are egregious, as the Court is certainly aware, and it just found the Defendant

3  guilty.

4          We would be asking for considerable jail time.

5      THE COURT:  You said he has no prior felony convictions.  Any misdemeanors

6  or anything else?

7      MR. KOUGIAS: I don't show anything.

8      THE COURT:  No prior convictions?  All right.  Anything else?

9      MR. KOUGIAS:  Nothing further, Judge.

10      THE COURT:  Counsel, Mitigation please?

11      MR. AMIRANTE:  Your Honor, in Mitigation, I am sure you heard the people

12  who work for him tell you about his impeccable background.  He doesn't even have a

13  traffic ticket.  Talk about convictions, there is no arrests, no allegations, there is no

14  complaints.  The only complaint he ever got against him was, as he told you, he was

15  candid with you, some woman who felt he abandoned her because she didn't have

16  anymore money to pay his fees.

17          I mean, Judge, you have before you a Father, a husband, just

18  notwithstanding your Honor's findings here of credibility, just a completely upstanding

19  member of the community, and if you wish to hear from his wife, she is here today,

20  Judge.

21          We are not prepared for a complete hearing in mitigation, but Judge, I am

22  sure, if the State had anything in aggravation, other than the facts in this case, when they

23  presented aggravation to you, they would have brought it out.

24

1    Now, he is 35 years old, Judge, and he is a professional man.  Your

2  Honor's finding alone is a life sentence, Judge.  This is a professional man who has been

3  brought into public shame and ridicule, and there is no jail time, length of jail time long

4  enough that could compare to that kind of sentence this man has now.

5    He has been accused and found guilty of violating his trust as a doctor, and

6  your Honor, I am sure you know, as a professional yourself, that that is just a horrible

7  thing for this man and his family to cope with.

8    He is going to have to deal with a lot of other repercussions other than the

9  finding and sentence of this Court.

10    We would be asking for mercy, your Honor.  We would be asking for

11  compassion.  Although the allegations here, which you found to be credible, Judge, were

12  one of battery, there was no allegation or any evidence of any type of force or restraining

13  or sexual type penetration.  It is a charge of simple battery of an insulting nature, Judge.

14    I would ask simply that you would treat him on an equal basis with any

15  other Defendant, give him an opportunity at least to serve his sentence, perhaps order

16  some Community Service, but he has suffered a devastating result here, Judge.

17    I would be asking your Honor to place him on a period of Supervision.  He

18  has no background whatsoever.  He is going to have to deal with the Department of

19  Registration and Professional Regulation.

20    You wish to hear from his Wife?

21    THE COURT: If you would like to call her, I am not telling you what to do.  If

22  you want to put on Mrs. Hayashi, again, it is up to you.

23    MR. AMIRANTE:  I am sure she will want to say something, Judge.

24    THE COURT:  Raise your right hand, please?

133

1          (Witness sworn)

2                    D E B O R A H    H A Y A S H I

3     called as a witness herein, having been first duly sworn under oath, was examined and

4     testified as follows:

5                    D I R E C T    E X A M I N A T I O N,

6     BY MR. AMIRANTE:

7          Q     Please state your name, and spell it for Her Honor?

8          A     Deborah Hayashi, H-A-Y-A-S-H-I.

9          Q     And you are Dr. Hayashi's wife?

10         A     Correct.

11         Q     And how long have you been married?

12         A     For--it will be four years in January.

13         Q     And do you have any children?

14         A     Yes, we do.

15         Q     How many children do you have?

16         A     Two children, and one on the way.

17         Q     Okay.  Please tell Her Honor the kind of man you live with, describe him.

18         A     He has been fantastic, Judge.  Obviously, what I believe and what you

19    found to be true are two separate things.

20              I know Brad and how he is in the community, how he is with his patients,

21    how he is with his family.  If he didn't have an impeccable reputation, if he wasn't the

22    man that he is, I would never have married him, if he had any--again, that is irrelevant,

23    but--

24         Q     How did you two meet?

1    A    Through Church.

2    Q    And did you know he was a chiropractor when you met him?

3    A    Yes.  I was also a patient of his.

4    Q    And while you were a patient, did he do anything inappropriate?

5    A    Never.

6    Q    Before you married your husband, were you familiar with his reputation?

7    A    Yes, very much so.

8    Q    What was that reputation?

9    A    Impeccable, he was incredible through the Community, the Church.  He

10   treats a lot of patients for free.

11   Q    Is he a good Father?

12   A    The best.

13   Q    You have another child on the way?  How pregnant are  you?

14   A    Three and a half months.

15   Q    And are you employed?

16   A    No.

17   Q    Were you employed before you married Dr. Hayashi?

18   A    Yes, I was.

19   Q    And what type of work did you do?

20   A    I worked for Cook County Social Services in this building.

21   Q    You were the Head of Social Services?

22   A    I was Supervisor for the Domestic Violence and Sex Offender Unit.

23   Q    You monitored many types of cases and Defendants were sentenced?

24   A    Yes.

1       Q       It is unusual to ask you here, would you feel this man standing next to you

2    is an appropriate candidate for Supervison, as you worked in that field?

3       A       He is very appropriate, he has no background, no prior complaints, no

4    tickets, no history, he has nothing.

5       Q       And you are not working now, so he is your sole support?

6       A       Correct.

7       Q       He would be the sole support of your children, also?

8       A       Correct.

9       Q       Would it be financially, and every other way?

10      A       Every way, and he also helps me.

11      Q       How old is your Mom?

12      A       My Mom is 65.

13      Q       Doesn't he help you with Grandma, too?

14      A       He has helped me.

15      Q       How old is your Grandma?

16      A       88.

17      Q       Is there anything else you wish to tell Judge Hanlon before she sentences

18   your husband?

19      A       Again, grant him mercy.

20      THE COURT:  All right.  Anything further, Counsel?

21      MR. AMIRANTE:  Nothing further at this time, Judge.  I assume my client is

22   going to waive his statement in elocution.

23      THE COURT:  Is there anything you would like to say to me before I sentence

24   you?

1          MR. HAYASHI:  No.

2          THE COURT:  I will need one second.  I need to get something in my Chambers.

3   I will be right out for sentencing.

4                              (Whereupon a short recess was had)

5

6          THE COURT:  All right.  I am going to enter a judgement in this finding.  This is

7   not an appropriate case for Supervision.  Even though  you do have--you don't have any

8   background, I don't believe the facts of the case warrant Supervision, so I am going to

9   sentence you to twelve months of Probation, and I am also going to sentence you to ten

10  days in the Cook County Department of Corrections, mandatory fines and costs, and that

11  would be my sentence.

12          You have the right to appeal the Judgement and Sentence of this Court.  In

13  order to appeal the judgement, excluding the sentence, you must file a Notice of Appeal

14  within thirty days of today's date with the Clerk of the Circuit Court.

15          You have a right to request the Clerk to prepare and file a Notice of

16  Appeal on your behalf, seeking to challenge the sentence or any aspect of the Sentencing

17  Hearing.

18          Prior to taking an appeal, you must file in the Trial Court within thirty

19  days of today's date a written motion, asking the Court to reconsider the sentence

20  imposed or reconsider any challenges to the sentencing hearing.

21          You must set forth all of the reasons you are challenging the sentence or

22  sentencing hearing.

23

24

137

1          If the Motion to Reconsider your Sentence is granted, a Resentencing

2   Hearing will be conducted.  Anything you fail to put in your written motion would be

3   waived for all time.

4          In order to preserve your Right to Appeal of your sentence or the

5   sentencing hearing, you must file a Notice of Appeal with the Clerk of the Circuit Court

6   within thirty days of the entry of the order of your Motion to Reconsider.

7          You have a right to a transcript of the proceedings of this case.  If you

8   cannot afford one, because you are indigent, a copy of the transcript of proceedings, as

9   well as the services of an attorney, would be provided to you free of charge.

10         Those are your Appellate Rights.  Do you understand those rights?

11      MR. HAYASHI:  Yes.

12      THE COURT:  All right.

13      MR. AMIRANTE:  Your Honor, if I may, we intend to file a Post Trial Motion,

14   which I will file in thirty days regarding the finding and the sentence.  Mr.--I am sorry--

15   Dr. Hayashi has no background at all.  Can I ask your Honor to stay the jail sentence at

16   this time, pending the arguing of those motions before the Court?

17      MR. KOUGIAS: Judge, I am going to ask that all bonds be revoked at this time.

18      MR. AMIRANTE:  There is no violent history.  There is no history of bond

19   forfeitures.  He has an ongoing practice, Judge.  He is self-employed, where somebody

20   has to be able to take over that.

21         He has a wife who is pregnant, three and a half months pregnant.  She has

22   no other source of support, financial or other.  I don't think we are asking you too much,

23   to stay the sentence pending the filing of our motions and our ordering the transcript here.

24         To sweep him off the floor today, Judge, I mean--

1          THE COURT:  Here is what I will do.  I am not going to stay the mittimus for an

2    indeterminate amount of time until the post trial motions.

3          If you are asking for a week or two weeks to get his affairs in order, get his

4    practice in order, do some things with his home life, I don't think there is any chance he

5    is going to flee the jurisdiction.

6          I will stay the mittimus for two or three weeks, that is it.  If you are asking

7    me to do that, I will do that.  It is not going to be for--until post trial motions and all the

8    other stuff.  It is not going to happen.

9          MR. AMIRANTE;  We would hope to file those.

10         THE COURT:   I will stay the mitt.  You want a couple of weeks?

11         MR. AMIRANTE:  I will get my schedule, Judge.

12         Your Honor, Mrs. Hayashi is asking if there is any possibility you would

13   consider Periodic Imprisonment in this case, because he has to continue his work.

14         THE COURT:  Right now, it is ten days in the Cook County Department of

15   Corrections.  I will stay the mitt.  You want two weeks, Counsel?  First week in June, or

16   we will go to June 11th.

17         You want to turn him in on a Friday, June 8th?

18         MR. AMIRANTE:  You said the week of June 11th?  Yes, that week.

19         Friday, June 15th?

20         THE COURT:  Mittimus will be stayed, over the State's objection, to June 15th of

21   '07.  You absolutely must be in this room, 107, at 9:00 in the morning to turn yourself in

22   to go into custody.  You understand that?

23         MR. HAYASHI:  Yes.

24         THE COURT:  Okay.  That will be the order.

1          MR. KOUGIAS:  Judge, I would also ask there be no--absolutely no contact with

2   the victim and the victim's family in this case.  There was some type of relationship

3   between the Parties.

4          MR. AMIRANTE:  Your Honor, I would ask that that order go both ways.

5          THE COURT:  Absolutely, there is to be no contact between the Complaining

6   Witness and the Defendant in any way, shape or form.  No contact.  Thank you.

7                State, here is the exhibits also.  Make sure you give those to them.

8

9

10                          (Which was and is all the evidence

11                              had in the hearing of said cause)

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3          STATE OF ILLINOIS

4          COUNTY OF C O O K

5

6

7

8                                    I, KATHLEEN JACKSON, Official Court Reporter

9     of the County of Cook and State of Illinois, do hereby certify that I reported in shorthand

10    the foregoing proceedings, in re:  People versus Bradley Hayashi; and that the foregoing

11    is a true and correct transcript of said proceedings had before the Honorable Judge Susan

12    Hanlon.

13

14

15          _____

16          Official Court Reporter of the 3rd Municipal

17          District, Cook County, Illinois.

18          #084-000973.

19

20

21

22

23

24